No. 23-2140

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

JOHN BROOKS and GREGORY SIMMONS,

> Plaintiffs-Appellants,

v.

CITY OF PEKIN, et al.,

> Defendants-Appellees.

---

Appeal from the United States District Court
for the Central District of Illinois
Case No. 1:18-cv-01334

The Honorable James E. Shadid Presiding

---

BRIEF OF PLAINTIFFS-APPELLANTS
JOHN BROOKS and GREGORY SIMMONS

---

JULIE L. GALASSI, ESQ., Bar No. 6198035
HASSELBERG, ROCK, BELL & KUPPLER, LLP
Associated Bank Building, Suite 200
4600 N. Brandywine Drive
Peoria, Illinois 61614
Telephone: (309) 688-9400
Facsimile: (309) 688-9430
Email: jgalassi@hrbklaw.com

JAMES L. HAFELE, ESQ., Bar No. 1096834
HALL RUSTOM, LLC
316 SW Washington St., Ste.1A
Peoria, IL 61602
Telephone: (309) 699-4691
Facsimile: (309) 699-4693
Email: hafele@hallrustom.com

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No.: 23-2140

Short Caption: John Brooks and Gregory Simmons v. City of Pekin, et al.

(1)     The full name of every party the attorney represents in this case:

John Brooks, Gregory Simmons

(2)     The names of all law firms who partner or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Hasselberg, Rock, Bell & Kuppler LLP, James L. Hafele of Hall Rustom, LLC

(3)     If the party or amicus is a corporation: N/A.


Attorney's signature: *Julie L. Galassi*_____ Date: August 3, 2023

Attorney's printed name: Julie L. Galassi

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes __X__   No

Address:     HASSELBERG, ROCK, BELL & KUPPLER LLP
Suite 200 Associated Bank Building
4600 N. Brandywine Drive
Peoria, IL 61614-5591
Phone Number: (309) 688-9400
Fax Number:  (309) 688-9430
E-Mail address:  jgalassi@hrbklaw.com

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No.: 23-2140

Short Caption: John Brooks and Gregory Simmons v. City of Pekin, et al.

(1)     The full name of every party the attorney represents in this case:

John Brooks, Gregory Simmons

(2)     The names of all law firms who partner or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Hasselberg, Rock, Bell & Kuppler LLP, James L. Hafele of Hall Rustom, LLC

(3)     If the party or amicus is a corporation: N/A.

Attorney's signature: *James L. Hafele*_____ Date: August 3, 2023

Attorney's printed name: James L. Hafele

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes __X__   No

Address:     Hall Rustom, LLC
316 SW Washington Street, Suite 1A
Peoria, IL 61602
Phone Number: (309) 699-4691
Fax Number:  (309) 699-4693
E-Mail address:  hafele@hallrustom.com

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ................................................ i, ii

TABLE OF CONTENTS ................................................................................. iii

TABLE OF AUTHORITIES/CASES ................................................................ v

JURISDICTIONAL STATEMENT ................................................................. 1

ISSUES PRESENTED FOR REVIEW ........................................................... 2

STATEMENT OF THE CASE ....................................................................... 2

    Introduction ..................................................................................... 2

    Patrol Officer Melton's actions following Burris' Discipline ...................... 4

    Dossey and the Commission .................................................................. 6

    Brooks' disability and inability to work second and third shift ................................................................................................ 8

    Four accommodations were made by Brooks .................................... 11

    Brooks complains about his prior reprimand and transfer to second shift. ...................................................................................... 13

    Brooks files charges with EEOC and IDHR and the internal investigation that follows ........................................................................ 16

STANDARD OF REVIEW ......................................................................... 16

SUMMARY OF THE ARGUMENT ............................................................. 17

ARGUMENT ......................................................................................... 18

    Rule 56 and Local Rule 7.1(D) ......................................................... 18

    Count IV – Simmons complaint of sexual harassment resulted in retaliation ........................................................................................ 20

    Burris is a valid comparator for Simmons ........................................ 33

Count I – city failed to provide Brooks a reasonable accommodation......**34**

    A.    Brooks' request to be moved back to first shift was reasonable **35**

    B.    Brooks did not refuse offered accommodations ...........................**38**

    C.    There was enough time to reasonably accommodate Brooks.....**40**

    D.    The city failed to engage in the interactive process with Brooks...............................................................................**41**

Count II – Brooks was disciplined and discriminatorily constructively discharged because of his disability.................................................**42**

    A.    The court's failure to consider all evidence led it to an absurd result...............................................................................**42**

    B.    Brooks was constructively discharged ......................................**43**

    C.    Burris is a valid comparator for Brooks..............................**45**

Count III – Brooks was discharged in retaliation for his accommodation requests and his complaints of discrimination...................................**46**

CONCLUSION...............................................................................**49**

FED. R. APP. P 32(g) CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS ..................................................**51**

CERTIFICATE OF SERVICE....................................................**52**

COUNSELS CIRCUIT RULE 30(d) STATEMENT .................................**53**

REQUIRED SHORT APPENDIX TABLE OF CONTENTS...............................**53**

# TABLE OF AUTHORITIES/CASES

<u>Cases</u>

*Adeyeye v. Heartland Sweeteners, LLC,* 721 F .3d444,454 (7th Cir. 2013)…………**37**

*Ahmed v. Johnson*, 752 F. 3rd 490 (1st Cir. 2014) ................................................. **16**

*Bender v Board of Fire & Police Commissioners of the Village of Dolton*, 539 N.E.2d 234 (Ill. App. Ct. 1989)......................................................................................... **20, 22**

*Best v. City of Portland*, 554 F. 3d 698 (7th Cir. 2009)…………………………………**31**

*Bradford v Village of Lombard*, 2012 WL 1655966 (N.D. Ill. May 10, 2012) ........... **24**

*Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676 (7th Cir. 2014)............................... **34**

*Coleman v. Donahoe*, 667 F.3rd 835 (7th Cir. 2012) ........................................... **25, 29**

*Colwell v. Rite Aid Corp.*, 602 F.3d 495 (3d Cir. 2010) ............................................. **37**

*Cook Au Vin, LLC v. Mid-Century Ins. Co.*, 2023 IL App (1st) 220601 ....... **20, 21, 22**

*Forgue v. City of Chicago*, 873 F. 3rd 962 (7th Cir. 2017)......................................... **22**

*Giese v. City of Kankakee*, 71 F.4th 582 (7th Cir. 2023) ......................................... **26**

*Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049 (7th Cir. 2000)................................. **17**

*Kirincich v. Illinois State Police*, 196 F. Supp. 3d 845 (N.D. Ill. 2016) .................... **41**

*Ores v. Vill. of Dolton*, 152 F. Supp. 3d 1069 (N.D. Ill. 2015)................................... **24**

*Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016) .............................. **43**

*Owusu v. Cook Cnty.*, 211 F. Supp. 3d 1004 (N.D. Ill. 2016)................................... **44**

*Parker v. Brooks Life Science, Inc.*, 39 F.4th 931 (2022) .................................... **23, 25**

*PBLC v. City of Pekin*, 2023 IL. App. 4th 2210180-U…………………..……..…………**7**

*People v. Beardsley*, 503 N.E.2d 346 (Ill. 1986) ...................................................... **21**

*Policemen's Benevolent Lab. Comm. v. City of Pekin*, 2023 IL App (4th) 221018-U **30**

*Porter v. City of Chicago*, 700 F.3d 944 (7th Cir. 2012) ........................................... **44**

*Stinnett v. Iron Works Gym/Exec. Health Spa, Inc.*, 301 F.3d 610 (7th Cir. 2002).. **16**

*Vill. of Bartonville v. Lopez*, 77 N.E.3d 639 (Ill. 2017)................... **7, 23, 28, 29, 30, 31**

*Zande v. State of Wis. Dept. of Admin.*, 44 F.3d 538, 543 (7th Cir. 1995)...............**37**

Statutes, Rules, and Other Authorities

29 C.F.R. § 1630.2(o)(1)(ii) ........................................................................ **34**

65 ILCS 5/10-2.1-17 .......................................................... **6, 24, 31, 32**

Fed. R. Civ. P. R. 56 ........................................................................... **18, 19**

Fed. R. Evidence R. 408 ........................................................................ **32**

Local R. U.S. Dist. Ct. C.D. Ill. R. 7.1(D) ........................................ **18, 19**

Pekin Police Rules and Regulations 400.10(2) ....................................... **46**

## JURISDICTION

The District Court's jurisdiction in this case arose under 28 U.S.C. § 1331 based on the existence of a federal question, as Appellant Simmons was the victim of retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000, and Appellant Brooks was the victim of employment discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111, *et seq.* Jurisdiction did not depend on diversity of citizenship. Appellants are from Pekin, Illinois though Simmons is now a resident of Missouri. Appellee, the City of Pekin, is the sole defendant for the purposes of this appeal, is a municipality located in Pekin, Illinois.

The Seventh Circuit's jurisdiction is based on the above, as well as 28 U.S.C. § 1291, which grants the courts of appeals jurisdiction over appeals from all final decisions of the district courts of the United States, and Federal Rules of Appellate Procedure 3 and 4, which permit appeals as of right from a district court to a court of appeals so long as a notice of appeal is filed with the district clerk within 30 days after the entry of the judgement or order appealed from.

On February 2, 2023, Judge James E. Shadid of the United States District Court for the Central District of Illinois entered an Order denying Plaintiffs' Motion to Amend/Correct their Summary Judgment Responses and on May 10, 2023 filed its Order and Opinion granting Defendants' Motion for Summary Judgment and dismissing Appellant Simmons' state claim against Defendant Jennifer Melton, entering final judgment in accordance with its Order and Opinion on May 11, 2023.

Appellants seek a reversal of said Orders regarding counts 1-4 of their second amended complaint. On June 7, 2023, within 30 days of said Orders, Appellants filed a Notice of Appeal with the United States District Court for the Central District of Illinois.

## STATEMENT OF THE ISSUES

i.      Did the trial court abuse its discretion in denying Plaintiffs' Motion to Amend/Correct their summary judgement responses on February 2, 2023?

ii.     Was there a genuine issue of material fact which should have precluded the trial court's entry of summary judgment on Plaintiff-Appellant Simmons' claim of retaliation prohibited by Title VII?

iii.    Was there a genuine issue of material fact which should have precluded the trial court's entry of summary judgment on Plaintiff-Appellant Brooks' ADA claims of failure to accommodate, disparate treatment and retaliation?

## STATEMENT OF THE CASE

*Introduction.*

It all started with Lt. Burris, who was patrol officer Greg Simmons' Command. Lt. Burris engaged in a course of harassment of Simmons for an extended period. (# 172-1 p. 91-93; 125; 126) Then, in December of 2016 the harassment escalated and became sexual in nature. Simmons was dating a woman named Ina. Burris, in shift brief with most of the day shift officers present, loudly said to Simmons are you "fucking Ina"; "Did you fuck Ina". (#172-1, p. 122)

Simmons characterized what Burris had done as "my girlfriend is being called a whore in the presence of my peers. (#172-1, p. 126) Simmons reported the matter to his Sgt. (#172-1, p. 127) Burris was disciplined by Chief Dossey with the loss of two personal days (#172-27, p. 36), for "crude and harmful conversation". Burris was a salaried officer. (#177-104, p. 2) A salaried command officer could not lawfully be suspended without pay except by the Fire & Police Commission ("commission"). (#172-27, p. 38) (#172-46, p. 10-16)

In April of 2017 Simmons reported to Dossey that Burris, again at shift brief, loudly said to Simmons "are you fucking that Iraqi?" (#172-2, p.1) Burris was then placed on paid administrative leave because he had initiated a conversation that was "crude and harmful". (#177-36) (#177-137) Burris lied during the investigation because he denied he had said it (#177-28, p. 5), but he was not disciplined for lying. Burris was granted progressive discipline by way of a "Stipulated Last Chance Agreement for Discipline" in lieu of termination because Dossey and Deputy Chief Baxter wanted to save his job, (#177-30), (#172-27, p. 54-55) pursuant to which he agreed to a twenty-one day suspension and demotion to patrol officer. (#172-14) Burris' suspension ended on May 22 at 11:00 p.m. (#177-123) When the time came, Simmons (or Brooks) was offered no last chance agreement or to negotiate a resolution to save his job. (#172-1, p. 239) By accepting the Last Chance Agreement Burris admitted he engaged in the "conversation" which he lied about and denied. The district court ignored this contradiction. (#187, p. 8)

*Patrol Officer Melton's actions following Burris' discipline.*

Patrol Officer Jen Melton and Simmons had been friends for a long time, they talked a lot. (#172-1, p. 259) When Burris got in trouble over the Iraqi chick (Shayma-April 2017) statements at shift brief, Melton instantly became distant from Simmons. She even waived Simmons off of being a backup officer on official police calls. (#172-1, p. 259) She had been giving Simmons the silent treatment after Burris got into trouble over Simmons' complaints. (#172-1, p. 259-260)

Melton was disciplined (counseled), on May 22 for calling Simmons a "jackass" at shift brief on May 5, 2017. (#172-19, p. 41-44) (#177-46) On May 26, 2017, Deputy Chief Baxter ordered Lt. Brooks to investigate an incident reported to Baxter by Melton, a few days earlier, where she claimed while eating lunch with officers Richardson and Simmons, Simmons "made reference to the size of Melton's breasts to an individual." (#177-58) Baxter characterized the incident as "petty behavior". (#177-58) Baxter stated Melton told him she was reporting this incident "because she was counseled for calling Simmons a "jackass". (#177-58) Baxter ordered Brooks to investigate the matter and on May 26, in an email, Baxter confirmed Brooks' verbal report that both Simmons and Richardson denied any such comments were made. (#177-15).

On May 26, 2017, Brooks reported to Baxter that Simmons denied saying anything about Melton's breasts, and Richardson said that he did not recall any such thing, and that he would remember it if it had happened. (#172-26, p. 1) Melton told Brooks, in answer to the question of why she did not report the incident

4

when it occurred, "with all the stuff going on, I felt someone needs to know about this now". (#172-26, p. 1) The only "stuff" going on was Burris' suspension and demotion. Brooks reported that "it appears this complaint may be retaliatory considering the timing". (#172-26, p. 1) After searching police records Melton came up with the date of March 25, 2017, for the Steak N' Shake incident. (#172-19, p. 71)

Melton filed a sworn complaint against Simmons on June 19, (#172-34) when the interrogation of Simmons was interrupted to call Melton into the station for that purpose. (#172-40, p. 10-12).

Baxter and Dossey had previously told Brooks the matter was over (# 172-29, p. 7) and Brooks told Simmons it was over. (#172-15, p. 294) Brooks asked Baxter and Dossey if they wanted him to find Vogel, the individual at lunch, and Brooks was told no, because it was not a big deal. (#172-15, p. 104-105). Baxter, on his own, later went to find Vogel and interviewed him. (#177-17) (172-23, p. 1) Vogel is a mentally challenged person (#172-23, p. 1) and has told many different versions of the Steak N Shake incident. (#177-55, p. 35, 37, 41-42, 44-45).

On June 6, 2017, Simmons was served with a Notice of Formal Interrogation (NOI). (#172-37) He was informed that he had allegedly violated department Rules and Regulations for events on March 3, 2017, and March 25, 2017, where he made comments about the physical attributes of a fellow officer and embarrassment of Pekin community member. (#172-37) Simmons called Brooks to try to find out of what he was accused. (#177-44, p. 14) Because of the lack of required information in the first NOI, Simmons was served on June 13, 2017 with a "Revised Date" NOI

5

(#177-73) including more factual allegations ("Officer Melton") and ("breasts") and ("Doug") and ("her husband") and a new date to be interrogated. (#177-73) Simmons was told to "refrain from discussing this investigation or the underlying facts with any other officer" until the investigation is over. (#172-37) Simmons was disciplined by being placed on paid leave and to surrender his I.D.s and badges, on the same date he was served with the first NOI. (#172-38) Simmons was interrogated pursuant to the second NOI, during which he denied making any comments about Melton's breasts. (#172-40, p. 3) Simmons denied he had talked to any other officer than Brooks. (#172-40, p. 4-5) On July 21, 2017, Dossey put Simmons on unpaid leave[1] with no limit on the duration (#172-42) thereby violating 65 ILCS 5/10-2.1-17. Dossey's "unpaid order" also banned Simmons from city property and ordered him not to discuss the matter with any department personnel. (#172-42) Simmons remained on unpaid status through March 18, 2018.

*Dossey and the Commission.*

On or about August 23, 2017, Dossey filed a complaint against Simmons with the commission. (#172-63) The complaint requested discipline or termination on the grounds that Simmons made remarks about another officer's anatomy, that he denied the same, and that he lied during the investigation pending a hearing, (#172-63, p. 3) but did not request that the commission put Simmons on unpaid status. Two days before the scheduled hearing, on or about February 19, 2018,

---

[1] "Unpaid leave" is nothing more than a suspension without pay. There is no provision allowing for "unpaid leave." (#172-77, p. 39) (#172-78, p. 16) (#172-35, p. 129) (177-24, p. 10, ¶ 25)

Dossey filed an amended complaint with the commission alleging the same grounds but adding Simmons making "surreptitious, unauthorized recordings" as an additional charge. (#172-72, p. 4) The amended complaint did not charge Simmons with releasing a recording to LeFante Law. (#172-72)

The commission entered an order on March 13, 2018 terminating Simmons without any back pay. (#172-73, p. 5)

The Collective Bargaining Agreement (CBA) between the City of Pekin and the Pekin Police Benevolent Labor Committee, effective May 1, 2015- April 30, 2019, provides for a grievance procedure and arbitration. (#172-28, p. 14-16) A grievance not settled in step three "shall be referred to arbitration". (#172-78, p. 15, "Step 4") Simmons grieved through his union the charges made by Dossey. (#177-94, p. 2) Pursuant to a declaratory judgement action brought by the union in state court and based on *Vill. of Bartonville v. Lopez*, 77 N.E.3d 639 (Ill. 2017), the Circuit Court of Tazewell County, Illinois, held that Simmons had not waived his contractual right to arbitration. (#177-68) Arbitrator Hayford on February 22, 2021, entered an award that the arbitrator will conduct a *de novo* hearing regarding Simmons' termination. (#177-69, p. 24) The city appealed Hayford's decision, and on October 22, 2022, the Circuit Court of Tazewell County entered its Order directing the parties to proceed to arbitration in accordance with Hayford's award. (#177-85) The city appealed that decision to the Appellate Court of Illinois Fourth District, which filed its order on June 16, 2023. (*PBLC v. City of Pekin*, 2023 IL.App. 4th 2210180-U) The appellate court dismissed the appeal for lack of appellate

jurisdiction. The city has now filed a petition for leave to appeal to the Illinois Supreme Court. (Appendix, p. 69-91)

*Brooks' disability and inability to work second and third shift.*

Prior to May 2017, Brooks had taken steps to retire because he could no longer work second or third shift due to his sleep apnea. (#172-15, p. 19, ¶¶79-80) (#172-15, p. 367) In June 2016, Brooks told his superiors he was contemplating retirement because Burris was going to bump him off of first shift due to seniority and Brooks could not work third shift.  (#177-13, ¶¶ 58, 72-74,76-80) Brooks applied for a job in the city transportation department and interviewed with HR Director Newcomb over the position. (#172-15, p. 336) Months later, Brooks paid the Pension Board to purchase additional pension credits in order to increase the amount of monthly pension he would receive upon retirement. (#177-13, ¶ 58) Brooks had not worked second shift since 2004 when he was promoted to sergeant in the first week of January 2005. (#172-53, p. 3) Brooks was promoted to lieutenant in April 2012 working mostly on first shift and never on second shift. (#177-31) Brooks had made prior statements that working first shift extended his career. (#177-50, p. 1) (#172-32, p. 35-36)

Brooks was first told that a transfer to second shift was to remove him as a command officer working on the same shift as Melton. (#172-27, p. 152-153) However, Melton had already bid to move to third shift, before Simmons' internal investigation had even started, (#172-32, p. 14) (#177-56, p.5, ¶19) just as she had done six months prior (#172-19, p. 20-21), which was after Brooks was directed to

issue Melton a written reprimand. (#177-105) The union contract allowed officers to bid for a new shift every six months, which officers like Melton used to escape supervision from command officers they did not like. (#172-32, p. 31-32), (#172-19, p. 21)

To justify Brooks' transfer, Baxter made statements that Brooks' bias against Melton was evident because he did not do much to investigate Melton's allegation against Simmons over the Steak N Shake matter. (#172-45, p.2, 11, 36) (#172-32, p. 14-17) Newcomb commented that according to Baxter, had Brooks not been part of the Simmons' investigation and shown clear bias, there may not have been as much merit in moving him. (#172-45, p. 4) On October 13, 2017, the city's attorney told Brooks that… "through our investigation, revealed that you gave what is at best, a lackluster review of allegations against Officer Simmons' complaint and based on that, the city has decided that you cannot be on that shift [first] by virtue of needing to protect its' employees while still giving you the best shake it can, which is why you've been moved to second." "I am telling you based on the information we have, it's unreasonable to move you back to first, which is why we're trying to accommodate this issue as best we can under these circumstances." (#172-53, p. 19-20)

In addition to the "lackluster investigation," Brooks' forced transfer to second shift was claimed to be justified because Melton feared retaliation by Brooks. (#172-32, p. 16) (#172-45, p. 2, 11, 13) There was never any documented complaint from Melton regarding her baseless fear of retaliation from Brooks. Baxter testified that

9

he found no evidence that Brooks had retaliated against Melton. (#172-27, p. 102-103)

Brooks' investigation into the Steak N Shake allegation was confirmed later by Baxter to be anything but "lackluster."  In a prior statement Baxter signed for Newcomb, he had said, "Sarah asked me about Brooks investigation into the Melton complaint and I told her Brooks put very little effort into it and didn't appear to investigate it all. As a matter of fact, I was able to find the witness within about 3 hours and interviewed him that afternoon. It was obvious that Brooks was biased toward Simmons in the investigation." (#177-17) However, under oath, Baxter stated that "I told John not to mess with it anymore". "I never once said John didn't do his job. I knew John did exactly what I told him to do. He asked him [Simmons] about it, he came back, and I told him don't do anymore". (#172-27, p. 96-99)

After Brooks received a reprimand in early May 2017, on an unrelated matter, Dossey and Baxter told Brooks as long as he did his job and didn't get himself in any trouble, he would remain on first shift. (#172-45, p. 10-11) On June 8, 2017, Brooks was interviewed regarding Melton's Steak N Shake allegation. (#177-44) On June 16, 2017, Brooks was told he was being permanently transferred to second shift. (#177-13, ¶ 46-47) The only event between the assurances made to Brooks and his permanent transfer was his interview on June 8. (#172-45, p. 2-11) (#177-44)

*Four accommodation requests were made by Brooks.*

After being notified that he was going to be transferred to second shift rather than retire, Brooks made his first accommodation request on June 16, 2017 which was denied via email nine minutes later. (#177-14) Dossey testified he was not going to accommodate Brooks by leaving him on first shift because it was Brooks' own fault he had to be moved in the first place. (#172-35, p. 87-88)

On July 12, 2017, the only accommodation discussed between Brooks, Kaminski and Newcomb was adjusting Brooks' hours which Kaminski said would not work due to scheduling issues, which is contrary to Newcomb's letter of July 14, 2017 which stated Brooks did not like "adjusting hours", denied his request to stay on first shift and deemed his request withdrawn. (#177-50, p. 1-2) (#172-48)

Brooks' counsel wrote to Newcomb on August 1, 2017 renewing Brooks' accommodation request and the city's failure to engage in the interactive process. (#177-48, p. 1-2) There was no response until October 2017. (#172-53)

On September 1, 2017, Brooks' counsel wrote to the city's attorney concerning Brooks' shift assignment and disability. (#177-118, p. 1-3) Again, there was no response until October 2017. (#172-53)

The city eventually addressed Brooks' accommodation request, after his fourth accommodation request on September 28, 2017. (#177-123) An accommodation meeting was held on October 13, 2017, which included a report from Brooks' doctor issued that same day. (#172-53) (#177-52) (#177-123) Brooks' doctor

11

indicated that given Brooks' long standing problems, even though Brooks' least favorite shift to work was first shift, first shift was the shift he needed to work. (#177-52) In the meeting, Brooks explained that he had not adjusted to working second shift as he was falling asleep in the squad car and while approving reports. (#172-53, p. 4)

In the meeting, Brooks was only asked about his doctor's recommendations for shift work disorder which is different than sleep apnea. The doctor's only recommendation for Brooks' sleep apnea was a transfer to first shift. (#177-52, p. 1) As for the shift work disorder recommendations, Brooks was dieting. (#172-53, p. 4) Brooks did not refuse to take melatonin, he had tried it before and experienced extreme headaches. (#172-53, p. 5-6) Brooks affirmed he would take other prescriptions if his doctor told him it was his only choice. (#172-53, p. 7) Brooks said he would try the City's proposed rest periods. (#172-53, p. 20-21,34) Brooks agreed to consistent naps while on duty even if on certain days he was not tired. (#172-53, pg. 31, 39) The District Court found Brooks refused all accommodation offers. (#187, p. 43)

Brooks did not immediately leave for vacation after the October 13, 2017 meeting, as the district court's opinion found. (#187, p. 44) His vacation was scheduled for the end of the month. (#172-53, p. 34) The October 13 plan for the next two weeks was to try the rest periods, keep a log of meal times, try to see Brooks' doctor and meet again. Brooks agreed to take any medications prescribed. (#172-53, p. 34-38) Brooks said he would try different shift hours if it was on the

table. It was not an option offered. (#172-53 p. 38-39, 41-43) Brooks' prior request for accommodation to work first shift in investigations, which would not involve working with Melton, was denied. (#177-48, p. 2) (#177-11, p. 3, ¶9) Brooks' request that he remain as first shift lieutenant and that the other lieutenants, sergeants, deputy chiefs and the chief, who all worked first shift, handle any issues involving Melton, was denied. (#172-53, p. 10-12) Brooks had no authority to discipline Melton, he could only counsel her. (#172-79, p. 7, ¶ 20) Some six months earlier, after Simmons complained about his fear of retaliation by Burris, Burris was directed to involve other command officers regarding any issues arising with Simmons. (#177-54, p. 2)

*Brooks complains about his prior reprimand and transfer to second shift.*

On June 26, 2017, Brooks sent a written complaint to Newcomb expressing, in part, that he was being retaliated and discriminated against by Melton, Baxter and Dossey. [2] (#172-43, p. 1-7) Brooks claimed Melton falsely asserted Brooks might retaliate against her because of her allegations against Simmons. (#172-43, p. 4) Baxter had told Brooks that Melton claimed Brooks was retaliating against her by "nitpicking" her about going over her allotted lunch time. (#172-43, p. 4-5) Brooks claimed Baxter and Dossey's forced transfer to second shift was in retaliation for his statements about believing Simmons and Richardson regarding Melton's allegations against Simmons, and payback for the Burris demotion. (#172-43, p. 6) Brooks was

---

[2] Though Brooks' complaint accused Baxter of discrimination and retaliation, it was Baxter who was ordered to investigate whether Brooks' complaint contained lies, an extremely odd thing to do according to D.C. Kaminski. (#172-46, p. 46)

13

told the day after his June 8, 2017 interview that he would likely be permanently on second shift. (#172-43, p. 6) After Newcomb released her report regarding Brooks' complaint, essentially dismissing it, and claiming Brooks had lied, Brooks complained that the report contained false information. (#177-10)

Though Newcomb promised to talk to Brooks about his complaint, she did not. Newcomb claimed she did not talk to Brooks on the advice of the City's labor attorney, Josh Herman. (#172-32, p. 40, 44) Newcomb did not interview 10 witnesses as she claimed. Melton admitted Newcomb did not interview her subsequent to Brooks' June 26 complaint. (#172-33, p. 16-18, 38-40) Newcomb first testified that after receiving Brooks' complaint she interviewed Melton. (#172-32, p.55) Newcomb later admitted she incorporated a June 5 meeting with Melton and memorandum regarding it into her investigation into Brooks' complaint (#172-45, p. 33-34) and that she did not interview Melton at all after June 26. (#172-33, p. 16-17, 38-40) Newcomb claimed in her investigation report Brooks was disciplined on June 20, 2017 over a conversation with Officer Ward. Newcomb claimed Baxter told her about the letter of reprimand. Brooks' July 6 complaint refuted this allegation. (#172-44) Brooks was never issued a letter of reprimand. (#172-45, p. 3) (#172-61, p. 26) (#177-88, p. 3-5)

Newcomb's report referenced negative statements about Brooks by Officer Thompson. Thompson was reinterviewed by both Newcomb and Baxter on January 18, 2018 where he stated the comments Newcomb attributed to him in her 2017 report into Brooks' complaint were not true. (#177-36, p. 1-4) (#177-19, p. 19-21)

14

Newcomb generated a memorandum to the City Manager with her report stating Brooks had filed a false complaint. (#177-132, p. 1-2) Providing examples of Brooks' untruthfulness, Newcomb first cited Sgt. VonRohr's statement regarding whether he had told Brooks the union did not deem Brooks' conversation with other officers as an unfair labor practice. (#177-132, p. 1-2) VonRohr's statement had been directly contradicted by testimony from Officer Thompson and Officer Richardson who affirmed Brooks' statements in his complaint and rebuttal. (#172-45, p. 38) (#177-40, p. 11)(#177-19, p. 12-18) Newcomb was aware that VonRohr's statement was contradicted by Thompson, Richardson and Brooks. She took an active part in the Formal Investigation interviews conducted by Baxter. (#172-32, p. 61) (#177-20, no. 15).

Newcomb's second example of Brooks' untruthfulness was her claim Brooks had lied to his attorney. (#177-132, p. 1-2) Brooks' attorney wrote Newcomb on August 1, 2017 about Brooks' request for an accommodation. (#177-48) Newcomb claimed that Brooks had not asked for an accommodation. (#177-132, p. 1-2) (#172-48) Brooks did so in writing, on June 20, 2017. (#172-36, p. 1-2)

Newcomb's third example of untruthfulness was the conversation with Officer Ward and the purported discipline resulting from it. (#177-132, p. 2) (#172-45, p. 3) (#172-61, p. 26) In her report, Newcomb claimed Brooks had been disciplined when he had not. (#177-88, p. 3-5)

*Brooks files charge with EEOC and IDHR and the internal investigation that follows.*

Brooks filed a charge alleging the city failed to reasonably accommodate his disability on September 27, 2017. (#172-49, p. 1-2) The city received the charge on October 27, 2017. (#172-51, p. 1-10) (#187, p. 47) On October 30 a formal internal investigation against Brooks was initiated. (#172-55)

On November 13, 2017 Brooks was placed on paid suspension by Dossey. (#172-57) On March 27, 2018 Dossey placed Brooks on unpaid suspension. (#172-74) On March 28, 2018 Dossey filed charges against Brooks with the commission seeking his termination. (#172-75) Brooks was charged, in part, with violation of the Personnel Records Review Act. (#172-75, p. 4) Brooks submitted his forced retirement letter on July 10, 2018. (177-84, p. 1-3)

## STANDARD OF REVIEW

The Appellate Court reviews "the district court's grant of summary judgment *de novo,* construing all facts and drawing all inferences from the record in the light most favorable to the non-moving party." *Stinnett v. Iron Works Gym/Exec. Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002). To determine if a trial-worthy issue exists, the Appellate Court must look to *all* the record materials on file. *Ahmed v Johnson*, 752 F. 3rd 490, 495 (1st Cir. 2014) (emphasis added).

However, as to examination of whether the District Court was correct to strike or disregard parts of evidence cited in opposition to a motion for summary judgment, the Appellate Court reviews for an abuse of discretion. "Under this

standard, '[d]ecisions that are reasonable, i.e., not arbitrary, will not be questioned.'" *Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049 (7th Cir. 2000).

## SUMMARY OF ARGUMENT

The court should not have allowed its umbridge to influence its discretion in denying Plaintiffs' request to amend their response.

Simmons' recordings could not have interrupted the causal chain of protected activity and his termination or the extended time he spent on unpaid suspension prior to his termination. All disciplinary action against Simmons was retaliatory. The procedures used against him violated state law, showing animus and pretext, including the commission hearing itself.

Simmons was guaranteed arbitration by his union contract which was disregarded by the city.

Simmons did not say anything to Melton about her breasts, neither in the presence of her husband or a private citizen. The city clearly took Melton's side. Officer Richardson's testimony denying her claimed conduct was ignored, including at the commission hearing.

The court failed to recognize questions of material fact clearly presented to the court. Summary judgment on Simmons' Title VII claim was improperly granted.

Brooks had an acknowledged disability. The city ignored and denied Brooks' reasonable accommodation requests.

The city deliberately and pretextually transferred Brooks to second shift, a shift the city knew he could not work.

The city constructively discharged Brooks for pretextual reasons.

The court failed to recognize questions of material fact clearly presented to the court. Summary judgment on Brooks' ADA claims were improperly granted.

## ARGUMENT

### Rule 56 and Local Rule 7.1(D).

Plaintiffs admit their fault in failing to properly document their initial response (#175) and their first amended response (#181). Plaintiffs filed their second attempt to amend (#183) out of a sense of duty to present to the court a clean record, while recognizing Plaintiffs' fault by offering to pay defendants' fees if allowed to correct the record which could require defendants to redo their documents. (#183, p. 3, ¶11) Plaintiffs' request was appropriate under FRCP 56(e)(1) and (4). The district court abused its discretion by instead treating those facts as undisputed.

First, the district court improperly took Plaintiffs' citation errors as a nefarious plot and improperly took "umbrage" against Plaintiffs for having citation errors. In doing so, Plaintiffs had no opportunity to contest Defendants' accusations, which were accepted as factual by the court. [3] (#187, p. 4 n. 4). Plaintiffs did not intend to be misleading in any way. Instead, they simply wanted an opportunity to correct the very problems the court describes.

---

[3] The trial court did not indicate those facts it actually disregarded, only that it would disregard improperly cited facts (#187, p. 3-5)

Second, the court claims Plaintiffs have not raised their arguments properly in the argument section of their Response. (#187, p.11-12, 13, note 13 and note 14). Plaintiffs' disputes of specific facts appear in their responses to Defendant's stated facts. Nothing in local rule 7.1 (D)(2) requires the response to restate in section (2)(c) "argument" what has been included in Section (2)(b), (1), (2), (3), (4), and (5). Plaintiff is required by the rules only to "respond directly to the argument in the Motion for Summary Judgment . . . ." Additionally, FRCP 56 contains no requirement that the argument included in response to the movants' stated facts must be restated in the argument section. It was not feasible for Plaintiffs to recount all the facts in its argument section when the Response was already 245 pages long.

Third, even given Plaintiffs' fault, it was too severe of a penalty to take material facts the court knows are disputed as undisputed solely due to citation mistakes and formatting errors. The court arbitrarily assumed the worst about Plaintiffs' mistakes and allowed that impression to affect the substance of the case, where even most of the errors themselves were not substantive.

Even ignoring the facts that Plaintiffs admittedly miscited, the following will show that the court failed to abide by its own ruling, ignoring almost all of Plaintiffs correctly cited facts or inappropriately making credibility determinations against them at summary judgment.

**Count IV – Simmons' complaint of sexual harassment resulted in retaliation.**

At page 70 of Defendants' Motion for Summary Judgement (#172, p. 70) Defendants argue that Simmons' "illegal" recording campaign could never convince a reasonable jury that Simmons was brought before the commission as a pretext to retaliate for his reporting Burris' conduct. What Defendants overlook is the law. Simmons' recordings were legal.

On May 24, 2023, the Illinois Appellate Court published its opinion in *Cook Au Vin LLC v. Mid-Century Ins. Co.*, 2023 IL. App. (1st) 220601. A claim representative for the insurance company contacted the attorney for plaintiff. After a brief introductory conversation, the claim representative informed the attorney that the call was being recorded. The attorney protested, but the recording continued throughout the conversation. Cook Au Vin alleged that Mid-Century had violated the eavesdropping statute by surreptitiously recording the telephone conversation. Mid-Century filed a combined motion to dismiss which was granted by the trial court. The appellate court affirmed the decision of the trial court.

> "Rather, a surreptitious recording implies that the recorder is listening to a conversation that he or she 'could not otherwise have heard' *Bender v Board of Fire & Police Commissioners of the Village of Dolton*, 183 Ill. App. 3rd 562, 566 (1989).
> ***
> Furthermore, this was not a secret conversation that Mid-Century could not otherwise have heard.
> ***
> The determinative issue, however, is whether plaintiff's expectation of privacy was reasonable under the circumstances. Id., at ¶ 22-26."

Dossey's Amended Complaint (#172-72, p. 1-9) filed with the commission two days before the commission hearing on the case against Simmons made no attempt to allege facts that support the expectation of privacy was reasonable under the circumstances. The allegations of the amended complaint regarding surreptitious recording appear on page 3 of the Amended Complaint and consist of only three paragraphs, none of which attempt to allege that the police department's expectation of privacy "was reasonable under the circumstances". Also, the Commission's findings and decision (#172-73, p. 1-5) made no findings on the reasonableness of an expectation of privacy but found that "his surreptitious unauthorized recordings are violations of the following Policies, Rules, and Regulations of the Police Department". (#172-73, p. 4-5)

The Illinois Legislature amended the eavesdropping statute in 2014. *Cook Au Vin LLC* found that the language of the amendment mirrored language found in *People v Beardsley,* 115 Ill. 2d 46 (1986). The court stated that the *Beardsley* Court concluded that "… if the officers had intended to keep their conversations 'entirely private,' they would have left the police vehicle instead of speaking in front of the defendant. *Id.*, at ¶ 55. Thus, no violation of the eavesdropping statute occurred where the defendant did not surreptitiously record a private conversation. Id. at ¶ 33-34."

If Dossey had intended to keep his comments "entirely secret" he would have followed the custom and practice of stating "this conversation is not to leave this room." (#177-6, ¶49)

"Crucially, however, an entitlement need not be codified in writing; a '*de facto*' unwritten or implied policy is sufficient to create an entitlement and protectable property interest.

***

Forgue pleads a plausible claim that the CPD has an unwritten, *de facto* custom to grant virtually all retiring employees a Card."

*Forgue v. City of Chicago* 873 F. 3rd 962, 970 (7th Cir., 2017)

*Cook Au Vin LLC* relied on *Bender v. The Bd. of Fire & Police Comm'rs. of the Vill. of Dolton*, 183 Ill. App 3rd 562 (1st Dist.,1989), decided long before the amendment to the eavesdropping statute. In that case Bender, a police officer, used a pocket recorder to record a conversation he had with the chief of police, in the chief's office.

> The first is that, if plaintiff did not commit eavesdropping, he did not violate any criminal law of the State of Illinois. If he did not violate any criminal law, he did not violate Article 4, Section 2.1 of the rules and regulations of the Dolton police department. If he did not violate that provision, there was no basis for charging a violation of article 4, section 2.2 thereof. Therefore, he should not have been discharged.

***

> …plaintiff did not use his pocket recorder to listen in on a conversation he could not otherwise have heard. As such, he did not commit eavesdropping in recording his conversation with Pfotenhauer. It therefore follows, *a fortiori*, that plaintiff did not violate article 4, section 2.1 or section 2.2. of the rules and regulations of the Dolton Police Department." *Id.*, at 565-566.

Defendants did not argue Simmons' releasing confidential briefings was an intervening or superseding cause; they argued only that the class 4 felony caused his termination. (#172-29, p.71) Yet the court found that the "releasing" was one of the factors that broke the causal chain. (#187, p. 50) Also, the commission made no

22

findings regarding "releasing", logically, since Dossey had made no allegation concerning "releasing" one of the recordings.

In addition, Plaintiffs had created a question of fact on this "recording" issue. (#186, p. 129) (#186, p. 197-198) (#172-1, p. 150-153) The most significant of these is the testimony that Simmons could "record anything he likes". (#172-29, p. 15) Also, the city and Dossey denied Simmons the opportunity to respond to the "recordings" charges. Dossey filed his Amended Complaint knowing Simmons could not appear based on *Vill. of Bartonville v. Lopez* 77 N.E.3d 639 (Ill.2017). Also, Simmons had filed through his union a grievance on the Amended Complaint regarding the recordings which could not be completed before the City rushed to the Commission. And, as to the release of the recording, Simmons was no longer a police officer. As of the 6th day he was on unpaid status, he was essentially fired by Dossey.

In *Parker v Brooks Life Science, Inc.*, 39 F. 4th 931 (2022) this court stated:

> Circumstantial evidence of causation may include '(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action. *Id.* at p. 937.

In the introduction to their Motion for Summary Judgement (#172, p. 6) Defendants stated that the complaint against Simmons before the commission was amended to add the "...revealing of confidential information to LeFante Law". The Amended Complaint included no such allegation. (#172-72, p. 1-9) The court must have been misled by Defendants' undocumented and untrue statement because it

23

found that Plaintiffs "fail to show how Simmons…releasing confidential briefings is not a superseding cause… ." (#187, p. 50) While it is an undisputed fact that Simmons admitted he gave the recording to LeFante Law, it is not a fact that he was charged with having done so, or that the commission found that he had done so and cannot be an intervening, superseding, sole, or "but for" cause of the employer's adverse action. If Dossey and Baxter honestly believed Simmons should be terminated because he "… gave those recordings to parties suing the City", (#187, p.49, n. 25) then why did they fail to allege and prove the matter before the Commission.

Moreover, termination was not the initial adverse action by the city against Simmons. Dossey put Simmons on unpaid suspension on July 21, 2017, where he remained until March of 2018. Dossey did this in complete and obvious violation of the mandate of the Illinois Board of Fire and Police Commissioners Act, 65 ILCS 5/10-2.1-17. Under said statute a Chief is allowed only five days of unpaid suspension and the Commission only 30 days pending a hearing.

> 'Pursuant to the Illinois municipal code, any disciplinary action in excess of a five-day suspension can only be issued by the Board after a hearing. 65 ILCS 5/10-2.1-17. In other words, [the police chief] could not have terminated [the police officer's] employment' or suspended him for more than five days because 'only the Board could take such action'. *Bradford v Village of Lombard*, 2012 WL 1655966 at ¶ 2 (N.D. Ill. May 10, 2012) *Ores v Village of Dolton*, 152 F. Supp. 3rd 1069, §20 (N.D. Ill. 2015).

No order was agreed to by the commission by which Simmons was suspended without pay at any time during the period between the filing of the complaint with the commission and the hearing before the commission. Dossey far exceeded his

five-day authority. Simmons was unlawfully placed on unpaid status by Dossey. Simmons was unlawfully kept on unpaid status far in excess of the thirty-day statutory limit. Thus, Dossey and the commission exacted their own adverse action long before the termination hearing because Simmons remained on unpaid suspension for nearly eight whole months.

Suspicious timing may be competent evidence of causation, albeit rarely alone. *Parker v Brooks Life Science*, 39 F. 4th 931, 937 (7th Cir. 2022).

> In a vacuum, this timing may appear suspicious; indeed, we have held that summary judgement is inappropriate where as much as a month's delay occurred between the protected activity and the adverse employment action, where that suspicious timing was combined with additional evidence of pretext. See, e.g. *Coleman v. Donahoe*, 667 F.3rd 835, 860 (7th Cir. 2012) (One month between filing of complaints alleging discrimination and termination sufficient when combined with evidence that the policy the Plaintiff allegedly violated did not apply and was not even handedly enforced). *Parker* at ¶937.

There was no intervening event (e.g., recordings) between Melton's bizarre complaints and the placing of Simmons on unpaid status, and the time span between Melton's signed complaint and unpaid status was approximately one month. So, suspicious timing is present. Baxter himself described the conduct Melton alleged as being "petty" at most. (#177-58) If found to be true, Simmons would receive counseling. (#172-29, p. 9) Also, Simmons' denial that he talked with any "other officer" is demonstrably true. His interrogator knew he had talked to Brooks after the first NOI because Simmons admitted just seconds earlier in the interrogation that he had talked to Brooks after the first NOI, but not after the second NOI. There is no evidence Simmons talked to any officer "other" than

25

Brooks. At the very least a question of fact exists whether Simmons lied when he answered "no"; therefore, the charge that he "lied" is pretext. The court ignored the factual dispute by noting Plaintiffs did not raise the facts in the argument section of their brief. (#187, p. 13, n 14)

To survive summary judgement on a retaliation claim, as stated in *Giese v City of Kankakee,* 22-2022 (7th Cir., 2023) p.9, a plaintiff must offer evidence of: (1) a statutorily protected activity (HERE:  Reporting the sexual harassment by Burris.); (2) a materially adverse action taken by the employer; (HERE: Simmons placed on unpaid leave from July 21, 2017, until March 13, 2018.); (3) a causal connection between the two:

a)  Burris lost two personal days (#177-18, p. 36), and then for the second offense 21 days and reduction in rank for his sexual harassment of Simmons. (#177-30, p. 1).

b)  Using the "boobs" complaint made by Melton as pretext the department started an investigation like no other against Simmons and later Brooks.

c)  That the city's and its employees' conduct was pretext is illustrated by the following facts all properly supported in the record on summary judgement:

i)  Baxter did not initially seek out Richardson before the investigation against Simmons was launched (#177-71); taking the investigation away from Brooks (172-29, p. 9, 25), a

26

command officer, after Baxter had just characterized the conduct involved as being "petty" (#177-58); personally finding and interviewing Vogel (#172-29, p. 9); violating UPODA by interrogating Simmons without a sworn complaint (#172-40, p. 10-12); ordering Simmons to stay off city property (#172-42); ordering Simmons not to talk to other patrolmen. (172-37, p. 1)

ii)   Melton waited months to make a sworn complaint (#172-34); Baxter's memo of July 18 where he falsely claimed Melton reported to him both incidents on May 24 (#172-23, p. 1) (#177-44, p. 1-2); she made her initial complaint immediately after Burris returned from suspension on May 23,2017 and demotion and after she was counseled for calling Simmons a jackass (#172-14; 177-58; 177-46); she gave Simmons the silent treatment and then exploded at him at shift brief with the "jackass" comment (#172-1, p. 260-261; 177-46); she claimed what "was going on around here", i.e., the Burris/Shayma matter, and her counseling justified her long-delayed complaints (#172-26, p. 1); the delay in making the squad room complaint after making the Steak N Shake complaint (#177-58; 172-34) (#172-30); she needed to search the record to find the date for the Steak N' Shake complaint (#172-19, p. 71)

iii)  City not calling Officer Richardson, an eyewitness, to testify
       before the Commission, knowing that there would be no one to
       refute Melton's claims, including Simmons who had chosen to go
       to arbitration. (#172-29, p. 2)

The court claims, without any evidence at all, of any kind, that the city tried
to negotiate a "last chance agreement" with Simmons. (#187, p. 39-40) What is
worse, the court states that Simmons' counsel refused or failed to negotiate such an
agreement. The statement is made without reference to any facts in the record. But
it is important because the court goes on to state that "if this was the sole basis for
Simmons termination the validity of this comparison would be an issue for the jury
to resolve". (#187, p. 40) No "last chance agreement" was ever discussed or offered.

Much was made by the defendants of their claim that "Simmons lied" during
his interrogation about having spoken with an "other officer". Totally ignored by the
defendants was that Melton lied during the Humphreys' investigation and was only
counseled. (#177-100, p. 4, 7) (#172-19, p. 126) Also ignored was the fact that Burris
lied during the April-Shayma investigation because he repeatedly stated that "I did
not say it, I did not say it, I did not say it" (#177-28, p. 5), yet he was disciplined
only for having said it. (#177-136) (#172-14)

The district court stated, in relation to Brooks' ADA retaliation claim, that a
plaintiff may prove a causal connection between his protected activity and adverse
treatment through "suspicious timing, ambiguous statements, oral or written [] and
other bits of evidence from which an inference of retaliatory intent might be drawn,"

citing *Coleman v Donahoe*, 667 F. 3rd 835 (7th Cir. 2012). (#187, p.46) But *Coleman* is ignored in the portion of the court's decision relating to Count IV- Simmons Title VII retaliation claim. (#187, p.49-50)

Dossey announced his decision to seek termination on September 11, 2017. (#177-49) Dossey knew nothing of the "recordings" until long after he notified the union of his termination decision.

The district court completely ignored the Illinois Supreme Court's controlling decision in *Vill. of Bartonville v. Lopez,* 77 N.E.3d 639 (Ill. 2017). That court held an officer waives his right to arbitration by participating in the commission proceedings. Id. at 648.

*Vill. of Bartonville v. Lopez*, 77 N.E. 3rd 639 (Ill., 2017) is the controlling authority on waiver of arbitration. Simmons' union filed a state court declaratory judgement action (#177-94) which resulted in Judge Kouri's decision of July 20, 2022 (#177-68). Judge Kouri held as follows: "The decision in Village of Bartonville v Lopez, 2017 IL. 120643 was based primarily on a finding that the officer waived his contractual right to arbitrate by participating in the proceeding before the Police and Fire commission. Under the circumstances presented here, it has not been established that the officer has waived his contractual right to arbitration."

In its Order and Opinion (#187, p. 15) the court stated that Simmons "..claims that he sought to have the disciplinary charges handled through arbitration rather than through the commission and that he would have waived his right to arbitration had he attended the hearing." But to be clear, Simmons had no

choice. In order to preserve his right to arbitration, Illinois law required him to refrain from participating in the commission proceedings. The use by the court of the word "claims" implies a lack of justification. For Simmons to have participated was for Simmons to terminate any rights to arbitrate the dispute. It was not a "claim" made by Simmons. It was established state law. The court obviously misconstrued the significance of *Lopez*. True, the court did find that Simmons was not bound by the factual determinations of the commission (#187, p. 27) but it did so for the wrong reasons. Waiver and collateral estoppel have little or nothing to do with the controversy. *Lopez* established the controlling legal principle. Curiously, according to the court, Simmons is not bound by any factual determinations of the commission, except for the recordings and the release of a recording.

The city, through its attorney and Dossey, dodged and weaved to avoid the union's right to arbitrate the dispute. Circuit Judge Kouri (#177-68) ruled, adverse to the city, that Simmons had not waived his right to arbitration, consistent with the Supreme Court's decision in *Lopez.* Arbitrator Hayford ruled that the union was entitled to *de novo* arbitration. (177-69, p.24) The City appealed that decision to the Circuit Court. Judge Bauer affirmed the arbitrator's decision. (#177-85) The city appealed to the Fourth District Appellate Court of Illinois. In its decision rendered on June 16, 2023, *Policemen's Benevolent Lab. Comm. v. City of Pekin*, 2023 IL App. (4th 221018-U) that court found there to be no appellate jurisdiction as the case was not ripe. Thus, throughout this five-year ginned-up controversy the city was wrong, and the union and Simmons were right. The city and its commission could

not by their rush to judgement deprive Simmons of his CBA property right to arbitration. Therefore, the commission decision is unenforceable. As a logical consequence the district court's reliance on the recordings, and Simmons releasing one of them, as an established fact, cannot stand as "superseding cause that breaks this chain." (#187, p. 50) Also, no affirmative defense of "intervening cause" or "superseding cause" was plead by the defendants. (#150-1, p. 33)

The commission is required to conduct a fair and impartial hearing, a duty separate and apart from any duties borne by any of the Defendants, including the city. The commission did not demand to hear the testimony of Richardson, which was not offered by the Chief or the city. Is that not indicia of animus? The commission ignored *Lopez*, again a violation of its statutory duty.

> "The Board of Fire and Police Commissioners shall conduct a
> fair and impartial hearing of the charges, to be commenced
> within 30 days of the filing thereof, which hearing may be
> continued from time to time.
> ***
> In the conduct of this hearing, each member of the Board shall
> have power to administer oaths and affirmations, and the Board
> shall have power to secure by its subpoena both the attendance
> and testimony of witnesses and the production of books and
> papers relevant to the hearing." 65 ILCS 5/10-2.1-17

The commission made no inquiry as to the reason for Simmons' absence, although it had to be aware of the reasons. Certainly, Mr. Gilfillan, the commission's attorney, was aware of the reason. (#177-66) The city attorney also knew the reason. (#177-66)

The commission is an arm of the city and cannot be sued under §1983. *Best v. City of Portland*, 554 F. 3d 698 (7th Cir. 2009) Another indicia of the commission's

retaliatory intent is its failure to address the issue of Dossey having placed Simmons on unpaid leave. (#172-73, p. 5) By law, Dossey may place an officer on unpaid leave for no more than five days. 65 ILCS 5/10-2.1-17 The commission may continue an officer on unpaid status, pending the hearing on the underlying complaint for no more than 30 days. Dossey filed his complaint against Simmons on August 23, 2017, by which time Simmons had been unlawfully on unpaid suspension for 22 days.

At page 28 of its Order and Opinion (#187, p. 28) the court finds the evidence "slim" that Dossey had the requisite retaliatory animus to impute it to the commission, obviously a weighing of the evidence. Even a "slim" fact is a fact. True, the city attorney and Simmons' private attorney were negotiating to reach settlement during a bit of that period, which is of no benefit to Dossey because those negotiations are inadmissible in evidence under FRE 408. The commission hearing occurred on February 21, 2018, with its decision on March 13, 2018. At no point between August 23, 2017, and March 13, 2018, did the commission address the issue of Simmons' unpaid suspension. Such a clear violation of state law is also a clear indication of animus by Dossey and by the commission.

At page 50 of its Order and Opinion (#187, p. 50) the court ruled that, "it feels too implausible that an employees' mere friendship with another who is the target of complaints creates a genuine issue of fact for retaliation." Melton clearly admitted her retaliatory intent. In his May 26, 2017, email to Brooks, Baxter stated, "a couple of days ago, I spoke to Officer Melton regarding an incident at Steak N

Shake. She was reporting this incident because she was counseled for calling Simmons a jackass." (#177-58) Again, in her own words, Melton stated, "due to recent events, I feel that an incident that occurred earlier this year needs to be brought to light." (#172-30) Melton's email was dated May 27, 2017, and concerned the Steak N Shake incident which occurred, she later said, on March 25, 2017. Clearly, Melton sought retaliation. Baxter knew she sought retaliation and assisted her. Melton persisted in her retaliatory intent all the way through the commission. In his report to Dossey dated July 18, 2017, Baxter stated, "I asked Melton why she had waited so long to bring up these obvious issues. She said she just wanted to fit in with the guys and would ignore it most of the time. She brought this forward due to all of the turmoil on the shift that she believes was caused due to officers prior to this being disciplined for things of the same nature." (#172-23, p. 2) Melton's words "due to officers prior to this being disciplined" is an obvious and direct reference to Burris having been disciplined, and clearly establishes a retaliatory intent as well as animus. Equally revealing are her words "…for things of the same nature," another direct reference to Burris' conduct.

**Burris is a valid comparator for Simmons.**

Burris was a valid comparator for Simmons. The court admitted "Burris' misconduct is similar to the accusations regarding Simmons' alleged comments about Officer Melton's breasts." It also noted "[t]heir conduct was in violation of the same departmental rules and policies and was similarly serious." (#187. p. 39) However, by its own admission, the court took this question away from the jury

because of Simmons' recordings. This was error. As described above, a reasonable jury could find Simmons was brought before the commission as a pretext to retaliate against Simmons for reporting Burris' conduct. Simmons violated no law, and he only provided the recording to LeFante Law after he had already effectively been terminated. Therefore, a reasonable jury could find that the recording does not differentiate Simmons from Burris. As a result, if Simmons were provided all reasonable inferences—as he is entitled to at summary judgment—Burris is a valid comparator.

**Count I – City failed to provide Brooks a reasonable accommodation.**

To survive Defendants' motion for summary judgment on the failure to accommodate claim, Brooks needed to show: (1) he is a qualified individual with a disability; (2) the employer was aware of his disability; and (3) the employer failed to reasonably accommodate his disability. *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 682 (7th Cir. 2014). The parties agree that "Brooks was disabled due to his sleep apnea and that the Defendants were aware of that issue." (#187, p. 42) Thus, the issue turned on whether the city reasonably accommodated Brooks' sleep apnea. As the Court noted, a "'[r]easonable accommodation' means modification to the work environment or the manner in which the position is performed to enable a qualified individual with a disability to perform the essential functions of the position[.] 29 C.F.R. § 1630.2(o)(1)(ii)." *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 682.

The city did not reasonably accommodate Brooks. It was reasonable to put Brooks back on first shift. No other accommodation attempts enabled Brooks to perform the essential functions of the job on second shift. The court errored in finding the city reasonably accommodated Brooks' sleep apnea by: (1) refusing to make inferences in Brooks' favor as to whether it was reasonable to move Brooks' back to first shift; (2) ignoring the summary judgment standard by weighing Brooks' credibility against the city's credibility as to whether offered accommodations would allow Brooks to perform the essential functions of the job; (3) by determining no reasonable jury could find the city even had enough time to reasonably accommodate Brooks' disability; and (4) by finding the city engaged in the interactive process with Brooks.

### A. Brooks' request to be moved back to first shift was reasonable.

It is undisputed that allowing Brooks to go back to first shift would have allowed him to perform the essential functions of the position. However, Defendants maintain that it would be unreasonable to move Brooks back to first shift because Melton and Brooks needed to be separated. The city states this is why Brooks was moved to second shift in the first place. Specifically, Baxter noted Brooks was moved from first shift to move him away from Melton because Brooks did not do much to investigate Melton's Steak N Shake complaint against Simmons. Newcomb noted Baxter told her that Brooks' clear bias in the investigation was why he was removed from first shift. The city attorney called Brooks' investigation of Simmons "lackluster," noting that it was why the city had to move Brooks. (#172-53, p. 19-20)

However, the court errored by refusing to consider Plaintiffs' evidence that this reasoning is pretextual. Baxter's own deposition noted, "I knew John did exactly what I told him to do. He asked him [Simmons] about it, he came back, and I told him don't do anymore." Therefore, a reasonable jury could find that Brooks did exactly as he was told, the opposite of "lackluster." Baxter knew Brooks did exactly as he was told, and Baxter still intentionally accused Brooks of bias against Melton to move him from first shift.

Additionally, there is clear evidence of pretext merely from the fact that Melton voluntarily bid for third shift. There was no need to move Brooks off of first shift to get him away from Melton. The city could have allowed Melton to move to third shift early. Likewise, there is clear evidence of pretext merely from the fact that Dossey would not allow Brooks to use seniority to work third shift if Melton stayed on first. Dossey's only stated rationale was that it was Brooks' fault and that Brooks moving to third would inconvenience another lieutenant, which is far from an undue burden. (#172-35, p. 86-88) As a result, a reasonable jury could find the city was pretextually forcing Brooks to second shift.

The question then becomes whether the city even had a justifiable reason to move Brooks from first shift? A reasonable jury could find the city did so due to discriminatory animus based on Brooks' disability. In June of 2016, Brooks told supervisors he was contemplating retirement due to only being able to work first shift due to his sleep apnea. In May of 2017, Brooks took steps to retire because he could only work first shift due to his sleep apnea. Brooks had not worked second

36

shift since 2004. Brooks had made statements that working first shift extended his career. Brooks stated on June 8, 2017 that he believed Simmons and Richardson over Melton. Merely 8 days later, Brooks was told he was being transferred to second shift. A reasonable jury could infer that it was commonly known that Brooks could only work first shift, Brooks saw through Melton and the city's plan to get back at Simmons over the Burris matter, and, therefore, the city concocted a lie that Brooks was biased against Melton to move Brooks to a shift they knew he could not work due to his disability. The city engineered a way to keep Melton on first shift so it could force Brooks to second shift. Melton's shift bid to go to third shift had already been completed. The city allowed Melton to trade shifts with another officer to stay on first shift three days after Brooks' first accommodation request. (#177-16) Since Brooks should have never been moved from first shift, a jury could find that it was reasonable to put Brooks back on first shift and that placing him back on first is the exact type of accommodation that the ADA contemplated. *See Colwell v. Rite Aid Corp.*, 602 F.3d 495, 504 (3d Cir. 2010) (noting, "changing Colwell's working schedule to day shifts in order to alleviate her disability-related difficulties in getting to work is a type of accommodation that the ADA contemplates").

Likewise a jury could find that the refusal to move Brooks to first shift was not an undue hardship or an "action requiring significant difficulty or expense." *Zande v. State of Wis. Dept. of Admin.*, 44 F.3d 538, 543 (7th Cir. 1995). As with religious accommodation cases, the ADA requires undue hardship, not minor inconveniences. *Adeyeye v. Heartland Sweeteners*, LLC, 721 F.3d 444, 454 (7th Cir.

37

2013). Allowing Brooks to remain on first shift and have other command officers deal with any issues concerning Melton was a mere inconvenience and one the city was more than willing to tolerate when it came to Burris and Simmons.

By ignoring these material facts and the reasonable inferences from them, the district court errored.

### B. Brooks did not refuse offered accommodations.

The district court tried to avoid the above by claiming Brooks refused all the city's offered accommodations. Nowhere in the record is there any evidence or argument that Brooks refused any proposed accommodations. Instead, Brooks presented evidence that the city denied all of Brooks' requests. Brooks' June 16, 2017 request was denied within nine minutes. On July 12, 2017, Newcomb refused to adjust Brooks' hours, denied his request to stay on first shift, and deemed his request withdrawn. Brooks' request for accommodation to work first shift in investigations, which would not involve working with Melton, was denied. On October 13, 2017, Brooks was asked about his doctor's recommendations for shift work disorder. Contrary to the district court's findings, the doctor's only recommendation for sleep apnea was a transfer to first shift. (#177-52, p. 1-3) The other recommendations were for shift work disorder, not sleep apnea. (#177-52, p. 1) The city denied the recommendation, even with Brooks offering to have the other lieutenants, sergeants, deputy chiefs and the chief, who all worked first shift, handle any issues involving Melton and despite Brooks not having authority to do

anything but counsel Melton. Brooks said he would try different shift hours if it was on the table. It was not an option offered. (#172-53 pg. 38-39, 41, 43)

The court wrongfully implies Brooks was not doing all he could to reduce the effects of his sleep apnea, especially given the summary judgment standard. Brooks was dieting. (#172-53, pg. 4). Brooks did not refuse to take melatonin, he had tried it before and experienced extreme headaches. (#172-53, pg. 5). Brooks affirmed he would take other prescriptions if his doctor told him it was his only choice. (#172-53, pg.7). Brooks agreed to take any medications prescribed. (#172-53, pg. 7-8, 35). Even so, none of these are workplace accommodations, nor did they help to the point of allowing Brooks to perform the essential functions of the position on second shift due to his sleep apnea. Instead, they were focused on shift work disorder. (#177-52, p. 1-3)

The court mainly relies on the October 13 plan for the next two weeks—which was to try rest periods, keep a log of meal times, see Brooks' doctor, then meet again—to determine the city was reasonably accommodating Brooks. However, Brooks' testimony that none of these rose to the level of a reasonable accommodation for his sleep apnea, because they do not allow Brooks to perform the essential functions of the position on second shift. (#172-15, p. 238-239) Further, they were not intended to address his sleep apnea, but instead the newly diagnosed sleep work disorder. Thus, it was error for the court to ignore the summary judgment standard by deciding the city's allegations that these accommodations were sufficient was more credible than Brooks' personal testimony that trying these

accommodations for two weeks did not help enough to be reasonable. (#172-15, p. 36, 239, 366-368)

### C. There was enough time to reasonably accommodate Brooks.

The court tries to ignore Brooks' testimony that the October 13 plan failed to rise to the level of a reasonable accommodation by alleging that there was not enough time for the city to reasonably accommodate Brooks because Brooks went on vacation, then was placed on leave. (#187, p. 19) (#172-15, p. 277-278) (#172-53, p. 38) However, Brooks did not immediately leave for vacation after the October 13, 2017 meeting. His vacation was scheduled for the end of the month. (#172-53, pg. 34) (#177-20, no. 34). There is no evidence that two weeks was not enough time for Brooks and the city to know whether the October 13 plan would work to quell Brooks' disability. The city never argued such. Further, the city had known about Brooks' sleep apnea and its impact on his ability to work other shifts since at least June of 2016. Brooks made his first official accommodation request on June 16, 2017. He was placed on leave on November 13, 2017. A jury could find that this was enough time for the city to reasonably accommodate Brooks' disability but the city refused to do so. Therefore, a reasonable jury could find: the city had known about the condition and that only first shift could mitigate its effects for at least a year before the request was even made; the city had at least five months after the initial request to reasonably accommodate Brooks' condition; at any point in those five months the city could have reasonably accommodated Brooks by placing Brooks on

first shift; the city refused to do so and never found another accommodation. As a result, the city never reasonably accommodated Brooks.

### D. The city failed to engage in the interactive process with Brooks.

After the July refusal to accommodate, the city was required to reengage with Brooks to discuss an accommodation that would work. On August 1, 2017, Brooks' counsel sent correspondence to Newcomb disputing her reasons for denying an accommodation and requested Brooks be transferred to first shift patrol or investigations. (#177-48, p. 1-2). Counsel and the request were ignored. Brooks' counsel sent a follow up with the same request on September 1, 2017. This was also ignored. The city never reengaged regarding sleep apnea. Brooks renewed his accommodation request on September 28. (#177-123) The October 13 meeting only dealt with shift work disorder. (#172-53). Due to this alone, a reasonable jury could find the city violated its obligations. *See, Kirincich v. Illinois State Police*, 196 F. Supp. 3d 845, 852 (N.D. Ill. 2016) (noting, "[a]n employer 'flunk[s] its obligation under the ADA' when, in the face of a shift transfer request, it refuses to grant the request and then does nothing to engage in finding alternative accommodations."). Given this delay where the city did nothing despite Brooks' efforts and the summary judgment standard, it was absurd for the court to opine that the city did not have enough time to accommodate Brooks.

**Count II – Brooks was disciplined and discriminatorily constructively discharged because of his disability.**

The court errored in granting Defendants' Motion for Summary Judgment on Brooks' ADA Disparate Treatment claim by: (1) denying Brooks the reasonable inferences he was entitled to at summary judgment; (2) failing to recognize that Brooks presented sufficient facts that the city exploited a "known vulnerability;" and (3) failing to consider Burris a comparator.

### A. The court's failure to consider all evidence led it to an absurd result.

The court errored by denying Brooks' the reasonable inferences he was entitled to at summary judgment. The court did so by taking the city's various allegations against Brooks seriously, despite stating that Brooks had presented facts that dispute all of the city's alleged rationales as pretext. This led the court to the absurd result that Brooks could not have been discriminated against because the city alleges he was fired for other reasons. This completely misapprehends the entire question at hand: was Brooks constructively discharged due to his disability or discharged due to misconduct? These are two competing stories that each side had alleged facts to support. The trial court noted that Brooks did not prove the city did not have a reasonable belief that other officers feared retaliation from him. (#187, p. 21) Brooks was only required to point to at least one fact that showed other officers did not fear retaliation. Brooks did just that in pointing to the officer's actual statements about retaliation rather than Baxter and Newcomb's reports

containing misstatements about the interviews with the officers. (#177-60, p. 1-2) (#177-32, p.6-9) (#177-36, p. 8-10) (#172-46, p. 48-49)

As will be described below, a jury could find for Brooks if it finds him credible. Therefore, the reasons for his discharge are a material, factual dispute. That there is a dispute does not preclude Brooks' ability to have a jury determine his credibility. Absurd results to the contrary are likely what led the Appellate Court to note, "[e]vidence is evidence." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016).

**B. Brooks was constructively discharged.**

The above creates a question of fact for the jury as to constructive discharge. Clearly, a reasonable person who was placed on a shift they could not work due to a disability would consider the workplace so unbearable that he had to quit. In finding otherwise, the court wrongfully stated Brooks "introduced no evidence showing that he was facing serious medical problems during the months after his transfer back to the second shift and the only doctor's note in evidence does not support such bold claims" as that Brooks' sleep apnea was killing him. In doing so, the court ignored Brooks' deposition testimony that sleep apnea was killing him (#172-15, p. 20-21, 36, 269, 366), which is enough to create an issue for the jury, by characterizing it instead as his lawyer's statement. Brooks was not required to show his denied accommodation caused serious medical problems but only that the refusal to accommodate prevented him from performing the essential functions of his job. (#172-53, p. 4) The court also ignored a memorandum from Deputy Chief

43

Brecher that notes how Brooks' sleep apnea affects his performance when he is placed on second or third shift, noting Brooks blacked out while driving. (#177-125, p. 2). Brooks did note this in regard to his transfer back to second shift (#172-15, p. 36) where Brooks noted any change from first shift after May 1, 2017 would have ended his career and maintained second shift caused the most sleep related issues. (#177-13 ¶74) Given these facts, a reasonable jury could find Brooks' sleep apnea was such that he physically could not work second shift and any reasonable person placed in his scenario would have been forced to quit.

Further, the court failed to consider *Owusu v. Cook Cnty.*, 211 F. Supp. 3d 1004 (N.D. Ill. 2016), which suggests shift changes that exploit a "known vulnerability" may be actionable as an adverse employment action outside of the retaliation context. Thus, there is a case within the Circuit that applies *Porter v. City of Chicago*, 700 F.3d 944 (7th Cir. 2012), in the manner Brooks asked. Regardless, the court's misapplication of *Porter* reaches an absurd result by failing to consider the above to be discrimination. The very purpose of the ADA is to protect employees from intentional discrimination against a known disability.

The court's other rationales for rejecting Brooks' constructive discharge claim are also disputed by material facts. Brooks did not retire to simply avoid a potential termination and loss of insurance. The city kept pursuing the pretextual investigation against Brooks in an effort to remove his insurance. (#177-116, p. 1-2) Further, Policy 339.7 notes that resignations or retirements shall not serve as grounds for the termination of an investigation or of pending discipline. (#172-80, p.

8) Brooks had no compensation for 4 months. Likewise, the commission would have had no effect on the city's refusal to allow Brooks to work first shift, so Brooks would have still been forced to retire even had he fought the pretextual charges before the commission and won.

### C. Burris is a valid comparator for Brooks.

The court found that Burris was not a comparator with Brooks because "his misconduct was substantially different and less serious than what Brooks was accused of." (#187, p. 40)

This improperly ignores that Burris lied during the April 2017 investigation but was not disciplined for it. Brooks was accused of lying which was used in part as a pretext to strive to terminate him. (#177-131) (#177-132, p. 1-2, 14) (#172-75, p. 3, 8-9) (#177-138, p. 6-9)

The city repeatedly stressed that it was because Brooks lied (as well as Simmons), and not necessarily because of the misconduct, he had to be fired. The city used this distinction to separate Brooks' (and Simmons') alleged misconduct from all the other officers (who lied) as justification progressive discipline was inappropriate. Brooks and Simmons could not continue to be police officers because of "the lying" and the city's obligation under *Brady*. (#172-29, p. 15) (#172-29, p. 17) (#172-56, p. 1-12) (#177-132, p. 1) What the Court ignored regarding the comparators, including Burris, was that there was evidence of lying on the part of other officers, yet the city ignored it. If Simmons lied about making breast comments, then Richardson must have lied when he said Simmons did not make

45

the comments. There is no evidence that the city took any action against Richardson for lying. Similarly, Dossey admitted he has never made a disclosure to the State's Attorney as required by *Brady*. (#172-35, p. 79-80) The trial court failed to grasp that "lying" was only a concern for the city when it involved Plaintiffs, but not other officers not within a protected group.

Further, a reasonable jury may find that sexual comments in the workplace are more serious than pointing out that your supervisors had lied about you, following Pekin Police Rules and Regulations 400.10(2), and telling your co-workers to always tell the truth, which is exactly what Brooks did. By instead characterizing Brooks' conduct as "spreading insubordination, improperly copying and removing disciplinary and personnel records, and pressuring subordinates into supporting his case," the court failed to construe all facts and draw all inferences in the light most favorable to Brooks. Even so, a reasonable jury could still find that lying and sexual comments are more damaging to the workplace than what Brooks is pretextually accused of.

The court also only referred to Burris' comment about Simmons, ignoring his mistreatment and abuse of Officer Taylor and other officers. (#187, p. 40) (#177-138, p. 2-3)

## Count III – Brooks was discharged in retaliation for his accommodation requests and his complaints of discrimination.

The court admits Brooks can make a prima facie case of retaliation. However, it wrongfully claims that he cannot show pretext.

First, the court inexplicably found that "Brooks argues at most that the city should not have suspended or threatened to terminate him for these offenses, and not that these reasons were a lie to justify their true retaliatory and discriminatory purpose." (#187, p. 48) Brooks has always maintained that the city lied to cook up the allegations and an investigation as a pretext to discharge him as explained above. (#172-43) (#177-10) (#177-106)

Second, the court claims that the best Brooks can do is to show that he was making insubordinate comments to other officers denigrating the city's administration. However, in the comments the court is referring to, Brooks merely was conveying that the city's administration lied about him as a pretext to initiate his discharge.

Third, the court claims Brooks "has no evidence showing that those officers and the city did not legitimately fear retaliation from him" or that Baxter and Dossey did not believe the retaliation concerns were reasonable. However, Brooks maintains that he did not even have the authority to do anything but on the spot corrections for minor incidents.(#187, p. 48) Brooks had to send anything serious in a report to the Chief. (#172-79, p. 7, 300.3(20)). Thus, the city and the officers knew that Brooks could not retaliate even if he wanted to and they could not have truly feared retaliation.

Fourth, the court claims "Brooks undisputedly had access to at least one record that should have been destroyed years before he prepared his rebuttal to the allegations against him." (#187, p. 48) This refers to VonRohr's letter of reprimand,

which should have been destroyed after 18 months instead of remaining in the lieutenant's office where it was accessible to all of the lieutenants and chiefs. However, destroying the letter was not Brooks' responsibility. (#172-61, p. 44)  The reprimand was dated September 7, 2007. Eighteen months after its issuance by Lt. Gleason, Brooks held the rank of sergeant and had no access to the documents kept in the lieutenants' office. (#177-31) (#177-13, ¶56) Further, that Brooks provided the records to his employer who already knew about VonRohr's reprimand is not a violation of the Illinois Personnel Record Review Act, which prohibits disclosure to a third party. 820 ILCS 40/7(1). Brooks could not have "published" this document as the court claimed. (#187, p. 36, fn. 21) As a result, a reasonable jury could find that it was pretextual to blame Brooks on this basis and that the city could not have truly believed Brooks violated department policies or the law.

Fifth, the court claims Brooks "cannot show that the city did not honestly believe that he was responsible for Melton's missing FTO file." (#187, p. 48) However, Brooks denies having access to Melton's FTO file. Baxter was the FTO program director who maintained the FTO files. Furthermore, just because a file is missing does not mean that Brooks took it. Brooks denied doing so at his deposition. (#172-15, p. 50-51) Additionally, the city did not accuse Brooks of taking Melton's FTO file in its Motion or Reply. Therefore, a reasonable jury could find that it was pretextual to blame Brooks on this basis, that the city could not have truly believed Brooks took the file, and the city does not even maintain that Brooks took Melton's FTO file.

Sixth, the court claims Brooks' "deposition testimony clearly indicates that he emailed several records to his personal email address in violation of city policies." (#187, p. 48) However, Brooks was never accused of providing the records to anyone outside of his employer. (#172-75) Further, Brooks notes that officers were encouraged to check their email and work on department business at home. As a result, a reasonable jury could find that it was pretextual to blame Brooks on this basis and that the city could not have truly believed Brooks violated any law or policy by forwarding records to his personal email address so he could work from home. On January 9, 2018, Baxter ordered Brooks to submit a response to Newcomb's report within the next 24 hours. Since Brooks was banned from city property, the only way for him to do so was via his home computer and department email account. (#177-134)

## CONCLUSION

Plaintiffs-Appellants, John Brooks and Gregory Simmons request that the Court reverse the District Court's dismissal of Count1-4 and remand the cause for further proceedings.

John Brooks and Gregory Simmons,
Plaintiffs-Appellants

By: /s/ Julie L. Galassi
    One of the Attorneys for
    Plaintiffs-Appellants

JULIE L. GALASSI, Esq., Bar No. 6198035
HASSELBERG, ROCK, BELL & KUPPLER, LLP

49

Associated Bank Building, Suite 200
4600 N. Brandywine Drive
Peoria, Illinois 61614
Telephone:   (309) 688-9400
Facsimile:   (309) 688-9430
Email:      jgalassi@hrbklaw.com


JAMES L. HAFELE, ESQ., BAR NO. 1096834
HALL RUSTOM, LLC
316 SW Washington St., Ste.1A
Peoria, IL 61602
Telephone: (309) 699-4691
Facsimile: (309) 699-4693
Email: hafele@hallrustom.com

**FED. R. APP. P 32(g) CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and the word limit of Cir. R. 32(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

 X  this document contains 12,972 words, **or**

___this brief uses a monospaced typeface and contains [state the number of ] lines of text.


2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5), Cir. R. 32(b), and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

__this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO in 12-point Times New Roman type, **or**

 X this document has been prepared in a monospaced typeface using Microsoft Word with 12-point Century type


(s) */s/ Julie L. Galassi*_____    Attorney for Plaintiffs-Appellants

Dated: 8/03/2023

## CERTIFICATE OF SERVICE

The undersigned, counsel for the Plaintiffs-Appellants, John Brooks and

Gregory Simmons, hereby certifies that on August 3, 2023, the Brief with Required

Short Appendix and separate Supplemental Index were filed electronically with the

Clerk of the Appellate Court of Illinois.

Dated August 3, 2023.


John Brooks and Gregory Simmons,
Plaintiffs-Appellants


BY: /s/ Julie L. Galassi
        Attorney for Plaintiffs-Appellants


JULIE L. GALASSI, Esq., Bar No. 6198035
HASSELBERG, ROCK, BELL & KUPPLER, LLP
Associated Bank Building, Suite 200
4600 N. Brandywine Drive
Peoria, Illinois 61614
Telephone:   (309) 688-9400
Facsimile:   (309) 688-9430
Email:       jgalassi@hrbklaw.com

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the appendix.

John Brooks and Gregory Simmons,
Plaintiffs-Appellants

BY: /s/ Julie L. Galassi
Attorney for Plaintiffs-Appellants

JULIE L. GALASSI, Esq., Bar No. 6198035
HASSELBERG, ROCK, BELL & KUPPLER, LLP
Associated Bank Building, Suite 200
4600 N. Brandywine Drive
Peoria, Illinois 61614
Telephone:    (309) 688-9400
Facsimile:    (309) 688-9430
Email:    jgalassi@hrbklaw.com

## REQUIRED SHORT APPENDIX

### TABLE OF CONTENTS

DISTRICT COURT TEXT ORDER REGARDING PLAINTIFFS' MOTION TO AMEND/CORRECT RESPONSES, February 2, 2023.......................................P1

DISTRICT COURT ORDER AND OPINION, May 10, 2023..............................P4

JUDGMENT, May 11, 2023.........................................................................P69

| From: | ECF_Returns@ilcd.uscourts.gov |
|---|---|
| To: | ECF_Notices@ilcd.uscourts.gov |
| Subject: | Activity in Case 1:18-cv-01334-JES-JEH Brooks et al v. City of Pekin et al Order on Motion for Leave to File |
| Date: | Thursday, February 2, 2023 10:27:10 AM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**CENTRAL DISTRICT OF ILLINOIS**

**Notice of Electronic Filing**

The following transaction was entered on 2/2/2023 at 10:25 AM CST and filed on 2/2/2023
**Case Name:**          Brooks et al v. City of Pekin et al
**Case Number:**      1:18-cv-01334-JES-JEH
**Filer:**
**Document Number:** No document attached

**Docket Text:**
**TEXT ONLY ORDER: For the sake of docket clarity, the Court will recite the background to Plaintiffs' latest request in [183]. On 9/30/2022, Defendants filed their Motion [172] for Summary Judgment. After extensions of time were granted for Plaintiffs' Response and Defendants' Reply, Defendants filed their Reply [180] in support of their Motion for Summary Judgment on 1/4/2023. Two days later, Plaintiffs filed a Motion [181] to Amend/Correct Response [175] to Defendants' Motion for Summary Judgment. Plaintiffs asked to amend around 13 record citations and Defendants did not object so long as it did not change the substance of Plaintiffs Response or require Defendants to file an amended reply. On 1/13/2023, The Court granted Plaintiffs' motion [181], struck [175], and directed Plaintiffs to file their proposed amended response within 5 days. On that due date, rather than filing the amended response as described, Plaintiffs filed a Response [183] to their Motion [181] to Amend/Correct [175] Response to Motion *for Summary Judgment Citations*. The "Response" [183] asks the Court for leave to file a second amended response and amended exhibits to Defendants' Motion for Summary Judgment. Therefore, the Court construes [183] as a Motion.**

**Due to the way Plaintiffs incorrectly filed the above Motion, Defendants properly filed a Motion [184] for leave to respond to Plaintiffs [183]. Defendants' request is granted and the Court will consider [184-1] as a Response to Motion**

[183]. Plaintiffs' counsel should be well-aware that their "Response" [185] to Motion [184] was also improperly filed. [185] is a Reply to Plaintiffs' [183]; therefore, it should have been filed as a motion for leave to file a reply. *See* CDIL-LR 7.1(B)(3). Counsel's repeated and blatant disregard for the Local Rules and for proper docketing are not well-taken. The Court would strike [185] but it is unnecessary to add further confusion to the docket, because, for the reasons below, Plaintiffs request for leave in [183] is DENIED.

Plaintiffs base their request on Federal Rule of Civil Procedure 56(e) and that they "may" be prejudiced if the court does not allow them to file a Second Amended Response. Doc. 183. Defendants object to Plaintiffs' request for various reasons: the age of the case, the weeks Plaintiffs had to catch their errors, the amount of time Defendants spent replying to Plaintiffs' original response, the sheer volume of proposed changes, and the time it would take to scrutinize and compare all 251 pages of the new response. Doc. 184-1. They also provide examples of how many new additions are not just typographical corrections but an attempt to re-write their response or file a sur-reply by adding additional record citations for support or cite exhibits that change the substance of their original proposed fact.

Neither party can find a case where a court has allowed a non-movant to amend their response after having reviewed the defendant's reply to summary judgment. Nonetheless, it is well-settled district courts have discretion to manage their dockets and strictly enforce their local rules and summary judgment rules. *See e.g., Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 537 (7th Cir. 2011) (affirming a district court's decision to deny a plaintiff's motion for leave to file a response with excess pages). Federal Rule of Civil Procedure 56(e) emphasizes the Court's discretion at summary judgment. When "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the court may: " (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials including the facts considered undisputed show that the movant is entitled to it; or (4) issue any other appropriate order. " Rule 56(e).

The Court already gave Plaintiffs ample opportunities by granting them two extensions of time to file their original response brief, choosing not to strike Plaintiffs' original exhibits to their response for being filed a day late, and allowing Plaintiffs to re-file their exhibits when they had trouble with the original filing. Then, after Defendants had filed their Reply, the Court allowed Plaintiffs to amend their Response brief to update about 13 record citations. Now, over two months after filing their original response, Plaintiffs would like yet another opportunity to change their response to include what appears to be, hundreds of record citation changes and five new exhibits. Notably, Plaintiffs only contend there is an unidentifiable risk of prejudice. Defendants have already replied to a 245-page response brief and thousands of pages of cited exhibits. It would be prejudicial to force them to do so a second time simply because of Plaintiffs' lack of diligence, for which they have offered no

good cause justification. **Based on the age of this case, the extraordinary length of the summary judgment briefing, the trial schedule which has already been adjusted because of the briefing, and the opportunities Plaintiffs were previously allowed, Plaintiffs' request to file yet another amended response is denied.**

**Finally, although Plaintiffs waived their opportunity to file their first amended response by instead asking to file a second amended response, the Court will give them one last chance. Within 3 days of this Order, Plaintiffs may file the first amended response that the Court previously granted them leave to file.** *See* **Text Order dated 01/13/2023. The Amended Response may only include the updated citations, as set out on pages 2 and 3 in Plaintiffs' first motion [181] to amend. No other citation updates or substantive changes shall be included. If Plaintiffs choose to again ignore the Court's instruction and ask for something else, then the Court will consider this matter fully briefed without any response from Plaintiffs to the Summary Judgment Motion. Entered by Judge James E. Shadid on 2/2/2023. (GN)**

**1:18-cv-01334-JES-JEH Notice has been electronically mailed to:**

Christopher H Sokn    chsokn@kdwolaw.com, aabrown@kdwolaw.com

James L Hafele    hafele@hallrustom.com, mercedesgonzalez@ksswf.com

Julie L Galassi    jgalassi@hrbklaw.com, aswearingen@hrbklaw.com

Melinda L Mannlein    mmannlein@hrbklaw.com, aswearingen@hrbklaw.com

Philip M O'Donnell    pmodonnell@kdwolaw.com, hemeldrum@kdwolaw.com, madavidson@kdwolaw.com, philodonnell@sbcglobal.net

**1:18-cv-01334-JES-JEH Notice has been delivered by other means to:**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

JOHN BROOKS, and )
GREGORY SIMMONS, )
)
Plaintiffs, )
)
v. ) Case No. 18-cv-1334-JES-JEH
)
CITY OF PEKIN, ET AL, )
)
Defendants. )

## **ORDER AND OPINION**

This matter is before the Court on the Defendants' Motion for Summary Judgment. Doc. 172. The Plaintiffs filed their Response (Doc. 186) in Opposition and supporting Memorandum of Law and supporting exhibits (Doc. 177).[1] The Defendants filed their Reply. Doc. 180. For the reasons set forth below, Defendants' Motion (Doc. 175) is GRANTED IN PART and DENIED IN PART.

## **Background**

### A.  Procedural Background

This case has been extensively litigated for four and a half years. It began on September 14, 2018, when Plaintiffs John Brooks ("Brooks") and Gregory Simmons ("Simmons") filed a seventeen count complaint against the City of Pekin ("the City" or "Pekin") and four Pekin employees: Pekin Chief of Police John Dossey ("Chief Dossey" or "Dossey"), Pekin Deputy Chief of Police Donald Baxter ("Deputy Chief Baxter" or "Baxter"), Pekin Director of Human Resources Sarah Newcomb ("Newcomb"), and Pekin Police Officer Jennifer Melton ("Officer Melton" or "Melton"). Doc. 1. On September 30, 2019, Plaintiffs filed the operative complaint in

---

[1] See the Court's 2/2/23 Text Order for background context.

this proceeding, the Second Amended Complaint.[2] Doc. 37. The Second Amended Complaint contains thirteen (13) counts against the same Defendants.

Counts I-III allege that Brooks is disabled as he suffers from sleep apnea and that City failed to provide a reasonable accommodation (Count I); that he was disciplined and constructive discharged discriminatory because of his disability (Count II) and in retaliation for his requests for accommodations and complaints he filed internally and with the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Commission ("EEOC") (Count III).

Count IV alleges that Simmons' discipline and termination were in retaliation because he complained internally of sexual harassment he experienced. Count XII alleges that Brooks was disciplined and constructively discharged in retaliation for exercising his rights under Title VII by filing a retaliation complaint with IDHR and the EEOC.[3]

Counts V, VI, IX, and X allege that Simmons' and Brooks' discipline and termination and constructive discharge, respectively, were the result of unlawful age discrimination. Brooks (Count V) and Simmons (Count VI) charge the City with violating rights under the Age Discrimination in Employment Act ("ADEA"). Brooks (Count IX) and Simmons (X) charge Defendants Dossey, Baxter, and Newcomb with violating the Equal Protection Clause of the Fourteenth Amendment on age discrimination grounds.

---

[2] Confusingly, the Second Amended Complaint (Doc. 30) is the third amended complaint Plaintiffs filed. Plaintiffs filed their first Second Amended Complaint (Doc. 30) on September 11, 2019. Subsequently, Plaintiffs sought leave to amend their complaint to include an additional claim under the Illinois Wage Payment and Collections Act and the Court granted this request. When Plaintiffs chose to file the third amended complaint, they captioned it the Second Amended Complaint (Doc. 37). The court will refer to this document, which is in effect the second Second Amended Complaint, solely as the Second Amended Complaint for the sake of clarity. This also avoids confusion with the Third Amended Complaint (Doc. 95) which Plaintiff were denied leave to file.
[3] This count initially also included the alleged retaliation underpinning Brooks' Title VII retaliation complaint. Doc. 1. That portion of the count was dismissed with prejudice and the claim continues solely based on the post-charge filing retaliation. Doc. 24.

In Count VIII, Simmons alleges a Due Process claim based on Pekin's refusal to pay retiree insurance benefits allegedly owed under a collective bargaining agreement ("CBA").

The Plaintiffs also bring several state law claims. In Count VII, Simmons alleges a state law Intentional Interference With Employment Relations claims against Officer Melton. In Count XI, Simmons brings a state law Breach of Contract claim on the same theory as his due process claim. In Count XIII, Brooks brings a claim under the Illinois Wage Payment and Collections Act ("IWPCA"), alleging that Pekin owes him payment for additional sick days he did or should have accrued.

### B.  Rule 56 and Local Rule 7.1(D)

Before discussing the undisputed facts, the Court addresses Plaintiffs compliance with the rules for summary judgment as set out in Federal Rule of Civil Procedure 56 and Local Rule 7.1(D). These issues began with the filing of the summary judgment briefing in this case. Plaintiffs filed their Response (Doc. 175) to Defendants' Motion for Summary Judgment on November 14, 2022. Plaintiffs' response was extensive and came out to nearly 245 pages. Defendants filed their Reply (Doc. 180) on January 4, 2023. Two days after Defendants filed their Reply, Plaintiffs sought leave to amend to correct roughly 13 citations. *See* Doc. 181. Defendants indicated that they did not object so long as the corrections did not require them to duplicate the extensive effort they'd invested in preparing their responses to Plaintiff's 440+ additional material facts for their Reply. *See* Doc. 182. The Court granted leave for Plaintiffs to file their amended summary judgment motion with the 13 citation corrections. *See* Text Order Dated 1/13/2023.

Instead of filing that amended response, Plaintiffs filed a second motion for leave to file an amended response. Doc. 181. Their motion indicated that in preparing their amended

response, they discovered "significantly more miscites to the record than previously identified" caused by the "utilization of multiple proofreaders some of whom used incorrect or outdated exhibit lists" as well as problems from "internal electronic uploading of text and exhibits." Doc. 181 at 2. They included their proposed amended response, which was six pages longer than their already lengthy prior response, made changes throughout their statement of facts, and included eight new exhibits or portions of exhibits. Plaintiffs offered to reimburse Defendants for the expense of replying to their newly amended response. Defendants objected to this and the Court, acting on its well-settled authority to enforce local rules and manage its docket, denied Plaintiffs motion and allowed them only to file the first amended response they had sought and been granted leave to file. *See* Text Order Dated 2/2/2023.[4] Plaintiffs did so. Doc. 186.

Plaintiffs' noncompliance with local rules and summary judgment pervades their response, even with the corrections they were allowed to make and those they attempted. They spend much of their responses to Defendants Undisputed Material Facts and their Additional Material Facts arguing about whether the investigation and discipline of Brooks and Simmons complied with the Uniform Peace Officers Discipline Act ("UPODA"), 50 ILCS 725/1-1 *et al*, which is of dubious relevance[5] and which they never reference or explain in their actual argument. The Court noted noncompliance in more than 70 of Plaintiffs Additional Material Facts, including citing documents which do not support some or any of the facts Plaintiffs allege, rewriting quotes- sometimes fully inverting their meaning[6], and repeatedly citing to the entirety

---

[4] In particular, this Court took umbrage at the extent to which Plaintiffs' amended response went beyond merely correcting citations and re-wrote or supplemented their brief based on issues identified by the Defendants in their reply.

[5] See n. 21 below.

[6] For example, Plaintiffs counsel asked Baxter at his deposition why he thought Simmons alleged comments on Melton's breasts were worse than what Burris did. Baxter testified that "[w]here I see the difference in the two things is this is sexual harassment directed directly at the female" in clear reference to the Melton comments. In Plaintiffs Material Fact ¶328, Plaintiffs cut out just the "this is sexual harassment" and inaccurately claim that he was referring to Burris's comments to Simmons rather than Simmons comments to Melton.

of lengthy documents or even entire hundred plus page depositions without identifying specific

portions that prove or disprove specific facts[7].  Plaintiffs seek to introduce most of their

comparator evidence through Brooks' affidavit in the form of inadmissible hearsay without

explanation or support as to how Brooks would have personal knowledge of these facts. Of

particular concern, given the three Americans with Disabilities Act ("ADA") claims at issue,

Plaintiffs repeatedly include statements by Brooks' physician over a period of years which are

not found in any of the included exhibits. The only exhibit included from Brook's doctor is a

single 2017 report that does not support half of the conclusions Plaintiffs cite it for.

When "a party fails to properly support an assertion of fact or fails to properly address

another party's assertion of fact," the court may: " (1) give an opportunity to properly support or

address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary

judgment if the motion and supporting materials including the facts considered undisputed show

that the movant is entitled to it; or (4) issue any other appropriate order." Fed. R. Civ. P. 56(e).

Given Plaintiffs' struggles so far in the summary judgment process, the Court finds that the

appropriate remedy is to treat as undisputed those facts that Plaintiffs failed to adequately

establish rather than allow them to replead to correct these issues or an alternative remedy.

C.  Factual Background

The Court takes the following facts from the parties' summary judgment briefs and the

supporting exhibits. Unless otherwise noted, the following facts are undisputed.

---

[7] See Plaintiff's AMF 212 (citing Doug Vogel's entire 40 page deposition for the fact that Doug met with Baxter and
City attorney Herman on June 13); Plaintiff's AMF 253 (citing the entire 31 page transcript of Brook's 6/8/17
interview for the proposition that he gave several reasons why Melton would lie about her charges against
Simmons); Plaintiff's AMF 303 (citing Brook's 77 page rebuttal to Newcomb's 40 page report and claiming that his
rebuttal corroborated "the majority of his allegations" without identifying any specific allegations and which page(s)
in the rebuttal corroborated them).

Plaintiff Gregory Simmons became a police officer in 1991 after serving in the United States Marine Corps. Simmons began working as a Pekin police officer in 1995. Simmons was elected to the police officer's union labor committee in 2005. Simmons was placed on unpaid medical leave between 2006 and 2008.[8] Simmons alleges that his work on the labor committee and the incidents underlying his 2006-08 leave resulted in him having a rocky relationship with Department leadership.

Plaintiff John Brooks became a law enforcement officer in 1990 after serving in the United States Navy. Brooks began working for the Pekin Police Department in 1995 and was promoted to sergeant in 2005 and lieutenant in 2012. Like Simmons, Brooks had a history of service with the officer's union prior to his promotion that put him at odds with the Department's leadership. Brooks suffered from sleep apnea since at least 2003. At that time, Brooks had a few incidents of falling asleep while driving when he worked the Department's third shift.

<u>The Contentious Working Relation Between Simmons and Lieutenant Greg Burris</u>

Prior to October 2015, Simmons started working under Lieutenant Greg Burris ("Burris" or "Lieutenant Burris") on the first shift. Simmons and Burris had an acrimonious and hostile working relationship. Once, Burris threatened to tase Simmons and then did so over Simmons objections.[9] Simmons was elected to the Pension Board in 2014 and Burris was elected to the Board in 2016. Simmons alleges that while they were both on the Pension Board, Burris would ask Simmons to work on pension work while on the clock, including menial work, and would

---

[8] Simmons alleges that he was placed on leave because he refused to accept a promotion in exchange for helping then Chief Gillespie overcome a vote of no confidence. Defendants dispute that this occurred and that it has any relevance.
[9] The Defendants contend that Simmons was wearing a vest and so couldn't be fully tased, but do not appear to dispute that the incident occurred.

disrespect and belittle Simmons. Simmons claims that he had to leave the Pension Board to avoid this treatment.

In October 2015, Burris was ordered by Deputy Chief Kaminski to look into a citizen complaint against Simmons involving a local restaurant, Andy's Diner. The exact details of the complaint and Simmons' underlying conduct is heavily disputed by the parties. Both parties agree that Simmons would frequently eat at Andy's Diner, often with his coworker Officer Richardson and others. In Simmons' retelling, Simmons had a friendly relationship with the Diner's owners and waitstaff and on one occasion a waiter named Cameron brought Simmons a donut with bright pink frosting which "jokingly impl[ied] that Simmons was a homosexual." Plaintiff's AMF ¶30. Simmons told Cameron "[t]hat is funny, just like your pink shirt is funny" and subsequently teased Cameron over his pink shirt. In Defendant's telling, Burris spoke with multiple employees at the Diner who told him that Simmons, in duty and on uniform, had been making comments about the sexuality of multiple teenage employees for at least seven months. Defendant's UMF ¶7. This included once telling the waitstaff that he did not want a homosexual employee to serve him; harassing two male employees, one of whom is homosexual and one not, about being in a relationship; and telling Cameron that he had a "fuck boy haircut." Defendant's UMF ¶69. Simmons either received no discipline or a verbal reprimand as a result of the complaint. *Compare* Defendant's UMF ¶12 *with* Plaintiff's AMF ¶42, 45.

<u>Burris Discusses Simmons' Sex Life At A Shift Briefing And Is Disciplined</u>

Prior to December 2016, Simmons began dating a woman named Ina. AMF ¶67. Burris knew Ina from the community. Ina had minor surgery to cauterize multiple apparent brain aneurysms. While Ina and Simmons were dating, Burris approached Simmons in the squad room and told him that "if you are after Ina's money you had better watch it because I'm going to have

her back. And you had better not fuck her over, and you better not…." At a shift briefing in December 2016, Burris asked Simmons about his relationship with Ina and whether Simmons had sex with her. Burris went on to say that Ina was a wild child and suffered from brain damage. The parties dispute whether Burris's comments were light-hearted and joking or angry and abusive, and whether the atmosphere at the briefing was jovial and laughing or tense and uncomfortable. Simmons complained about these comments to his Sergeant on December 16, 2016. Deputy Chief Baxter spoke with Simmons and Burris about the incident and Burris claimed the comments were joking and in line with other officers' conduct at the briefing. Burris was ultimately disciplined for this incident and was docked two paid personal days 'he had accrued.

Burris and Simmons continued to not get along. Simmons claims that Burris was hostile to him on several occasions in the following months, though none of it was sexual or motivated by Simmons' sex or sexual identity. On April 7, 2017, Burris again asked Simmons questions about his sex life at a shift briefing. Burris asked Simmons if he was "fucking that Iraqi? You know that is Baxter's girl and that could cause some problems." Deputy Chief Kaminski conducted an investigation into Burris's conduct, including an interrogation of Burris on April 12. Burris denied making the statements, but they were confirmed by several officers who were present. Kaminski was unable to determine Burris's credibility and one of the witnesses was close friends with Simmons, but another was an independent witness whose version of events aligned with Simmons. Chief Dossey and Deputy Chief Kaminski agreed that Burris needed to be disciplined. Burris was given the options of resigning, facing discipline up to and including termination at a hearing of the Police and Fire Commission, or accepting a "Last Chance

Agreement" in which he would be suspended without pay for 21 days and be demoted from Lieutenant all the way down to Patrolman. Burris accepted the 21-day suspension and demotion.

<u>Brooks Becomes First Shift Lieutenant</u>

With Burris's demotion, there was an opening for a first shift Lieutenant. The first shift is from 7:30 AM to 2:30 PM, while the second shift runs from 2:30 PM to 10:30 PM. Brooks preferred to work the first shift to avoid issues with his sleep apnea, though he had worked the second and third shift for many years, including those directly leading up to the case. Brooks was the Lieutenant with the most seniority after Burris's demotion, so he had the option to take over the first shift under the Department's seniority policy.

Brooks became the first shift Lieutenant on May 1, 2017. On that day, Brooks made several comments at shift briefing the exact nature of which the parties dispute, but which included comments on how he felt Burris had mistreated officers while Lieutenant and commenting on union business, though Brooks maintains that this was only because the officers asked him to do so because of his time working with the union. The next day, Brooks again commented on union business and again the parties dispute whether this was at the request of the officers. At that briefing, Brooks also asked Officer Taylor twice if "the drapes match the carpet" in reference to his pubic hair, though Brooks contends that other officers were making similar comments and Officer Taylor had no issue with it. On May 4, Deputy Chief Baxter recommended Brooks receive a written reprimand for making inappropriate comments and commenting on union business. Brooks received a Letter of Reprimand for this conduct on May 9, which he appealed, and which was ultimately upheld as appropriate by the Pekin City Manager.

As first shift Lieutenant, Brooks oversaw Simmons and Officer Jennifer Melton. Brooks and Simmons were good friends, as were Melton and Burris. Brooks alleges that he was told to look out for any retaliation against Simmons because of Burris's demotion. On May 5, 2017, Melton called Simmons a jackass. Brooks learned of the comment and recommended that she be disciplined and receive counseling as a result. Melton received a reprimand that was entered in the department's tracking software and she received counselling for the incident on May 22.

<u>Melton Reports Simmons For Alleged Inappropriate Comments About Her Breasts</u>

On May 24, Melton told Deputy Chief Baxter that Simmons had made inappropriate comments about her breasts in March 2017. Plaintiffs dispute whether Melton stated from the beginning that there were two such incidents, or whether she initially only mentioned a March 25 incident at Steak 'n Shake and only later, in June, claimed that there was an additional incident on March 3. Simmons has consistently denied making any of the comments attributed to him on either occasion.

In the March 3 incident, Simmons allegedly told Melton "Jen I didn't realize that you had such big boobs" in the squad room while Melton's husband Chuck was present. Simmons is also accused of making a hand gesture to indicate the size of her breasts that Chuck Melton observed. The parties dispute whether Chuck Melton's testimony at Simmons' termination hearing and deposition corroborates Officer Melton's account of this incident.

In the March 25 incident, Simmons, Melton, and Officer Richardson were having lunch at Steak 'n Shake when they had a conversation with a civilian named Doug.  During this conversation, Melton claims that Simmons told Doug that she had big boobs under her vest and made a hand gesture describing the size of her breasts. Richardson testified at his deposition that he did not believe that Simmons made any such comment.

On May 26, Baxter ordered Brooks to look into the matter.[10] Brooks asked Simmons and Richardson, who both denied that Simmons made the statements. Brooks asked Melton, who gave her version of the story and told him that Doug was a witness. Brooks relayed this in an email to Baxter on Baxter's request. At this point, Baxter decided to seek out the civilian witness, Doug. The parties dispute Baxter's reason for doing so.[11] Baxter determined that the witness was Doug Vogel, a local man with unspecified mental impairments, and spoke with him. Baxter and Doug had an initial unrecorded conversation and then Baxter took a recorded statement from Doug on the incident. The parties dispute the nature of Baxter and Doug's unrecorded conversation.[12] During the recorded conversation, Doug said that Simmons had commented on Melton's breasts on the date in question and that it made him uncomfortable. Baxter requested that Melton send him an email documenting her version of the event, which she did on May 27.

### Simmons Is Interrogated About Melton's Allegations

On June 6, 2017, Simmons received a formal Notice of Interrogation ("June 6 NOI") and was placed on paid administrative leave. The June 6 NOI indicated that it was based on Simmons' "conduct and comments with respect to the physical attributes of a fellow officer" on March 3 and March 25.[13] It included that Simmons was "ordered to refrain from discussing this

---

[10] Plaintiffs maintain that Baxter only told Brooks about the Steak 'n Shake incident, not the March 3 incident, and that Baxter did not tell Brooks that there was a civilian witness or that he should speak to the witness.
[11] Plaintiffs state that he did so because he saw an opportunity to "get back" at Simmons by manipulating Vogel into testifying against Simmons. Defendants claim that Baxter knew that either Simmons or Melton was lying to him as their stories were inherently contradictory, and so he decided to track down an unbiased witness.
[12] Plaintiffs attempt to imply with no evidence that Baxter somehow coerced, pressured or tricked Doug Vogel into believing and stating that Simmons commented on Melton's breasts. Defendants contend that the initial conversation was simply Baxter asking Doug what happened and then asking him if he would consent to being recorded. The only evidence that Plaintiff has for this serious allegation of misconduct is their contention that Vogel gave different and potentially inconsistent versions of his testimony in the ensuing five years, including signing a written statement prepared by Simmons' lawyers where he claimed that he, himself, had made the comments on Melton's breast. This is an insufficient basis to support a reasonable inference that Baxter engaged in the misconduct alleged. It does, however, create a genuine issue of fact as to what Vogel observed and undermines his credibility as a witness.
[13] Plaintiffs maintain that this notice was inadequate under UPODA. Defendant's state that it was adequate as UPODA only requires the information "be sufficient as to reasonably apprise the officer of the nature of the

investigation or the underlying facts with any other officer until the investigation is concluded or you are otherwise authorized to do so." After receiving the June 6 NOI, Simmons called Baxter to ask what it was about. Baxter did not answer his calls. Simmons then called Brooks. The parties dispute whether this was in violation of the notice's requirement that he not discuss the investigation with anyone and whether Simmons knew or reasonably should have known that he should not discuss the investigation even with his supervising officer. In either case, it is undisputed that the Defendants learned of Brooks' and Simmons' conversation prior to Simmons interrogation because Brooks spoke to Baxter on Simmons' request. On June 13, 2017, Simmons received a revised Notice of Interrogation ("June 13 NOI") that included more detail and granted a continuance requested by Simmons' counsel but was otherwise consistent with the June 6 NOI.

Simmons was interrogated about his alleged comments on Officer Melton's breasts on June 19, 2017. Throughout the interrogation Simmons denied ever making comments about Melton's breasts. Prior to the interrogation, Simmons was given a *Garrity* instruction informing him that he had an obligation to tell the truth. During the interrogation, Simmons was also asked whether he had spoken to anyone about the investigation and the parties dispute whether his answers were truthful. Simmons was asked if he reached out to anyone other than Baxter after being placed on paid leave. Simmons initially answered no, but  upon further questioning said "Uh, I reached out to, I never, I tried to reach out to you" and "I reached out to the Chief [Dossey]." He was then asked "Did you talk to anybody else?" and "Not even Lt. Brooks?", and he answered no to both questions. Simmons said that he talked to Lt. Brooks after being on paid leave "but not about this." Later in the interrogation, Simmons was asked if he talked about "the subject of this investigation with any other officer in the department?" to which he answered no.

investigation." 50 ILCS 725/3.2. Plaintiff ultimately fails to raise these procedural issues in their argument and thus fail to show why they are evidence of the discrimination and retaliation claims actually at issue in this case.

In their response to Defendant's Undisputed Material Facts and in their Additional Material Facts sections, Plaintiffs argue that it is unclear whether Simmons was referring to the June 6 NOI or the June 13 NOI and whether Simmons believed that the word "officers" in the June 6 and June 13 NOIs only referred to patrolmen not command officers. Plaintiffs also assert that asking what the investigation was about was not discussing the investigation.[14]

During Simmons' June 19 interrogation, his counsel demanded to see a formal sworn complaint. Simmons' counsel took the position that Melton's email was insufficient under UPODA. As a result, the Department called Melton in to sign a formal sworn complaint based on her testimony. Plaintiffs, despite demanding that procedure be followed, suggest that Melton's after-the-fact signing of the sworn statement is evidence of impropriety.

On June 21, Simmons' leave status was changed to unpaid based on the conclusion of the formal investigation. On August 23, 2017, Chief Dossey filed a complaint against Simmons with the Fire and Police Commission regarding his alleged comments about Officer Melton's breasts and his alleged misconduct during the internal investigation.

<u>Simmons Files Charges With IDHR & EEOC</u>

In January 2018, Simmons filed charges with the Illinois Department of Human Rights alleging retaliation because of his complaints against Officer Burris in violation of Title VII. These charges were cross-filed with the EEOC.

<u>The City Learns That Simmons Has Been Secretly Recording Police Meetings</u>

Starting in October 2017, Defendants came to learn that Simmons had been secretly recording police meetings and conversations for nearly a year. The City's risk manager was negotiating a settlement with attorneys for a minor who had been struck by then Pekin Police

---

[14] However, much like their arguments about UPODA violations, Plaintiffs do not raise these arguments properly in the argument section of their brief.

Officer Ujinski ("Ujinski"). During those negotiations, the minor's attorney provided an audio recording in which Chief Dossey referred to the minor as "a piece of shit." The City's risk manager asked Chief Dossey to provide a copy of the recording, and Dossey confirmed that the City was not in possession of any such recording.

This led to an investigation by Deputy Chief Baxter to determine the source of the recording. It was determined that the recording came from a January 11, 2017, shift briefing that Dossey gave on the Ujinski incident and Ujinski's subsequent termination by the Fire and Police Commission. Baxter questioned several officers who denied making the recording and many suspected it may have been Simmons. In conversation with the minor's attorney, the City's risk manager confirmed that the recording came from a male member of the Pekin Police Department and subsequently confirmed that it was Simmons. On August 16, 2017, Simmons filed a complaint against Dossey and Baxter regarding the Ujinski shift briefing. There, he included several direct quotes from Dossey and threatened "to use a different avenue of reporting these incidents" if he did not hear back within a week.

On February 14, 2018, Simmons was served with a Notice of Formal Interrogation regarding the allegations that he'd secretly recorded and leaked the Ujinski shift briefing. In his interrogation, Simmons admitted to recording the shift briefing and sending it to the minor's family and subsequently the minor's attorney. He also admitted that this was not the only meeting he had recorded. He began recording shift briefings and his meetings with department leadership after Burris's comments at the December 2016 shift briefing. He stated that he had to do this to protect himself from retaliation. Simmons said that he had recorded at least 8 briefings or meetings and retained copies of the recordings.

<u>Simmons Is Terminated By The Police and Fire Commission</u>

On February 19, 2018, an amended complaint against Simmons was filed with the Pekin Police and Fire Commission that added allegations about the secret recordings. The Fire and Police Commission held an evidentiary hearing on February 21, 2018. Simmons did not appear for the hearing. He claims that he sought to have the disciplinary charges handled through arbitration rather than through the Commission and that he would have waived his right to arbitration if he attended the hearing.

At the hearing, Officer Melton testified about Simmons' comments on March 3 and March 25, 2017. Officer Melton's husband, Chuck Melton, testified that he witnessed the March 3 comments. Doug Vogel testified that he witnessed Simmons make the alleged comments on March 25 and that they made him uncomfortable. Brooks testified that Simmons denied making the comments and that Simmons had talked to him after receiving the June 6 NOI. Baxter testified about the allegations that Simmons lied in his June 19 interrogation when asked about talking to Brooks. Baxter also testified about the extent of Simmons' recordings and that giving the Ujinski recording to the minor's lawyers was a violation of departmental policy.

On March 13, 2018, the Fire and Police Commission issued its findings of fact and decision on the complaint against Simmons. The Commission ordered that Simmons' employment be terminated. As a result of his termination, the City held that Simmons was not a retiree and therefore refused to pay for a portion of his post-retirement insurance as set out in the CBA between the police officers union.

<u>Brooks Is Transferred To Second Shift Due To Melton's Retaliation Concerns</u>

Shortly after making her initial complaint in May-June 2017, Melton told Baxter that she was concerned that Brooks would retaliate against her due to his close friendship with Simmons. Plaintiffs contend that this concern was invalid as Brooks would not have done so. Baxter

recommended he and Melton meet with Pekin HR Director Sarah Newcomb to discuss the issue. Melton stated that she believed Brooks did not like any of the female Pekin officers and that she had previously transferred from third to first shift to get away from Brooks on the third shift.[15] On June 7, 2017, Brooks was told he would likely be temporarily transferred to second shift because of Melton's concerns about retaliation.

On June 8, 2017, Brooks was interviewed over Melton's complaint against Simmons. When questioned why he thought Melton would make up charges against Simmons, Brooks gave a lengthy answer accusing of her of a history of making crude remarks, flirting, and engaging in lewd conduct with other officers, and more. Brooks may have implied in these remarks that Melton had it coming or was a hypocrite for complaining about others' crude remarks given her reputation. Afterwards, Baxter told Brooks that these comments about Melton crossed a line and he should not have said them.

On June 16, 2017, Brooks was told his transfer to second shift was permanent. That same day, Brooks emailed Deputy Chief Baxter stating that his sleep apnea prevented him from working second shift and requesting to be transferred back to first shift as a reasonable accommodation and for reasons of seniority. Baxter denied the request and Brooks forwarded his original email and Baxter's denial to Pekin's City manager.[16] This resulted in Brooks meeting with HR Director Newcomb on June 19 and being given the City's "Reasonable Accommodation Request Form," which he filled out and returned the next day. Brooks' comments on the form

---

[15] Plaintiffs do not dispute the substance of this meeting but note that it differs from how they allege the department treated Simmons' and Brooks' own concerns about retaliation. The Defendants note that Burris was briefly reassigned to second shift while Simmons second complaint against him was investigated to avoid any potential retaliation by Burris against Simmons.

[16] Defendants attempt to characterize this and Brooks' subsequent requests as solely based on seniority, but his email describes his disability and the issues it causes with his work and directly uses the phrase "'reasonable accommodation" and references the ADA. His inclusion of a second reason for the accommodation does not transform what is clearly a reasonable accommodation request into something else.

were a mixture of asking to be placed on first shift because of his seniority and because of his sleep apnea.

On June 26, Brooks filed two complaints against Officer Melton, Deputy Chief Baxter, and Chief Dossey in which he alleged that he was being harassed, discriminated against, and mistreated. One complaint was about his transfer to second shift, and the other involved a situation in which Brooks was accused of improperly encouraging an officer to file a grievance over a labor issue. HR Director Newcomb investigated Brooks' complaints throughout June and July 2017. She interviewed ten witnesses and spent between ten and forty hours on her investigation. At the conclusion, Newcomb decided that Brooks' complaints of harassment, discrimination, and retaliation were unfounded and substantially uncorroborated by other witnesses or evidence. She determined that Brooks' due process complaints failed because as a commanding officer, he was not in the patrolmen's union and therefore had no guaranteed work assignment and could be assigned shifts as needed. She further concluded that it would be unreasonable to move Brooks back to first shift given Melton's fears of retaliation. Brooks claims that Newcomb's investigation was "a farce and could not lead to any credible conclusions" because he feels that she should have talked to him about the issues in his complaint.[17] HR Director Newcomb did not speak to Brooks about the issues in part because she was advised not to by the City's Labor Attorney; and, in part, because she did not feel a need, given the extensive and detailed facts of his complaints and other communications.

---

[17] Brooks also alleges that she should have interviewed nameless unspecified others who were knowledgeable of the incidents. As he fails to provide an adequate basis for who she could have talked to or admissible evidence that there were specific other people knowledgeable about Brooks issues, Brooks has failed to satisfy the requirements of the Local Rule 7.1(D) and Rule 56 and so the Court disregards this unsupported assertion of fact. To the extent he elsewhere claims that Newcomb failed to interview Officers Palmer or Melton, the evidence properly shows that she did so.

During her investigation, Newcomb reported that she found "several incidents of opposing statements to those Lt. Brooks directly associated with people in his narrative." Upon request, several officers executed sworn statements denying making statements that Brooks had attributed to them in his complaints, including Deputy Chief Baxter, Chief Dossey, as well as Sergeant Rick Van Rohr, Lieutenant Jeffrey Little, and Officer Mike Ward. Brooks disputes whether these sworn denials were accurate and maintains that he did not falsely attribute these statements.

<u>Brooks and the City Discuss Accommodations</u>

On July 12, 2017, Brooks attended a meeting to discuss his accommodation request. The parties dispute what was said at this meeting. The Defendants claimed that Brooks denied needing any accommodation and was just asking for his seniority to be respected and to be returned to first shift on that basis. Brooks contends that this was in response to Newcomb asking if he was requesting that they create a new position, and that he maintained that they did not need to do so and could accommodate his disability through his desired shift change. On July 14, 2017, Newcomb informed Brooks that his request was denied, and she believed based on his comments that he was able to complete all job functions without an accommodation.

On October 12, 2017, Brooks and his attorney met again with the City to discuss reasonable accommodations. HR Director Newcomb, Deputy Chief Kaminski, and Joshua Herman, Labor Counsel for the City of Pekin, were present at this meeting. Brooks was asked if he would take the medication prescribed for his condition, which he did not want to do but said he would do if he had to. During the meeting, Herman proposed a number of alternative accommodations that the City would consider for Brooks. These included taking meal breaks whenever needed, taking rest periods during his shift where he could sleep and have the active

Sergeants fulfill some of his duties, the ability to nap during his shift, additional five minute breaks, and offering a schedule that would allow Brooks time to adjust to medications. Herman also proposed staggered shifts, but Kaminski and Brooks both agreed that this would be unworkable. Herman maintained that the City might not be okay with allowing all of these accommodations on a permanent basis, but wanted Brooks to have an opportunity to figure out which worked for him and which didn't so they could decide which ones to offer permanently. Brooks was asked to try them and log which ones worked best for him.

After the meeting, Brooks went on vacation for two weeks and next worked on October 28, 2017.

<u>Brooks Files Failure to Accommodate Charge with IDHR & EEOC</u>

On September 27, 2017, Brooks filed a charge with IDHR and requested it be cross-filed with the EEOC. His September 2017 charge alleged that the City had violated the ADA by failing to provide him a reasonable accommodation for his disability of sleep apnea. This charged was filed with the EEOC and perfected on October 16, 2017. On October 27, 2017, the City was notified of Brooks claim by a letter from IDHR.

<u>Subordinate Officers' Report Being Pressured by Brooks</u>

On October 26, 2017, Lieutenant Little sent an email to Deputy Chief Baxter about concerns he had heard from two officers. Little stated that Officer Willmert had stopped by Little's office and talked to him about a previous conversation between Willmert and Brooks. Brooks had told Willmert that he "hopes people tell the truth when the time comes" and had asked Willmert to provide him with "written documentation" if needed. Separately, Officer Jones texted Little about Brooks. Jones told Little that Brooks had asked him if Chief Dossey had ever lied to him, and Brooks then told Jones that Deputy Chief Kaminski and Chief Dossey wouldn't

be promoting Jones because of his complaining. Little was concerned that Brooks was putting "undue stress on our personnel at all different levels."

On October 28, 2017, Chief Dossey ordered Deputy Chief Baxter to conduct a formal investigation into the allegations against Brooks. Baxter interviewed several officers who substantially corroborated Lieutenant Little's report. Officer Willmert said that Brooks had said that the City was screwing with him and that he had a lawsuit. According to Willmert, Brooks asked Willmert to write a letter of support for him if needed and said he hoped people would have his back when the time came. Willmert stated that he was concerned about retribution from Brooks if he did not support him. Baxter spoke next with Officer Jones, who confirmed that Brooks asked about Chief Dossey lying to him and that Brooks said he was getting his "ducks in a row." Jones claimed that in their conversation, Brooks told Jones that he had heard from Deputy Chief Kaminski that Chief Dossey accused Jones of whining about not being promoted. When Baxter asked Deputy Chief Kaminski if he had told Brooks any such thing, Kaminski denied it.

Officer Eeten told Baxter that he had a conversation with Brooks in which Brooks told him that Chief Dossey was lying to Eeten and had lied to Brooks on several occasions. Brooks allegedly told Eeten that he might be subpoenaed to testify in Brooks' lawsuit and Eeten reported that these conversations made him uncomfortable because of Brooks' position as a command officer and Eeten's belief that Brooks was very vindictive. Sergeant Van Rohr was the union representative at Officer Eeten's and Officer Jones' meetings with Baxter. At the Eeten meeting, Van Rohr told Baxter that Jones had wanted a union representative present because of concerns that Brooks would retaliate against him. Baxter also investigated the rumor that Brooks was refusing to retire to prevent Jones from being promoted, and learned that Brooks himself was the

source. Brooks told officers in the squad room that he thought the administration was trying to ust him to promote Jones. Sergeant Bush reported to Baxter that Brooks had repeatedly called Chief Dossey, Deputy Chief Baxter, Pekin City Manager Tony Carson, and HR Director Newcomb liars; that he'd made statements at shift brief about how the City was a shitty place to work and other negative comments about the administration.

These comments and conversations all occurred in the period after Newcomb's investigation was completed. Baxter concluded, based on this timing, that Brooks was using his rank and an implied threat of retaliation to pressure subordinate officers into supporting him. As a result, Brooks was placed on paid administrative leave on November 13, 2017, and interrogated on December 15, 2017. At that time, he said he could not remember many of the conversations and statements alleged by his subordinate officers. He did admit to repeatedly telling other officers that Chief Dossey was a liar, and to calling Deputy Chief Baxter and HR Director Newcomb liars. Brooks admitted that he was aware of the City Policy that required Lieutenants not to ridicule rules and regulations, orders, subordinate officers, or superior officers; as well as the policy that Lieutenants were to foster discipline and morale.

Brooks' defense to these allegations is that he believed that everything he said was true. He felt that Chief Dossey had lied to him repeatedly, the City was a shitty place to work, and he was just asking his subordinates to tell the truth, if called. He claims that he would never have retaliated against anyone for not supporting his claims. Much like with the earlier situation with Melton, Brooks does not dispute that the officers genuinely feared retaliation- he only disputes that he would have retaliated given the chance.

<u>Brooks is Accused of Copying Officers' Personnel Records</u>

Following his December 15 interview, Brooks provided supplemental information and statements to the City on January 10, 2018. The 77-page document contained several narratives in response to the allegations against him, and HR Director Newcomb's investigative report. Brooks' rebuttal also included a number of documents, including copies of emails Brooks sent or received, and the disciplinary records and field training files for several Pekin officers. The parties hotly dispute exactly how Brooks obtained these documents and whether his possession of them violated departmental policy and Illinois law. Brooks maintains that it was standard for each lieutenant to maintain a file on officers under their command and that the lieutenants' office also had a Division file which contained copies of discipline reports on subordinate officers. Brooks maintains that he never had any copies of official records  that he should not have had and that he never removed any records from the Department.

Defendants contend that Brooks' rebuttal contained several documents that he should not have had access to and that there is evidence that he took important files out of the office either by physically removing them or emailing digital copies to his personal email address. They note that Brooks' rebuttal included a 2007 Letter of Reprimand for Sergeant Von Rohr that states that it will be removed from Van Rohr's personnel file after 18 months; so Brooks could not have included a copy of it unless he or someone else improperly kept a copy at the time. Chief Dossey confirmed that the letter of reprimand had indeed already been removed from Von Rohr's disciplinary file at the time Brooks filed his rebuttal. In his deposition testimony, Brooks admitted that he emailed documents he used to prepare his rebuttal to his personal email to save them. The Defendants accuse Brooks of taking Officer Melton's FTO file out of the department as it was discovered to be missing around this time, though Brooks denies this. Defendants

contend that Brooks' actions violated the Pekin Police Department Rule 400.10 and the Illinois Personnel Records Review Act, 820 ILCS 40 *et. seq.*

### Brooks Files a Second IDHR/EEOC Charge

On February 13, 2018, Brooks filed a second charge against the City with the IDHR and cross-filed with the EEOC on March 12, 2018. This charge alleged that his transfer to second shift was in retaliation for his interview testimony about Officer Melton during the internal investigation into her complaint against Simmons. Brooks alleged that this was unlawful retaliation for his exercise of his Title VII rights.

### Brooks Is Placed On Unpaid Leave And Retires Instead of Facing The Fire and Police Commission

On March 27, 2018, Brooks was placed on unpaid leave status by Chief Dossey. On March 28, 2018, Chief Dossey filed a complaint against Brooks with the Fire and Police Commission. The Complaint alleged that Brooks had intimidated subordinates, submitted untrue statements in complaints to the city, made mutinous and insubordinate comments against the Administration and superior officers, and had taken documents from other officers' disciplinary and personnel records in violation of the Illinois Personnel Record Review Act. On March 28, 2018, the Fire and Police Commission approved Brooks remaining on unpaid leave status pending the outcome of the complaint.

Brooks feared being terminated by the Commission and losing his insurance, as Simmons had. As a result, he authored a letter notifying the City of his retirement. His retirement letter characterized this as an "involuntary retirement" and repeated his accusations of harassment, discrimination, and mistreatment.

### Brooks and Simmons File Final Charges with IDHR & EEOC

On January 26, 2018, Simmons filed a charge with IDHR/EEOC alleging violations of the Age Discrimination in Employment Act ("ADEA") and Title VII retaliation. On August 8, 2018, Brooks filed a charge with IDHR/EEOC alleging violations of the ADA, ADEA, and Title VII retaliation.

## Legal Standard

Summary judgment is appropriate where the movant shows, through "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatory answers, or other materials" that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S., 317, 323-24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment nor is a metaphysical doubt as to the material facts. *Robin v. ESPO Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000).  The evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).[18]

---

[18]  In their reply brief, Plaintiff's make a great deal of defense counsel's omission of the requirement that the Court at summary judgment draws all reasonable inferences in favor of the non-movant. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Plaintiffs go astray, however, when they insist that on summary judgment that: "Defendants are stuck with Plaintiff's evidence" (Doc. 186, p. 223-24); the Court is stuck with Plaintiff's side of the story (Doc. 186, p. 236); and that the standard is merely "whether there is any evidence at all" to support Plaintiff's version of events (Doc. 186, p. 232).  These statements are simply inaccurate as a matter of law. The Court may

In employment discriminations cases in the Seventh Circuit, factfinders (and courts at summary judgment) should not separate the evidence of discrimination into separate "direct" and "indirect" piles and determine whether either pile in isolation provides sufficient evidence of discrimination. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 766 (7th Cir. 2016). Instead, they must consider all of the evidence as a whole and determine "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 765.

Plaintiffs rely largely on the *McDonnell Douglas* framework to argue their termination was motivated by unlawful discrimination or retaliation. This framework requires the plaintiff to show that (1) he is a member of a protected class or engaged in protected conduct; (2) he was meeting the defendant's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees who were not members of that class were treated more favorably. *Marnocha v. St. Vincent. Hospital and Health Care Center, Inc.*, 986 F.3d 711, 718-19 (7th Cir. 2021). If that prima facie case is made, the defendant must provide a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 719. To rebut this, the plaintiff must show the defendant's provided reason is pretextual. *Id.*

### Discussion

Simmons and Brooks have brought 13 claims alleging that their terminations were discriminatory and retaliatory under various anti-discrimination statutes, along with a federal due process claim and miscellaneous state law claims. At summary judgment, defendants argue that neither Plaintiff can challenge their termination. Even if they can, Defendants argue that there is no evidence that their discipline and terminations were discriminatory or retaliatory and no

consider all evidence introduced by the parties and plaintiff is entitled to only reasonable inferences drawn from the evidence presented.

reasonable jury could find so given the extensive and severe misconduct Brooks and Simmons engaged in. They argue that Plaintiffs' due process and state law claims fail as a matter of law. Plaintiffs respond, arguing that they can prove their discrimination claims under *McDonnell Douglas*, and the retaliation claims through suspicious timing and indirect evidence of retaliation, and that their due process and state law claims are viable. The Court will address each issue in turn.

I.        Plaintiffs Ability To Contest Their Terminations

We begin by addressing Defendants' argument that Brooks and Simmons cannot sustain a challenge to their terminations as a matter of law. Defendants argue that Simmons is collaterally estopped from challenging the factual determinations of the Fire and Police Commission because he refused to attend its hearing. Defendants argue that Brooks voluntarily retired and cannot show that he was constructively discharged.

a.        Collateral Estoppel & The Commission's Findings

The Defendants ask this Court to find that Simmons waived the argument that his termination was retaliatory or discriminatory by failing to attend his disciplinary hearing before the Fire and Police Commission. Waiver is "the intentional relinquishment or abandonment of a known right." *Bradley v. Village of Univ. Park, Ill.*, 59 F.4th 887, 895 (7th Cir. 2023). By refusing to attend the hearing, Simmons certainly relinquished some known rights. He relinquished the opportunity to defend himself and present his arguments to the Commission, and the opportunity to seek judicial review of the Commission's decision under the Illinois Administrative Review law, 735 ILCS 5/3-101 *et seq*. However, these are markedly different than the claims before the Court in this case. The court is unpersuaded that his failure to appear waived his right to argue

that his termination was retaliatory and/or discriminatory. Waiver is an equitable doctrine and the considerations of fairness do not support adopting an expansive interpretation of it in this case.

The Defendants further argue that Simmons should be collaterally estopped from relitigating the factual findings of the Commission. When a state agency acts in a judicial capacity, federal courts must give the "agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." *Univ. of Tenn. v. Elliot*, 478 U.S. 788 (1986). Under Illinois law, "fact issues finally decided in an administrative proceeding that is judicial in nature precludes litigation of those same fact issues in a subsequent proceeding." *Goodwin v. Bd. of Trustees of Univ. of Ill.*, 442 F.3d 611, 620 (7th Cir. 2006) (quoting *Vill. Of Oak Park v. Ill. Dep't of Employment Sec.*, 772 N.E.2d 951, 953 (Ill. App. 1st Dist. 2002)). Collateral estoppel "applies when: (1) a material fact issue decided in the earlier adjudication is identical to the one in the current proceeding; (2) there was a final judgment on the merits in the earlier adjudication; and (3) the party against whom estoppel is asserted was a party or was in privity with a party in the earlier adjudication." *Id.* Additionally, "the party sought to be bound must actually have litigated the issue in the first suit and a decision on the issue must have been necessary to the judgment in the first litigation." *American Family Mut. Ins. Co. v. Savickas*, 739 N.E.2d 445, 451 (Ill. 2000). Simmons did not appear at the disciplinary hearing and so did not actually litigate any of the factual findings that the Commission made. As a matter of Illinois law, that defeats the Defendant's invocation of collateral estoppel.

For those reasons, the Court finds that Simmons is not barred by waiver or collateral estoppel from arguing that his termination was retaliatory and/or discriminatory and Simmons is not bound by the factual determinations of the Commission.

   b.   <u>Simmons Fails to Establish Cat's Paw Liability</u>

Although he is not collaterally estopped due to the Fire and Police Commission's findings, Simmons must still show that there is a basis for liability for its decision to terminate him. The Fire and Police Commission is an independent body which provides adequate due process protections for officers, *Busche v. Burkee*, 649 F.2d 509, 516 (7th Cir. 1981), and Simmons introduces no evidence of discriminatory or retaliatory animus by the members of the Commission itself.

In order to get around this, Simmons relies on a cat's paw theory of liability.[19] In a cat's paw[20] situation, if the ultimate decisionmaker is by virtue of their role "dependent on another employee to supply the information on which to base the decision", it is appropriate to impute the discriminatory or retaliatory animus of the employee supplying information to the decisionmaker. *Hicks v. Forest Pres. Dist. of Cook County, Ill.*, 677 F.3d 781, 790 (7th Cir. 2012) (citing *Brewer v. Bd. of Trustees of the Univ. of Ill.*, 479 F.3d 908, 918 (7th Cir. 2007)). To prevail on a cat's paw theory, the plaintiff must show that the discriminatory or retaliatory acts of the non-decisionmaker were a proximate cause of the ultimate employment action. *Id.* (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 423 (2011)). In other words, that the animus of the police hierarchy so influenced the Commission that this animus may be imputed to the Commission.

Simmons' cat's paw theory fails for several reasons. First, the evidence that the non-decisionmakers, Melton, Baxter, and Dossey had the requisite discriminatory/retaliatory animus is slim. Simmons claims that each of them possessed the requisite discriminatory and retaliatory

---

[19] Defendant objects to Plaintiffs cat's paw theory on the grounds that Plaintiffs raised it for the first time on summary judgment. However, it is well-settled that complaints state causes of action, not legal theories. *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (a "complaint need not plead legal theories").

[20] The Supreme Court has explained the origin of the term cat's paw as follows: "The term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Posner in 1990. In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n. 1 (2011) (quoting *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir.1990)) (internal citations suppressed).

animus. At the outset, the Court notes that Plaintiffs repeatedly says in their arguments at summary judgment only that these actors had animus, not discriminatory or retaliatory animus. It is insufficient to merely show that these actors possessed a general dislike or animus against Brooks or Simmons, it must be shown that they had a discriminatory or retaliatory animus against them. While this could be the result of mere brevity, the substance of Plaintiffs arguments regarding animus makes the court wonder. In their section on individual liability, they argue that Melton had animus against Brooks because he "dared to hold [her] accountable when she made a mistake" and therefore she "made up a lie that Brooks was retaliating against her." Similarly, they argue that Melton had animus against Simmons based on the fact that Simmons reported her for calling him a jackass, after which she made up a lie about him. If this is Plaintiffs' case, that the people responsible didn't like Simmons and Brooks because of conduct unrelated to their protected activity, age, or disability, then they fail utterly to sufficiently allege that they were the victims of unlawful discrimination and retaliation in these instances.

Nevertheless, the Court does its best to construct the argument for the Plaintiffs that Melton, Baxter, and Dossey were motivated by discriminatory and retaliatory animus. Simmons' ironclad conviction that Melton was retaliating against him is based on little else than the fact that she was friends with Burris and that, according to him, Simmons and Melton got along well prior to his complaints against Burris. This combined with his denial of inappropriately commenting on her breasts is all the evidence he has that her actions were retaliation for his complaints about Burris.

As to Baxter, the sole evidence of his retaliatory animus is his alleged friendship with Burris and that he chose to investigate the accuracy of Melton's story by tracking down the witness to Simmons' alleged March 25 comments. Despite Plaintiffs best efforts to drape that

decision in impropriety, there seems to be nothing wrong with a commanding officer finding and interviewing an independent witness when two of his officers were telling him irreconcilable versions of the same story (Melton insisting that Simmons commented on her breasts and Simmons denying it).

As to the claims of discriminatory animus by Dossey, Plaintiffs rely on a conversation Brooks claims to have had with Dossey who said things had changed because of Simmons' complaint and that officers were no longer at liberty to joke around anymore. This conversation allegedly happened after Brooks disciplined Melton for calling Simmons a jackass. Dossey's comments at least relate to Simmons complaint and show some possible discomfort with or frustration at Simmons.

This evidence is far too thin to allow the reasonable inference that Melton, Baxter, and Dossey were retaliating against Simmons. It is considerably weaker than the evidence of animus in any of the cases identified by Plaintiffs. *See Hicks*, 677 F.3d at 787 (supervisor overseeing plaintiffs told intermediate supervisor that plaintiffs "'needed to be fired' because they had filed charges of discrimination against [supervisor]" and two other management-level employees told intermediate supervisor to "get rid of" plaintiffs.); *Staub*, 562 U.S. at 414 (evidence of supervisor's animus against plaintiff's military service consisted of statements that he would "pay back the department for everyone else having to bend over backwards to cover his schedule for the Reserves" and that his "military duty had been a strain on the department" and therefore asked another supervisor to "get rid of him.")(cleaned up).

Simmons' evidence of animus fares even worse on his age discrimination claims. He introduces no evidence that Melton or Baxter had any issue with his age or that Melton's complaint was in any way motivated by his age. Even assuming that the indirect comparator

evidence can be attributed to Chief Dossey, none of the comparators are sufficient for the reasons discussed below. The insufficient evidence of discriminatory or retaliatory animus is fatal to Simmons' case as he has no other basis to impute discrimination and retaliation to the ultimate decision-maker, the Commission.

Even if Dossey's comments or Burris's friendship with Melton and Baxter was sufficient evidence that their actions were motivated by retaliatory animus, the causal connection between Melton's complaint and Simmons' ultimate termination is so attenuated that it cannot be the proximate cause of his termination. Melton would have had to know that Baxter and Dossey would take her side when Simmons denied her accusation; that Doug Vogel would share her version of events; that Officer Richardson, the other alleged witness, would not be contacted or that his denial would not be credited; that HR Director Newcomb would agree with her after conducting an independent investigation; and that ultimately, the Fire and Police Commission would find her version of events more credible than Simmons. This chain seems far too attenuated for proximate cause purposes.

Accordingly, we find that Simmons has failed to show that his termination was retaliatory or discriminatory under a cat's paw theory of liability and to the extent that his claims rely thereon, Defendant's motion for summary judgment is granted.

c.   Brooks' Constructive Discharge

Unlike Simmons, Brooks chose to retire rather than face termination. This defeats his discrimination and retaliation claims to the extent they rely on his termination unless he can show that his decision to retire was a constructive discharge. The Seventh Circuit recognizes at least two forms of constructive discharge that could apply to Brooks. *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). "In the first form, an employee resigns due to

alleged discriminatory harassment. Such cases require a plaintiff to show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress, thereby allowing an employer to address a situation before it causes the employee to quit." *Id.* (citing *Roby v. CWI, Inc.*, 579 F.3d 779, 785 (7th Cir. 2009) and *Boumedhi v. Plastag Holdings, LLC*, 489 F.3d 781, 789-90 (7th Cir. 2007)). The second form occurs "when an employer acts in a manner so as to have communicated to a reasonable employee that [he] will be terminated." *Id.* (quoting *E.E.O.C. v. Univ. of Chi. Hosps.*, 276 F.3d 326, 333 (7th Cir. 2002)). Both forms of constructive discharge require showing that working conditions were objectively intolerable. *Id.*

Defendants argue that Brooks cannot establish that he was constructively discharged because his termination was ultimately up to the Fire and Police Commission. They direct us to *Palka v. Shelton*, 623 F.3d 447 (7th Cir. 2010), where the Seventh Circuit held that an officer who resigned rather than face a disciplinary hearing was not constructively discharged. The Seventh Circuit stated that the hearing included adequate due process protections and therefore the employee's decision to "resign rather than risk an unfavorable Merit Board decision does not make his resignation involuntary." *Id.*; *see also Swearnigen-El v. Cook County Sheriff's Dept.*, 602 F.3d 852, 859 (7th Cir. 2010); *Levenstein v. Salafsky*, 414 F.3d 767, 775 (7th Cir. 2005). Like the Merit Board, the Fire and Police Commission that would otherwise have heard the charges against Brooks, affords officers facing disciplinary charges adequate due process protections. *See Ulrey v. Reichart*, 941 F.3d 255, 262 n. 2 (7th Cir. 2019). If Brooks believed himself innocent of the disciplinary charges levied against him, he could have contested them before the Fire and Police Commission.

Plaintiffs argue that Brooks' case is distinguishable because he was on unpaid leave at the time he resigned, unlike the plaintiff in *Palka*. Failing that, Brooks argues that a jury could find his working conditions so unbearable that he was constructively discharged. Plaintiff's argument on this point consists almost entirely of claims that he himself made in his retirement letter. Brooks repeats that in his retirement letter he alleged "continued and deliberate 'harassment, retaliation, discrimination, threats, denial of accommodations, abuses of process, denial of access to employment processes, unfair alterations to work conditions, unfair alterations of work hours, disproportionate penalties, ignoring of complaints, and suspension without pay." They note that he alleged in his letter that these issues were repeated over time and said that they were severe. Plaintiffs' decision to base the core of their argument on statements Brooks made in his retirement letter, rather than actual evidence showing the truth of those statements, is questionable. At the summary judgment stage, the parties can neither rest on their pleadings nor create a genuine issue of fact by mere assertion. Brooks' statements in his retirement letter are at best evidence of his subjective state of mind or that the Defendants were on notice, neither of which are at issue here. Crucially, for constructive discharge, the issue is whether a reasonable employee in Brooks shoes, not Brooks himself, would have felt that the working conditions so unbearable that he had to quit.

Brooks has failed to produce sufficient evidence, even viewing it in the light most favorable to him and drawing all reasonable inferences in his favor, that his working conditions were so intolerable that a reasonable person in his position would be forced to quit. This standard is more exacting than an ordinary hostile work environment claim, which requires severe and pervasive discrimination. Brooks had been assigned to work a shift that created problems with his sleep apnea but which he had worked for years. While Plaintiffs' counsel claims that the job

was "literally killing him," this is not backed up by the evidence. He has introduced no evidence showing that he was facing serious medical problems during the months after his transfer back to the second shift and the only doctor's note in evidence does not support such bold claims. During the October 12, 2017, accommodations meeting, Brooks appeared ambivalent about taking medication for the condition he now claims was killing him. His additional claims that he faced termination, was suspended without pay, and, like Simmons, could have lost his retirement insurance coverage are not enough.

Accordingly, we find that Plaintiffs have failed to create a genuine issue of fact as to whether Brooks was constructively discharged. To the extent Brooks' claims depend on him being terminated, the Defendant's motion for summary judgment is granted.

II.     Plaintiffs Comparator Evidence for their Discrimination and Retaliation Claims

We now consider Plaintiffs' compactor evidence relied on for each of their discrimination and retaliation claims, many of which are supported by no other evidence of discrimination or retaliation. Plaintiffs seek to prove that their discipline and termination were discriminatory and retaliatory by evidence of eight officers who, they allege, were not members of Plaintiffs' protected classes (age, disability, and protected activity), and who had engaged in similar misconduct and were treated more favorably.

In employment discrimination cases, a plaintiff may introduce evidence of similarly situated employees who were not members of their protected class and were treated more favorably to prove that their treatment was motivated by discriminatory animus. *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012) (Title VII claims); *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 720 (7th Cir. 2021) (ADEA claims); *Tyler v. Ispat Inland*

*Inc.*, 245 F.3d 969, 972 (7th Cir. 2001) (ADA claims); *Reinebold v. Bruce*, 18 F.4th 922, 926 (7th Cir. 2021) (§1983 Equal Protection claims).

Similarly situated employees "must be directly comparable to the plaintiff[s] in all material respects, but they need not be identical in every conceivable way." *Coleman*, 667 F.3d at 846. Whether a comparator is similarly situated is "usually a question for the fact-finder" and summary judgment is appropriate only when "no reasonable fact-finder could find that plaintiffs have met their burden on the issue." *Srail v. Village of Lisle*, 588 F.3d 940, 945 (7th Cir. 2009). In the "usual case a plaintiff must show at least that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and 3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman*, 667 F.3d at 847.

In disparate discipline cases, the "similarly-situated inquiry often hinges on whether co-workers engaged in comparable rule or policy violations and received more lenient discipline." *Id.* at 850. This requirement can be satisfied by comparators whose misconduct was different but who were charged with violating the same rule or policy. *Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 689 (7th Cir. 2007). In determining whether two employees "have engaged in similar misconduct, the critical question is whether they have engaged in conduct of comparable seriousness." *Id.*

The alleged misconduct that led to Simmons' discipline and termination included him allegedly making two inappropriate comments about a female coworker's breasts, harassing waitstaff at a local diner, lying during an investigation about violating a *Garrity* order, and covertly taping a confidential police briefing and then giving the recording to the subject of the briefing and his lawyer. Brooks' alleged misconduct includes improperly copying personnel files,

making inappropriate comments about union business, filing internal complaints with falsified details, and undermining morale by repeatedly telling subordinates that the department's leaders were liars and couldn't be trusted.[21] Based on the admissible evidence introduced by Plaintiffs in their response to Defendant's motion for summary judgment, none of the eight officers committed comparably severe misconduct and so none is a suitable comparator. Additionally, it is undisputed that as a lieutenant, Brooks was subject to a higher standard. Of the eight comparators, only Burris was a lieutenant and therefore the other seven fail as comparators for Brooks as they were not subject to the same standards.[22] The Court addresses each individual officer in turn.

a. Officers Thompson and Ward and Sergeant Barth

---

[21] The Court notes that for each type of misconduct alleged, the Plaintiffs either dispute ' engaging in the alleged conduct (such as Simmons denial of commenting on Officer Melton's breasts or Brooks fabricating officers statements for his internal complaints) or admit doing so but dispute their impropriety (such as Simmons' claim that recording shift briefings and leaking them was not illegal or Brooks' claim that it was not unlawful to procure and publish the disciplinary records of others ). Plaintiffs have done everything they can to make this case about whether Simmons and Brooks were terminated for adequate cause and whether the Defendants complied with procedural requirements such as the Uniform Peace Officers Disciplinary Act ("UPODA"), 50 ILCS 725/1-1 et al, rather than the legal issues actually raised by their claims- whether Defendants actions were caused by unlawful discrimination and/or retaliation. These invocations frequently muddy the issues. To the extent that Plaintiffs seek to use these disputed procedural irregularities as evidence of discrimination or retaliation, they fail because Plaintiffs fail to make an adequate showing that Defendants complied with UPODA for officers who were younger/non-disabled/etc. or that their non-compliance in Brooks/Simmons were due to unlawful animus.

Plaintiffs seem to argue that their alleged misconduct should not be considered when comparing the discipline they faced with that of other employees at summary judgment. The Court finds this argument confusing and unpersuasive. The treatment of similarly situated employees is relevant because it helps the trier of fact determine whether the plaintiffs would have been treated the same but for their protected class. The factual question at issue is whether the Defendants would have disciplined Brooks and Simmons as harshly if they were younger, not disabled, or had not engaged in protected activity (depending on the specific claim). For purposes of comparators, then, the Court thinks it appropriate to consider the alleged misconduct.

The questions of whether Simmons and Brooks actually committed the alleged misconduct fits much more naturally into the issue of pretext. *See Curry v. Menard, Inc.*, 270 F.3d 473, 479-80 (7th Cir. 2001) (where black employee claimed she was disciplined more harshly than non-black coworkers, validity of discipline went to pretext).
[22] But see *Coleman*, 667 F.3d at 849-50 ("proposed comparator's position or rank may be important, but only *'provided that the employer took these factors into account* when making the personnel decision in question.") (quoting *Eaton v. Indiana Dep't. of Corrections*, 657 F.3d 551, 559 (7th Cir. 2011) (emphasis in original)).

Plaintiff's attempt to introduce key details of the alleged misconduct and discipline of Officer Thompson, Officer Ward, and Sergeant Barth through Brooks' affidavit. An affidavit "used to support or oppose a [summary judgment] motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "[S]tatements outside the affiant's personal knowledge or statements that are the result of speculation or conjecture or merely conclusory" do not meet this requirement. *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999). "Generally, a witness may only testify concerning matters about which that witness has personal knowledge and only if there is sufficient evidence to support the witness's personal knowledge as to that matter." *Sizelove v. Madison-Grant United Sch. Corp.*, 59 F. Supp. 3d 1246, 1263 (S.D. Ind. 2022) (citing Fed. R. Evid. 602). The evidence for several comparators fails to meet this requirement.

The key allegations against Officers Thompson and Ward are not presented in an admissible form. For Officer Thompson, Plaintiffs cite to a Letter of Reprimand and Brooks' affidavit. The Letter of Reprimand states that a Pekin citizen complained about text messages between Officer Thompson and the citizen's estranged wife. Doc. 177-139, Plaintiff's Exhibit 138. It notes that these text messages could reflect poorly on the department and that several of them were sent while he was on duty but offers no further details. *Id.* Plaintiffs attempt to introduce salacious details about the contents of those text messages through Brooks' affidavit. Doc. 186 at 206, Plaintiff's AMF ¶340-342 (claiming that the texts included a statement that Officer Thompson could not get an erection without cocaine as well as photos of himself in uniform with his genitals exposed). The only basis for Brooks personal knowledge of this is that

a different officer, Sergeant Van Rohr, saw them and told Brooks about it. *Id.* This is an

inadequate basis to establish Brooks personal knowledge of this fact.

The same issues arise with Plaintiff's evidence for comparator Officer Ward. Brooks'

affidavit alleges that Officer Ward used the law enforcement database LEADS to keep tabs on his

ex-wife. Brooks claims that Chief Dossey and Deputy Chief Baxter stated Ward could not be

disciplined because he was off the clock. Brooks alleges in his affidavit that this is not consistent,

with Officers Ray Besimi and Adrian Gonzales, who were apparently suspended for off duty

conduct. No foundation is given for how Brooks knows any of this, how he would be competent

to testify to these matters, or even sufficient details about the two additional officers to

meaningfully compare them.

The same issue underlies two of the three incidents of alleged misconduct by Sergeant

Barth. Brooks alleges that Barth pressured a Tazewell County deputy to fraudulently list another

Pekin officer as not at-fault in a traffic incident but was not disciplined for this after it was

reported to the Chiefs. Brooks' affidavit fails to include sufficient evidence to explain how he has

personal knowledge of the details of this incident. Brooks alleges via affidavit that Sergeant

Barth took a sniper rifle from the Department's armory to his home, and it was returned after

Deputy Chief Kaminski ordered an investigation.[23] Only one incident involving Sergeant Barth

is supported by admissible evidence beyond the Brooks affidavit. In that incident, Sergeant Barth

made a friendly wager with another officer about the results of the 2015 sergeant's promotional

process. The wager was for a single Mountain Dew, and Barth received a 1-day unpaid

---

[23] Plaintiffs allege that Barth in fact attempted to steal the sniper rifle and hoped that no one in the department would notice. Like their other allegations, this allegation in Brooks affidavit is merely his speculation or conjecture with no basis for his personal knowledge of Sergeant Barth's motive. The basis for Brooks knowledge in the affidavit is only that he was range master at the time and informed Kaminski of it. As such, the above reflects only the admissible allegations in Brooks' affidavit as to this incident.

suspension as discipline. To the extent that Sergeant Barth was disciplined for the bet as a violation of the policy requiring commanding officers to foster morale, his conduct is much less serious than the repeated behavior of Brooks. In summation, the first incident is wholly inadmissible as presented, the most serious details of the second incident are inadmissible as presented, and the third is not comparably serious.

No reasonable jury could find, even drawing all reasonable influences in Plaintiffs favor, that Thompson's, Ward's, or Barth's misconduct were comparably serious to that of Simmons and Brooks.

### b. Lieutenant Burris

Lieutenant Burris is the closest to a valid comparator that the Plaintiffs identify , but even this comparison falls short. Burris was disciplined for making inappropriate comments about Simmons' sex life in December 2016 and April 2017. In response, he was temporarily transferred to second shift while Simmons' complaint was investigated, and on conclusion of the investigation, docked two days of paid leave for the first offence. For the second instance, he was given the options of resigning, facing disciplinary charges at the Fire and Police Commission up to and including termination, or accepting a Last Chance Agreement in which he would be suspended for 21 days and demoted all the way from Lieutenant to Patrolman. Burris accepted the Last Chance Agreement.

Burris's misconduct is similar to the accusations regarding Simmons' alleged comments about  Officer Melton's breasts. Their conduct was in violation of the same departmental rules and policies and was similarly serious. It may be arguable whether Burris's discipline was more lenient than Simmons', especially given his significant demotion for the second offence. Burris escaped termination by accepting a Last Chance Agreement. Defendants claim that they tried to

negotiate a Last Chance Agreement with Simmons, but his counsel refused or failed to do so. If this was the sole basis for Simmons termination, the validity of this comparison would be an issue the jury to resolve. But that is not the case. Burris's conduct is not similar or similarly serious to Simmons recording internal police meetings and disclosing at least one confidential recording to lawyers for an adverse party, in violation of departmental policy. Accordingly, Burris is not a valid comparator for Simmons.

Burris was a Lieutenant, like Brooks, but his misconduct was substantially different and less serious than what Brooks was accused of. The accusation that Brooks was spreading insubordination, improperly copying and removing disciplinary and personnel records, and pressuring subordinates into supporting his case against the Administration are more serious than Burris's inappropriate comments about Simmons' sex life. They are also violations of different rules and policies. As such, Burris is not a valid comparator for Brooks.

### c. Officer Melton

Officer Melton fails as a comparator because her misconduct is considerably less severe than what Brooks and Simmons were accused of. Officer Melton used her cellphone while driving her squad car and denied doing so when asked during an investigation. Even drawing all reasonable inferences in Plaintiffs favor, no reasonable jury could find that talking on a cell phone while driving was similarly serious as the misconduct Simmons and Brooks are alleged to have committed.

### d. Officers Willmert and Gallup

The final pair of comparators are Officers Willmert and Gallup. The alleged misconduct by both officers arises from incidents involving B.R., a female minor who volunteered with the department. While speaking casually with B.R. one day, she was showing Officer Willmert

things on her phone when he asked her to show him "the bad stuff" on her phone. When she

showed him the photo gallery on her phone, he saw nude pictures of B.R. included amongst her

photos. He questioned her about them and learned that she had sent them to Officer Gallup and

possibly other officers of the Pekin Police Department and another local police department.

Officer Willmert reported this to Officer Melton and his superior officers, who ordered an

investigation into the matter. Upon confirming the likely accuracy of the minor's story, the

matter was referred to the Illinois State Police for an external investigation. The ISP investigation

indicated that Officer Gallup had improperly solicited nude pictures from the minor but

exonerated Officer Willmert of any misconduct. Officer Gallup was placed on unpaid suspension

and Chief Dossey sought to have him terminated by the Fire and Police Commission, but he

retired before that could happen.

Officer Willmert is not a suitable comparator because it is undisputed that he was

exonerated of any misconduct. As for Officer Gallup, he is not a suitable comparator because he

retired before any final discipline could be determined by the Fire and Police Commission.

Plaintiffs fail to articulate how this is more lenient discipline than what Simmons and Brooks

faced. Accordingly, Officers Willmert and Gallup are not suitable comparators.

III.    Plaintiffs Discrimination and Retaliation Claims

With these general matters addressed, we turn to the merits of Plaintiffs individual

discrimination and retaliation claims.

a.    Brooks ADA Claims (Counts I-III)

Brooks brings three claims under the Americans with Disabilities Act, 42 U.S.C. §12111

*et seq*. He claims that Defendants failed to reasonably accommodate his sleep apnea,

discriminated against him due to his disability, and retaliated against him for requesting reasonable accommodations.

i.  Count I- Brooks' Failure to Accommodate Claim

To prove a failure to accommodate, Brooks must show that (1) he is a qualified individual with a disability; (2) the employer was aware of his disability; and (3) the employer failed to reasonably accommodate his disability. *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 682 (7th Cir. 2014). "Reasonable accommodation" means modification to the work environment or the manner in which the position is performed to enable a qualified individual with a disability to perform the essential functions of the position. *Id.* (quoting 29 C.F.R. § 1630.2(o)(1)(ii)). A reasonable accommodation may include a modified work schedule. 29 C.F.R. § 1630.2(o)(2)(ii). The parties do not dispute that Brooks was disabled due to his sleep apnea and that the Defendants were aware of that issue. The claim therefore focuses on whether Brooks was a qualified individual and whether the City of Pekin failed to reasonably accommodate his sleep apnea. As the Court finds that Brooks has failed to show a genuine issue of material fact to support that the City did not offer him reasonable accommodation, we need not address whether he was qualified in light of his alleged misconduct.

The Defendants argue that the only accommodation Brooks was interested in, a transfer back to the first shift, was unreasonable and an undue hardship. Brooks was transferred to second shift due to the concerns of Officer Melton and others that Brooks would retaliate against them. The City argues that it would need to move those officers to different shifts in order to put Brooks back on the first shift, and that it could not do so under the CBA which limits the City's ability to switch officers' shifts. Brooks argues that there was no evidence that he ever retaliated against Melton and therefore the City should not have transferred him off of first shift on those

grounds. He argues that the only reasonable accommodation was to place him back on the first shift. He insists that none of the City's proposed accommodations would work for him and that as the lieutenant with the most seniority he was entitled to be on first shift.

Brooks' claim ultimately fails because he was offered multiple alternative accommodations and refused all of them. Whether this was because he was never actually interested in an accommodation, as the City claims, or because he sincerely believed that no other accommodation would work is ultimately irrelevant. On October 12, 2017, Brooks and his attorney met with HR Director Newcomb, Deputy Chief Kaminski, and Joshua Herman ("Herman"), Labor Counsel for the City. At this meeting, the City proposed multiple alternative accommodations. The City discussed the possibility of Brooks taking the medication he had been prescribed for his condition, something he initially refused. He was offered rest periods during his shifts, the ability to sleep during his shifts, and a work schedule that would allow him to adjust to his medication. The City offered to let him try any or all of these options and determine which, if any, worked for him.

Crucially, several of these accommodations are the same as those suggested by Brooks' doctor. *See* Doc. 177-52, Plaintiff's Exhibit 50 (Brooks' doctors note suggesting that he take melatonin and take brief naps during work breaks). Brooks acknowledged in the meeting that if he needed to take medication he would do so. Brooks argument in rebuttal that these were not the accommodations he wanted is unavailing. The City engaged in the interactive process and identified several potential reasonable accommodations which it could offer Brooks. This satisfied the City's obligations under the ADA. Brooks provides no evidence that he could not work second shift under any combination of the City's proposed accommodations other than his own assertion. The question then is whether a plaintiff can create a genuine issue of material fact

as to the reasonableness of accommodations solely by saying that he did not think they would work, especially when those accommodations are consistent with his doctor's recommendations? The only answer to that question can be no.

Even if Brooks could show that the only reasonable accommodation was a return to first shift, he runs into a second pitfall. After the October 12 meeting to discuss accommodations, Brooks went on vacation. When he returned from vacation, he was placed on paid leave within a few weeks. He was on paid leave till March 27, 2018, when Dossey placed him on unpaid leave. He remained on unpaid leave until he retired in July 2018. There was never an opportunity for him to be reasonably accommodated. While this suspicious timing is significant for his ADA retaliation claim, it is fatal to his ADA reasonable accommodation claim.

No reasonable jury could find that the only reasonable accommodation was returning Brooks to the day shift. Even if were, there was no opportunity for the proposed accommodations to be implemented as Brooks was almost immediately suspended. Accordingly, Defendants motion for summary judgment is granted as to Count I.

ii.  Count II- Brooks' ADA Disparate Treatment Claim

Plaintiffs have failed to show that there is a genuine issue of material fact as to whether Brooks' discharge was motivated by his disability. Brooks seeks to prove his ADA Disparate Treatment claim under the indirect, burden shifting method. As discussed above, the Court has found that Brooks cannot show that he was constructively discharged and there are no similarly situated comparators to Brooks.  This is fatal to his claim as the comparators are the sole evidence for causation.

Brooks seems to argue that he can satisfy the similarly situated prong on this claim, not through the previously identified comparators, but because the Department deviated from (what

he alleges) is its standard practice of letting lieutenants choose their shifts based on seniority. He argues that this shows that similarly situated non-disabled employees were treated more favorably.

The issue with this argument is that it views the elements of the *McDonnell-Douglas* test in isolation rather than as a cohesive whole. Similarly situated comparators are useful because they help the trier of fact isolate the discriminatory variable (in this case Brooks disability) as they try to answer the fundamental question in every discrimination case: if the plaintiff had not been disabled, would he have suffered the adverse employment action? For that reason, it's crucial that there be an adequate overlap between the adverse employment action at issue and the similarly situated comparators. Brooks argument would at most show that if not for his sleep apnea, he would have remained on the first shift. He fails to show that if not for his sleep apnea, he would not have been disciplined, put on unpaid leave, or faced termination and the loss of his insurance benefits, forcing him to retire. If the shift change is all that is attributable to his disability, then his claim fails as a matter of law as a shift change alone is not an adverse employment action. *Porter v. City of Chicago*, 700 F.3d 944, 956 (7th Cir. 2012).

While *Porter* seems to indicate that it could be an actionable if intended to exploit a known vulnerability, the only cases applying this theory arose under retaliation claims which are subject to a broader standard of actionable adverse actions. *Id.* (discussing *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005) but refusing to extend its holding to discrimination claim at issue). Decision of this court and others in the Seventh Circuit have not extended the known vulnerability theory to discrimination claims. *See Staub v. Hy-Vee, Inc.*, No. 19-4249, 2022 WL 826930 (C.D. Ill. 2022); *Douhit v. TC Heartland LLC*, 2014 WL 1584320 (S.D. Ind. 2014). We are not persuaded to do so in this case.

Accordingly, Defendant's motion for summary judgment is granted as to Count II.

iii. Count III- Brooks' ADA Retaliation Claim

Finally, while Brooks can make out a prima facie case of retaliation, he has no evidence

that Defendants reason for disciplining him was pretextual. The prima facie case for a retaliation

claim requires a plaintiff to prove "(1) he engaged in a statutorily protected activity; (2) he

suffered an adverse employment action; and (3) a causal connection between the two."

*Dickerson v. Bd. of Trs. Of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). A

plaintiff may prove a causal connection between his protected activity and adverse treatment

through "suspicious timing, ambiguous statements oral or written, [] and other bits of evidence

from which an inference of retaliatory intent might be drawn." *Coleman*, 667 F.3d at 860. As a

general rule, "temporal proximity between an employee's protected activity and an adverse

action is rarely sufficient to show that the former caused the latter." *Id.* (quoting *O'Leary v.

Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)).

The precise timing of Brooks protected activity and adverse treatment is as follows.

Brooks first requested remaining on first shift in June 2017 as an accommodation. The City

either denied that request or interpreted it as a request based on the seniority policy rather than as

a request for accommodations and so denied it. On September 28, 2017, Brooks again requested

an accommodation to be taken off of second shift. Brooks met with representatives from the City

on October 12, 2017, to discuss reasonable accommodations for his sleep apnea. After that

meeting, he went on vacation until October 28th. On October 27th, the City received notice of

Brooks' ADA claim that he cross-filed with the Illinois Department of Human Resources and the

Equal Employment Opportunity Commission. Neither party introduces evidence showing when the letter was received by the City or when Dossey was informed of its contents.[24]

Lieutenant Little emailed Deputy Chief Baxter on October 26, 2017, at 9:37 PM about Brooks improper conversations with subordinates. Dossey was informed of this either that night or the following morning and he emailed his assistant at 8:55 AM on the 27th to ask her to begin put together the paperwork for a formal investigation. Deputy Chief Baxter was ordered to begin his investigation on October 30, 2017. Brooks was placed on paid leave on November 13, 2017, as a result of the investigation. This became unpaid leave in March 2017 and he retired in July.

Viewing the timing in the light most favorable to Brooks, as we must do, the City received notice of the protected activity, Brooks' IDHR charge on October 27, 2017, and began an investigation into him that same day. This is arguably enough to create a genuine issue of material fact as to the causal connection between Brooks IDHR complaint and the investigation into him. *See Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) (holding that the fact that plaintiff was terminated the same day she complained created genuine issue of material fact as to causation). As Brooks engaged in protected activity by filing ADA charges with the IDHR/EEOC and his unpaid suspension was an adverse action, he can make out a prima facie case of retaliation.

Brooks cannot, however, show that the reasons given for his suspension were pretextual. Pretext is "more than a mistake on the part of the employer; pretext mans a lie, specifically a phony reason for some action." *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015). If the employer "honestly believed its reasons for taking the challenged actions, even if those

---

[24] Brooks did not include his ADA claims in his March 2018 IDHR/EEOC charge of discrimination. While they were included in his August 2018 IDHR/EEOC charges of discrimination, that was after he had retired and cannot be the causal basis for the alleged adverse actions.

reasons were incorrect, then the reasons were not pretextual." *See v. Ill. Gaming Bd.*, 29 F.4th 36, 368 (7th Cir. 2022). "Because courts are not super-personnel departments who sit in judgment of management decisions, it is of no moment if the employer's reasoning is incorrect, 'foolish, trivial or even baseless.'" *Brooks v. Avancez*, 39 F.4th 424, 436 (7th Cir. 2022) (quoting *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 879 (7th Cir. 2001)).

Brooks fails to produce evidence that would allow a reasonable jury to find that the City's decision to suspend him pretextual. He fails to meaningfully contest many of the allegations against him. Even viewing the evidence in the light most favorable to Brooks, he was making insubordinate comments to other officers in the department, denigrating the City's administration. While he contends that he never would have retaliated against subordinate officers, he has no evidence showing that those officers and the City did not legitimately fear retaliation from him. The undisputed evidence shows that the officers said as much to Baxter and that Baxter and Dossey believed their concerns were reasonable.

Brooks doesn't fare much better at his challenges to the personnel record allegations. While the precise details of the dispute are contested, Brooks undisputedly had access to at least one record that should have been destroyed years before he prepared his rebuttal to the allegations against him. And while he disputes physically removing any files from the police department, he cannot show that the City did not honestly believe that he was responsible for Melton's missing FTO file and his deposition testimony clearly indicates that he emailed several records to his personal email address in violation of City policies.

Because Brooks argues at most that the City should not have suspended or threatened to terminate him for these offenses, and not that these reasons were a lie to justify their true

retaliatory and discriminatory purpose, no reasonable jury could find the City's reasons for terminating him pretextual.[25]

As such, Defendants' motion for summary judgment is granted as to Count III.

### b.  Brooks' and Simmons' Title VII Retaliation Claims

Brooks and Simmons each bring a Title VII Retaliation claim. Each fails to establish an adequate causal link between their protected activity and the discipline/termination and neither can show that their misconduct was not an superseding factor.

### i.  Count IV- Simmons Title VII Retaliation Claim

Simmons Title VII retaliation claim alleges that he was disciplined and terminated because of his December 2016 and April 2017 complaints about Lieutenant Burris's comments about his sexual relationships. These comments are insufficient as a matter of law to violate Title VII, but this does not necessarily defeat Simmons' retaliation claim. An employee may engage in protected activity if he reasonably and sincerely believes that the conduct he complains of violates Title VII. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001). Defendants argue that Simmons could not have reasonably believed that Burris's two isolated comments violated Title VII. We do not address this issue because we find that Simmons fails to prove the required causal connection between his complaints and his termination.

Simmons' evidence of causation on this count is the same as discussed in the cat's paw and comparator sections above. As discussed in greater detail there, the Court finds that he has failed to create a genuine issue of fact that Melton, Burris, and Dossey fabricated or aided the fabrication of disciplinary charges against him in retaliation for his complaints against Burris.

---

[25] While we do not address the issue of pretext in detail for Simmons because he fails to establish causation, he also would fail to show that the reasons for his termination were pretextual. He has no evidence that the Dossey and Baxter's didn't honestly believe that Simmons should be terminated because he surreptitiously recorded shift briefings and gave those recordings to parties suing the City.

Ultimately, it feels too implausible to believe that an employee's mere friendship with another who is the target of complaints, creates a genuine issue of fact for retaliation.

Further, Plaintiffs fail to show how Simmons taping and releasing confidential briefings is not a superseding cause that breaks this chain. Plaintiffs repeatedly argue that Simmons was allowed to record anything he wanted in the department because the officers lacked a reasonable expectation of privacy, but utterly fail to explain why that also allowed him to send the recordings of a briefing discussing an excessive force incident to the affected civilian and his lawyers.

As such, Defendants' motion for summary judgment is granted as to Count IV.

### ii.  Count XII- Brooks Title VII Retaliation Claim

Brooks' Title VII Retaliation claim similarly fails. Brooks' Title VII claim was initially based on the City having retaliated against him for both (1) his participation in the Melton investigation and (2) his filing a Title VII retaliation charge with the EEOC. In ruling on the Defendant's motion to dismiss, the Court dismissed the retaliation claim with prejudice to the with regards to his participation in the Melton investigation. Doc. 24 at 11-13. It allowed the claim to proceed to the extent it claimed retaliation for having filed the March 12, 2018, EEOC charge. *Id*. At the pleading stage, it was sufficient for Brooks to allege that his constructive discharge was because of this filing. Now at the summary judgment stage, he must produce sufficient evidence to allow a reasonable jury to find that his March 12 EEOC charge was the cause of his constructive discharge. He has failed to do so, and so summary judgment is appropriate on this claim.

Brooks' argument that a jury could find he was retaliated against for filing his Title VII complaint is twofold: first, the short time period between when he filed his charge, March 12,

and when he was placed on unpaid leave, March 27; second, that none of his alleged comparators engaged in protected activity. As discussed above, none of the comparators is a fit for Brooks.

Brooks only evidence then is the timing, but this is insufficient. Unlike with his ADA claim, Brooks has no evidence that the Defendants had notice that he'd even filed a claim. The causal link is further weakened by the fact that there was already an ongoing investigation into Brooks when he filed his EEOC charge. The only potentially adverse action after the March 12 filing was a switch from paid leave to unpaid leave. Even drawing all reasonable inferences in his favor, this is not enough to create a genuine issue of fact as to whether his discipline was retaliation for his March EEOC charge.

As such, Defendant's motion for summary judgment is granted as to Count XII.

c.  Counts V, VI, IX, X- Brooks' and Simmons' Age Discrimination Claims

The plaintiffs have failed to create a genuine issue of material fact as to any of their age discrimination claims. ADEA claims are subject to the legal standard set forth in *Ortiz* and the *McDonnell Douglas* burden shifting framework. *Marnocha*, 986 F.3d at 718-19. Age-based discrimination claims under the Fourteenth Amendment are subject to rational basis review. *Reinebold v. Bruce*, 18 F.4th 922, 925 (7th Cir. 2021). This requires showing that "(1) the defendant intentionally treated him differently from others similarly situated, (2) the defendant intentionally treated him differently because of his membership in the class to which he belonged, and (3) the difference in treatment was not rationally related to a legitimate state interest." *Id.*

The Plaintiffs have failed to produce sufficient evidence to allow a reasonable jury to find that their treatment was motivated by discriminatory animus based on their age. They have no direct evidence of any kind showing age-related animus. They rely solely on the comparator

evidence discussed above which the court finds inapplicable. With respect to Plaintiffs' age

discrimination claims, their comparators fail for an additional reason. To state a prima facie case

of age discrimination under ADEA, a plaintiff must show that "similarly situated and

*substantially younger employees* were treated more favorably." *Fisher v. Wayne Dalton Corp.*,

139 F.3d 1137, 1142 (7th Cir. 1998) (emphasis added). To be considered substantially younger, a

comparator ordinarily must ordinarily be at least ten years younger than the plaintiffs. *Kariotis v.

Navistar Int. Trans. Corp.*, 131 F.3d 672, 676 n. 1 (7th Cir. 1997) (age difference of less than ten

years presumed insubstantial); *Fisher*, 139 F.3d at 1141 (same).

Plaintiffs fail to state the ages of the comparators with any meaningful particularity. At

the outset, they do not clearly indicate their own ages and state only that they "were two of the

oldest officers in the police department." Doc. 186 at 201, Plaintiff's AMF ¶310 (citing Brooks

affidavit, 177-13, saying same). Brooks' IDHR/EEOC charges include his full Date of Birth and

indicate that he would have been between 54 and 55 at the time of his discipline and retirement.

The copies of Simmons' IDHR/EEOC charges provided as exhibits were redacted his exact Date

of Birth, but included his year of birth and so he would have been between 51 and 52 at the time

of his discipline and retirement.

For Lieutenant Burris, the only evidence of his specific age is the statement that he "was

not immediately pensionable as were Simmons and Brooks due to the fact he was not yet age

50." *Id.*, Plaintiff's AMF ¶330. For Officer Gallup, they similarly state only that he was under 50.

*Id.* at 209, Plaintiff's AMF ¶361. For the other comparators, Plaintiffs are entirely silent about

their ages. *Id.*, Plaintiff's AMF ¶¶336-355. To be able to introduce them as comparators,

Plaintiffs must have admissible evidence showing that each was at least as young as 44-45 for

Brooks and 41-42 for Simmons at the relevant time. As they fail to do so, Plaintiffs cannot show

that the comparators were substantially younger and therefore cannot rely on them for a prima facie case of age discrimination as required by ADEA claims. *Fisher*, 139 F.3d at 1142. As they have failed to identify any valid comparators and have no direct evidence, they have failed to show that a reasonable jury could find for them on these claims.

As such, Defendants motion for summary judgment is therefore granted as to Counts V, VI, IX, and X.

IV.   Plaintiffs' Remaining Claims

We finally turn to Plaintiffs' non-employment discrimination claims. Simmons alleges that the City's refusal to pay part of his insurance premiums as a retiree under the police union's CBA is a breach of contract and a violation of his due process rights. Brooks brings a state law claim that the City deprived him of sick days he was entitled to in violation of the Illinois Wage Payment Collections Act. Simmons brings a state law claim against Officer Melton, alleging that she fabricated her sexual harassment complaint in order to get him fired. We address each claim in turn.

a.   Counts VIII and XI- Simmons Due Process and Breach of Contract Claims

Counts VIII and XI use different legal theories to articulate the same injury. Simmons claims that he should rightfully be considered a 'retiree' as that term is used in the collective bargaining agreement between the City of Pekin and its police officers, and therefore he is entitled to have half of his post termination/retirement health insurance premiums covered by the City. Count VIII states that this failure is a violation of Simmons' Fourteenth Amendment Due Process right, while Count XI styles it as a state law breach of contract claim. "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). A property

interest "can be created by 'contracts with public entities.'" *Forgue v. City of Chicago*, 873 F.3d 962, 970 (7th Cir. 2017) (quoting *O'Gorman v. City of Chicago*, 777 F.3d 885, 890 (7th Cir. 2015)). Simmons' due process claim then depends integrally on whether he qualifies as a retiree under the CBA. The same analysis therefore applies to the due process and contract claims.

Under Illinois law, "[w]here the terms of a contract are clear and unambiguous, they must be given effect as written, and under those circumstances, the meaning of the contract is a question of law." A contract term will only be found to be ambiguous "if the language is reasonably or fairly susceptible to more than one construction." *Omnitrus Merging Corp. v. Ill. Tool Works, Inc.*, 628 N.E.2d 1165, 1168 (Ill. App. Ct. 1st 1993). If a contract is ambiguous as a matter of law, however, "the meaning of any ambiguity found by the court is a question of fact for the determination of the jury." *Id.*

When a contract does not define a term, "the court must give the contractual language its common and generally accepted meaning. Furthermore, the court must place the meanings of words within the context of the contract as a whole." *Dean Mgmt., Inc. v. TBS Const., Inc.*, 790 N.E.2d 934, 939 (Ill. App. Ct. 2nd 2003).  "Contract terms should also be interpreted in accordance with the custom and usage of those particular terms in the trade or industry of the parties." *Intersport, Inc. v Nat'l Collegiate Athletic Ass'n*, 885 N.E.2d 532, 539 (Ill. App. Ct. 1st. 2008). The "contract terms need not be found to be ambiguous before evidence of the custom and usage of the terms in the parties' trade or practice can be considered." *Id.* (citing *Merchants Env't Indus., Inc. v. SLT Realty Ltd. P'ship*, 731 N.E.2d 394, 405 (Ill. App. Ct. 1st 2000). Dictionaries may also be used to discern the "plain and ordinary meaning" of terms in a contract. *Fremont Cas. Ins. Co. v. Ace-Chicago Great Dane Corp.*, 739 N.E.2d 85, 91 (Ill. App. Ct. 1st 2000). These principles are all ultimately aids to the primary objective in construing a contract,

which "is to give effect to the intent of the parties." *Gallagher v. Lenart*, 875 N.E.2d 43, 58 (Ill. 2007).

Defendants argue that the contract term "retiree" is unambiguous and does not include employees like Simmons who are terminated for cause. Plaintiffs disagree and claim that "retiree" is ambiguous, creating a genuine issue of disputed material fact that precludes summary judgment. We address the different bases that the parties use to support their interpretations one-by-one.

The Court has twice previously found that Plaintiff's failed to adequately allege that Simmons qualified as a retiree under the CBA. *See* Doc. 24, 29. Plaintiff had previously argued that Simmons was receiving pension benefits and was therefore entitled to retiree status. Doc. 20, 25. The Court was unpersuaded by this argument and Plaintiffs have abandoned it at summary judgment. Now on summary judgment, Plaintiffs' sole evidence that the contract language is ambiguous is two sets of dictionary definitions. They rely principally on thelawdictionary.org, a free legal resource that purports to have the definitions from the second edition of Black's Law Dictionary.[26] The site defines a retiree as someone who has retired from working; retired means "the act of being in retirement from working and with no plans to return to work"; and, finally reaching the bottom, retirement means "[f]orced or voluntary withdrawal from the job market." Alternatively, they claim that the most recent edition of Black's Law Dictionary defines retirement as "Termination of one's own employment or career, esp[ecially] upon reaching a certain age or for health reasons; the action or fact of stopping work at a job, usu[ally] upon reaching the normal age for leaving employment. Retirement may be voluntary or involuntary."

---

[26]When the Court checked independent copies of the Black's Law Dictionary, 2nd edition, it did not have the definitions listed at thelawdictionary.org. It's only definition for retire was related to bills of exchange, and it did not contain definitions for retiree, retired, or retirement. Black's Law Dictionary (2nd ed. 1910).

*Retirement*, Black's Law Dictionary (11th ed. 2019). These dictionary definitions do not squarely address the issue in this case. The most common definitions of involuntary retirement, in fact the one in Black's Law Dictionary's list of definitions for retirement that Plaintiff conspicuously omits, is a mandatory retirement based on reaching a set maximum age.[27] The dictionary definitions relied upon by Plaintiffs are at best tepidly consistent with their argument and are not strong evidence that the contract term retiree is ambiguous as to Simmons.

To interpret the meaning of retiree under the CBA, Defendants ask the Court to consider the City of Pekin Employee Handbook, which they claim explicitly says terminated employees are not retirees. Plaintiffs argue in response that the Handbook is irrelevant to interpreting the CBA because it has a disclaimer that employees covered by CBAs should refer to their specific contracts where appropriate as "[c]ontract language shall take precedence over statements found in the Manual." Doc 172-77, p. 15. Defendants' claim that the Handbook explicitly excludes terminated employees as retirees is an overstatement, at the least. Like the CBA, the Handbook does not explicitly define retiree, retire, or retirement. The portion of the Handbook that Defendants cite to in their statement of Undisputed Material Facts says merely that "if an employee resigns or is terminated prior to retirement, the employee will only have the rights, if any, provided by federal and state law." Doc. 127-77 at p.16. This statement is merely consistent with Defendant's argument that termination for cause precludes retiree status; it is not the definitive proof that they make it out to be. Plaintiffs' argument similarly overstates the relevance of the quoted section in the Handbook. This is not a case where the Handbook has one clear definition that conflicts with a clear definition in the CBA. The Handbook is relevant, if at all, because there is not a direct definition in the CBA as to who is or is not a retiree. As an additional

---

[27] *Retirement – compulsory retirement*, Black's Law Dictionary (11th ed. 2019).

(non-contractual) agreement between Pekin and its employees, the Handbook gives us some marginal insight into what they meant by the word retiree.

This Court previously agreed with Defendants that the plain and ordinary meaning of retiree is someone who voluntarily leaves the job market, and not someone terminated for cause. Defendants note that Brooks stated in his deposition that he retired because he believed that if he was fired, he would not be entitled to retiree insurance coverage. Finally, Defendants point out that Simmons is still trying to get his job back through arbitration and therefore has not retired.

While the parties do not address the usage of retire/retiree/retirement elsewhere in the contract, we are free to do so. The CBA uses retiree, retirement, or retire in 13 places. The first occurs in Section 19.- Termination of Seniority, which says that an employee's seniority shall cease when he: "a) quits by accepted written resignation; retires; is discharged for just cause; is laid off…." Doc. 172-78 at p. 22. In Section 29.2 Vacation Payoff Upon Termination, the CBA states that when "an officer's employment is terminated, he resigns, or he retires, he will receive pay for any vacation he became eligible for in the year of his termination, resignation or retirement that has not been taken." *Id.* at p. 29. The next sentence against lists termination, resignation, or retirement as three distinct alternatives. In Section 32.4 Unused Sick leave, the CBA provides that no "payment for any unused sick leave shall be made upon termination of employment for any purpose other than retirement with pension benefits." *Id.* at p. 31. The portions of the CBA repeatedly list termination as distinct from retirement, or specify termination for any cause other than retirement. This repeated usage throughout the CBA strongly indicates that the parties did not intend to include officers terminated for cause in the category of retirees.

Based on the totality of the evidence introduced by the parties, the Court finds that Plaintiffs fail to establish that the use of 'retiree' in the CBA is ambiguous. The plain meaning of the term does not include someone who is terminated for cause like Simmons.

Accordingly, Defendant's are entitled to summary judgment on Counts VIII and XI.

A. Due Process and Breaches of Contract

The Court grants summary judgment on Simmons due process claim for an additional reason that the parties did not address in their briefing. "To state a claim for a procedural due process violation, a plaintiff must demonstrate (1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process." *Manistee Apts., LLC v. City of Chicago*, 844 F.3d 630, 633 (7th Cir. 2016). A contract with a public entity can created a property interest protected by the due process clause, but that does not mean that the remedies for a due process clause violation are the same as those for the underlying contract.

The due process clause guarantees Simmons, if anything, a hearing on whether he is entitled to retirement benefits under the contract. But the due process clause does not "require hearings to resolve disputes about the meaning and effect of laws, regulations, and contracts." *Goros v. Cnty. Of Cook*, 489 F.3d 857, 859-60 (7th Cir. 2007). The "adequacy of litigation as a means to determine the meaning of a contract is a premise of our legal system." *Chi. United Indus., Ltd. V. City of Chi.*, 445 F.3d 940, 944 (7th Cir. 2006). The Seventh Circuit has long held that unless "the plaintiff maintains that the state actor had to offer a hearing to resolve some contested issue of fact, the dispute belongs in state court under state law." *Khan v. Bland*, 60 F.3d 519, 532-33 (7th Cir. 2010); *see also Indiana Land Co. v. City of Greenwood*, 378 F.3d 705, 710 (7th Cir. 2004). The relief Simmons requests under his due process claim is for this court to vindicate substantive rights under the CBA - payment of compensatory damages, recovery for

emotional distress, and injunctive relief in the form of an order that the City of Pekin continue

paying him retirement benefits. This relief is unavailable under a procedural due process claim as

a matter of law. For this additional reason, we grant Defendants motion for summary judgment

as to Count VIII.

  b.  <u>Count XIII- Brooks Illinois Wage Payment and Collections Act Claim</u>

In Count XIII, Brooks alleges that he was not paid for sick leave he was entitled to in

violation of the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.*

To state a claim under the IWPCA, an employee is "required to demonstrate that they are owed

compensation from defendants pursuant to an employment agreement." *Chagoya v. City of*

*Chicago*, 992 F.3d 607, 624 (7th Cir. 2021). The IWPCA "provides no substantive relief beyond

what the underlying employment contract [or agreement] requires." *Enger v. Chi. Carriage Cab*

*Corp.*, 812 F.3d 565, 568 (7th Cir. 2016).

Both parties agree that the relevant agreement is the City of Pekin Employee Handbook.

Doc. 172-77, Def. Ex. 77. The Handbook states that "employees who retire or whose

employment otherwise terminates will be paid for all earned but unused vacation in accordance

with Illinois law." *Id.* at p. 15. Upon "retirement, up to a maximum of 240 sick days (1,920

hours) can be used to pay for City of Pekin group health insurance premiums and/or to extend

IMRF service credit." *Id.* Both parties agree that upon Brooks retirement, the City placed

roughly $60,000 dollars into an account to pay for his health insurance premiums. The only

disagreement is whether this amount includes the entirety of the sick leave Brooks was entitled

to.

Brooks' argument works as follows. On March 27, 2018, Chief Dossey unilaterally

placed Brooks on unpaid leave for over five days.  Brooks argues that this unpaid leave violated

65 ILCS 5/10-2.1-17 and Rule 8.2 of the Fire and Police Commission. During this unpaid leave, Brooks claims that the City did not allow him to accrue sick leave and so, if not for his allegedly unlawful unpaid leave, he would have had additional sick leave when he retired in July 2018. Brooks argues therefore the payment did not include any sick leave he should have received for the period starting in March when he was placed on unpaid leave and ending in July when he retired.

Defendants argue that Brooks unpaid leave status was lawful and therefore he was not entitled to any further sick leave. Defendants note that Chief Dossey placed Brooks on unpaid leave status on March 27, 2018. Doc. 172-74. The Commission voted to approve Brooks unpaid leave status pending his disciplinary hearing the very next day on March 28, 2018. Doc. 177-151, Plaintiff's Ex. 150. Therefore, Defendant argues, Brooks suspension was entirely lawful, and he is not entitled to any additional sick pay and so has no claim under the IWPCA.

Based on these facts, Defendants have shown that there is no genuine issue of material fact, and they are entitled to judgment as a matter of law on Brooks IWPCA claim. Under Rule 8.2 of the City of Pekin Fire and Police Commission Rules and Regulations, the Chief of Police "shall have the right to suspend any officer under their command for a period not to exceed 5 days providing no charges on the same offense have been filed and are pending before the commission and they shall notify the commission in a timely manner of the time of the suspension." Doc. 177-76, Plaintiff's Ex. 74. Similarly, 65 ILCS 5/10-2.1-17 prohibits the Chief of Police from suspending an officer without pay for more than 5 days unless the Chief informs the Commission in writing and the Commission arranges for a hearing on the charges underlying the suspension. Defendant's unrebutted evidence shows that within one day of Brooks' suspension by Chief Dossey, the Commission met and approved his suspension pending a

disciplinary hearing. This satisfies both the Commission's Rule 8.2 and the Act's statutory requirements. Plaintiff has failed to produce specific evidence contradicting this and therefore failed to prove the existence of a genuine issue of material fact.

The Court additionally notes that Brooks has failed to show that he was entitled to more sick leave than he was paid, even if his suspension was unlawful. In the Undisputed Material Facts section of their Motion for Summary Judgment, Defendants state that Brooks received all sick pay he was entitled to. Doc. 172 at 48, UMF ¶303. Defendants base this on the deposition testimony of Defendant Sarah Newcomb, Pekin's Human Resources Director. Doc. 172-32 at p. 71-75. Newcomb testified that a full-time employee such as Brooks is eligible to receive 96 hours of sick time per calendar year. *Id.* at 73. On January 1, 2018, Brooks was given the entire 96 hours he would have been entitled to if he had worked the entire year. *Id.* at 71, 73. Although Plaintiffs identify this fact as a disputed and material, they point to no specific evidence showing that Brooks was paid any amount other than the full year's worth, or 96 hours, as testified to by Newcomb. It is therefore immaterial whether Brooks was entitled to sick leave for the period of March-July 2018, because the uncontradicted evidence shows that he was paid for all that time and more.

The Court finds that the Defendants have shown that there is no genuine issue of material fact as to Brooks' IWPCA claim and they are entitled to judgment as a matter of law. Therefore, their motion for summary judgment is granted as to Count XIII.

a.  <u>Count VII- Simmons Intentional Interference With Employment Relations Against Officer Melton</u>

We now turn to the final issue, Simmons' state law Intentional Interference With Employment Relations claim against Officer Melton. Plaintiffs have established a genuine issue

of material fact as to Simmons intentional interference with employment relationship against Officer Melton. Under Illinois law, a plaintiff can establish the tort of intentional interference with employment relationship by proving that plaintiff had "(1) [a] reasonable expectation of continued employment; (2) knowledge of the business relationship by the interferer; (3) intentional interference; and (4) resultant damage." *Marczak v. Drexel Nat. Bank*, 186 Ill.App.3d 640, 645 (Ill. App. 1st 1989). Not all interference is actionable, there must be "some impropriety in doing so." *Callis, Papa, Jackstadt & Halloran, P.C. v. Norfolk and Western Ry. Co.*, 195 Ill.2d 356, 369-70 (2001). Illinois courts have held that there is no impropriety in making truthful statements, but it is generally improper interference when someone makes knowingly and maliciously false statements. *Soderlund Bros., Inc. v. Carrier Corp.*, 663 N.E.2d 1, 10 (Ill. App. 1st 1995) (truthful statements cannot be basis for interference with contractual relationship); *Marczak*, 186 Ill. App. 3d at 646-47 (false and malicious allegations that resulted in plaintiff's loss of employment were sufficient to state claim for interference with contractual relationship). As such, Plaintiff can prevail only if he can show that Officer Melton knew her claims of sexual harassment were false when she made them.

Simmons argues that Officer Melton falsely accused him of commenting on her breasts on two dates in March 2017. He denies ever making the statements in question and argues that her knowingly false accusation caused him to be placed on unpaid leave and eventually terminated. In rebuttal, Defendants argue that Melton heard him make the statements and they were corroborated by several witnesses. As to the incident on March 3, 2017, Melton's husband, Charles Melton, testified that he observed Simmons comment and use hand gestures to describe the size of Officer Melton's breasts. As to the incident on March 25, 2017, it was witnessed by Doug Vogel. For both accounts, Deputy Chief Baxter investigated and found Officer Melton's

account credible, as did HR Director Newcomb, and the Pekin Police and Fire Commission. Defendants also raise very real concerns that allowing Simmons' claim to go to trial will have a chilling effect on reporting of harassment, as it would allow anyone accused of sexual harassment to threaten their accusers with legal action so long as the accused denies engaging in the underlying misconduct.

While Defendants' version of events is far more corroborated than Plaintiffs' and their chilling effect concerns are legitimate, this issue will ultimately be decided upon determinations of credibility that we cannot make on summary judgment. Drawing all reasonable inferences in Simmons' favor as we must, a reasonable jury could believe his denial of the statements attributed to him over Officer Melton and the corroborating witnesses.

As such, Defendants' motion for summary judgment is denied as to Count VII. However, the Court has dismissed or granted summary judgment on each claim over which it has original jurisdiction. The Court declines to maintain supplemental jurisdiction over the remaining state law claim against Officer Melton and so *sua sponte* dismisses Count VII without prejudice. *Groce v. Eli Lilly & Co.,* 193 F.3d 496, 501 (7th Cir. 1999) (stating "we pause to emphasize that it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."); *see also* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if— (3) the district court has dismissed all claims over which it has original jurisdiction.").

## Conclusion

For the reasons set forth above, Defendants' Motion (Doc. 172) for Summary Judgment is GRANTED IN PART and DENIED IN PART. Summary judgment is DENIED as to Count VII

and GRANTED as to all other Counts in Plaintiffs Second (Doc. 37) Amended Complaint. As

the Court has disposed of all claims over which it has original jurisdiction, it declines to maintain

jurisdiction over the remaining state law claim and so DISMISSES Count VII without prejudice.

The Clerk is directed to terminate this case.

        Signed on this 10th day of May, 2023,


                                        s/ James E Shadid_____
                                        James E. Shadid
                                        United States District Judge

AO 450 (Rev. 11/11)   Judgment in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central     District of     Illinois

| | |
|---|---|
| John Brooks and Gregory Simmons, <br> *Plaintiffs* <br> v. <br> City of Pekin, John Dossey, Donald Baxter, Sarah Newcomb and Jennifer Melton, <br> *Defendants* | ) <br> ) <br> ) <br> ) <br> )     Civil Action No.    18-cv-1334 |

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐ the plaintiff *(name)* _____ recover from the defendant *(name)* _____ the amount of _____ dollars ($ _____ ), which includes prejudgment interest at the rate of _____ %, plus post judgment interest at the rate of _____ % per annum, along with costs.

☐ the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____ recover costs from the plaintiff *(name)* _____ _____ .

☒ other:   Plaintiffs, John Brooks and Gregory Simmons, recover nothing on their claims against Defendants, City of Pekin, John Dossey, Donald Baxter, Sarah Newcomb and Jennifer Melton. _____ .

This action was *(check one)*:

☐ tried by a jury with Judge _____ presiding, and the jury has rendered a verdict.

☐ tried by Judge _____ without a jury and the above decision was reached.

☒ decided by Judge   James E. Shadid   on a motion for   for Summary Judgment. _____ .

Date:   5/11/2023

s/JES

CLERK OF COURT

_____
*Signature of Clerk or Deputy Clerk*

P. 68