No. 23-2140

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

---

| | |
|---|---|
| JOHN BROOKS and GREGORY SIMMONS, ) | |
| ) | On Appeal from the United |
| Plaintiffs-Appellants, ) | States District Court for the |
| ) | Central District of Illinois, |
| v. ) | Peoria Division |
| ) | |
| THE CITY OF PEKIN, ILLINOIS, ) | Case No. 1:18-CV-1334 |
| JOHN DOSSEY, DONALD BAXTER, ) | |
| SARAH NEWCOMB, and JENNIFER ) | Hon. Judge James E. Shadid |
| MELTON, ) | |
| ) | |
| Defendants-Appellees. ) | |

---

**BRIEF AND SUPPLEMENTAL APPENDIX
OF DEFENDANTS-APPELLEES**

---

Counsel for Defendants-Appellees:

CHRISTOPHER H. SOKN
Kingery Durree Wakeman & O'Donnell, Assoc.
416 Main Street, Suite 1600
Peoria, Illinois 61602
Telephone: (309) 676-3612
Email: chsokn@kdwolaw.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2140

Short Caption: John Brooks and Gregory Simmons v. City of Pekin, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
The City of Pekin, Illinois; John Dossey; Donald Baxter; Sarah Newcomb; Jennifer Melton

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Kingery Durree Wakeman & O'Donnell, Assoc.

(3)  If the party, amicus or intervenor is a corporation:

i)  Identify all its parent corporations, if any; and
N/A

ii)  list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
N/A

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: /s/Christopher H. Sokn          Date: 6/21/23

Attorney's Printed Name: Christopher H. Sokn

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** [✓]  **No** [ ]

Address: Kingery Durree Wakeman & O'Donnell, Assoc., 416 Main Street, Suite 1600, Peoria, IL 61602

Phone Number: 309-676-3612          Fax Number: 309-676-1329

E-Mail Address: chsokn@kdwolaw.com

rev. 12/19 AK

i

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT ................................................. i

TABLE OF CONTENTS ...................................................................... ii

TABLE OF AUTHORITIES ............................................................... vii

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF THE CASE ............................................................... 3

    Burris Votes Against Simmons' Pension Request ............................... 3

    Burris Investigates Simmons for Sexual Harassment ........................ 3

    Simmons Complains About a Burris Comment ................................... 4

    Simmons Begins Secretly Recording Police Meetings ........................ 4

    Simmons Reports Another Burris Comment ...................................... 5

    Brooks Makes Inappropriate Comments as First-Shift
    Lieutenant ........................................................................................ 5

    Simmons Reports Melton for Calling Him a "Jackass" ...................... 6

    Melton Reports Simmons' Comments about her Breasts ................... 6

    Melton Fears Retaliation from Brooks ............................................... 7

    Simmons Violates Instruction to Not Speak About the
    Investigation .................................................................................... 7

    Brooks is Reassigned to Second Shift ............................................... 8

    Brooks Immediately Requests to Stay on First Shift ......................... 8

    Simmons Denies Discussing the Investigation .................................. 8

    Brooks Files an HR Complaint .......................................................... 8

Brooks Denies He Needs Accommodation ...............................................9

A Disciplinary Complaint is Filed Against Simmons .............................10

Brooks Files an IDHR Complaint............................................................10

Brooks is Offered Multiple Accommodations.......................................10

Subordinate Officers Report Brooks Pressuring them for
Support ..................................................................................................11

Investigation Reveals Brooks' Insubordination and
Intimidation ..........................................................................................12

Simmons is Suspected of Secretly Recording Meetings ..........................13

Brooks Continues his Mutinous Conduct ............................................13

Brooks is Discovered Secretly Copying Personnel Records..................14

Simmons Files an IDHR and EEOC Complaint ...................................16

The City Investigates Who Recorded the Shift Brief ..........................16

Simmons Admits He Secretly Recorded Numerous Meetings .............16

An Amended Complaint is Filed against Simmons..............................17

Simmons Does Not Attend the FPC Hearing .....................................17

A Disciplinary Complaint Against Brooks is Filed..............................18

Brooks Retires Rather than Proceed to Hearing .................................18

Plaintiffs File Suit.................................................................................18

Defendants Move to Stay Proceedings as to Simmons........................18

Defendants' Motion for Summary Judgment is Filed and
Plaintiffs' Response is Stricken .............................................................19

Plaintiffs Re-File Their Response to the Motion for Summary Judgment and Defendants Reply ...........................................................19

Plaintiffs' First Request to Amend Their Response ..............................19

Plaintiffs' Second Request to Amend Their Response...........................19

The February 2, 2023 Order ..................................................................20

The District Court Grants Partial Summary Judgment and Plaintiffs Appeal ...................................................................................20

Simmons Files a Lawsuit in State Court Repleading Count VII........21

SUMMARY OF ARGUMENT....................................................................21

I.      Arguments unrelated to Counts I through IV were waived...........21

II.     The District Court did not abuse its discretion in refusing to allow Plaintiffs to file an Amended Response nor to deem the noncompliant paragraphs of the Response admitted..............21

III.    The City did not fail to accommodate Brooks' disability ...............21

IV.     Brooks did not receive disparate treatment for making ADA claims ...................................................................................22

V.      Brooks was not retaliated against for making ADA claims ...........22

VI.     Simmons was not retaliated against for reporting Burris .............22

VII.    The Court should hold this appeal frivolous ..................................23

ARGUMENT ...............................................................................................23

I.      Plaintiffs affirmatively waived review of any rulings beyond Counts I through IV.........................................................................23

II.     The District Court did not abuse its discretion in refusing to allow Plaintiffs to file an Amended Response or holding their noncompliant facts undisputed........................................................23

A. The District Court properly denied the request to file an Amended Response ...........................................24

B. Plaintiffs appealed a ruling exclusively to their benefit ........26

C. Plaintiffs have continued their rule violations in their brief .............................................................................27

III. Counts I – III – Brooks' ADA Claims ...............................27

    A. Count I – Failure to Accommodate ...........................29

        1. The City engaged in the interactive process with Brooks ...............................................................31

        2. Brooks waived argument on unreasonable delay by not presenting it to the District Court ...........................32

        3. Brooks and his Attorney Agreed to the Accommodation Plan...............................................33

        4. The offered accommodations were reasonable ones to try.....................................................................34

        5. Moving Brooks back to first shift was unreasonable......36

    B. Count II – ADA Disparate Treatment.......................38

        1. Brooks was not constructively discharged. ...................39

        2. Burris is not a valid comparator for Brooks..................40

    C. Count III – ADA Retaliation .....................................42

IV. Count IV – Simmons' Title VII Retaliation Claim ...........43

    A. Simmons' recordings violated department policy..................44

    B. Simmons cannot link his Burris complaints to his suspension ..............................................................49

C.    Simmons' arbitration proceedings are irrelevant to his
      Title VII claim .................................................................50

D.    The District Court's Order did not rely on a lack of
      retaliatory or discriminatory animus ....................................51

E.    Burris is not a valid comparator for Simmons .........................52

V.    The Court should hold the appeal frivolous ....................................52

VI.   Conclusion ..............................................................................55

CERTIFICATE OF COMPLIANCE ...........................................................56

CERTIFICATE OF SERVICE ..................................................................57

DEFENDANTS' SUPPLEMENTAL APPENDIX ATTACHED

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

*Benitez v. American Standard Circuits, Inc.,*
    678 F.Supp.2d 745 (N.D. Ill. 2010) ....................................................43

*Bradley v. Village of University Park, Illinois,*
    59 F.4th 887 (7th Cir. 2023) ...........................................................23

*Brooks v. Avancez,* 39 F.4th 424 (7th Cir. 2022) ........................................42

*Bunn v. Khoury Enterprises, Inc.,* 753 F.3d 676 (7th Cir. 2014)..............30

*Carlsbad Technology, Inc. v. HIF Bio, Inc.,* 556 U.S. 635 (2009) .............3

*Clark County School Dist. v. Breeden,* 532 U.S. 268 (2001) ....................43-44

*Cloe v. City of Indianapolis,* 712 F.3d 1171 (7th Cir. 2013) ....................30

*Coleman v. Donahoe,* 667 F.3d 835 (7th Cir. 2012) ..................................38

*Cook Au Vin LLC v. Mid-Century Ins. Co.,* 2023 IL App (1st) 220601 ....45-46

*EEOC v. Wal-Mart Stores, Inc.,* 38 F.4th 651 (7th Cir. 2022) .................35

*Gile v. United Airlines, Inc.,* 95 F.3d 492 (7th Cir. 1996).........................30

*Gonpo v. Sonam's Stonewalls & Art, LLC,* 41 F.4th 1 (1st Cir. 2022) .....2

*Grube v. Lau Industries, Inc.,* 257 F.3d 723 (7th Cir. 2001) ....................2

*Herzfeld & Stern v. Blair,* 769 F.2d 645, (10th Cir. 1985) ........................53

*Hillman v. City of Chicago,* 834 F.3d 787 (7th Cir. 2016) ........................38

*Holman v. Indiana,* 211 F.3d 399 (7th Cir. 2000) ....................................43

*In re Dordevic,* 67 F.4th 372 (7th Cir. 2023) .............................................52

*In re Lakisha M.,* 227 Ill.2d 259 (2008)......................................................48

*Jeppesen v. Rust,* 8 F.3d 1245 (7th Cir. 1993)...........................................31, 33

*Koty v. DuPage County, Illinois,* 900 F.3d 515 (7th Cir. 2018) ...............42

*Marnocha v. St. Vincent Hosp. & Health Care Ctr, Inc.,*
    986 F.3d 711 (7th Cir. 2021) ............................................................38

*McCray v. Wilkie,* 966 F.3d 616 (7th Cir. 2020) .......................................33

*McCurry v. Kenco Logistics Services, LLC,*
    942 F.3d 783 (7th Cir. 2019) ............................................................52

*Palka v. Shelton,* 623 F.3d 447 (7th Cir. 2010) .........................................39

*Parker v. Brooks Life Science, Inc.,* 39 F.4th 931, (7th Cir. 2022) ...........42-43

*Paulik v. Rizkalla,* 796 F.2d 456, (Fed. Cir. 1986) ....................................53

*People v. Beardsley,* 115 Ill.2d 47 (1986)....................................................46-47

*Philips Med. Sys Intl., B. V. v. Bruetman,*
    982 F.2d 211 (7th Cir. 1992) .............................................................2

*Poke v. City of La Cross Wisconsin,*
    2020 WL 143214 (W.D. Wis. Jan. 13, 2020) ...................................42

*Romala Corp. v. U.S.,* 927 F.2d 1219, 1222 (Fed. Cir. 1991) ..................53

*See v. Ill. Gaming Bd.,* 29 F.4th 363 (7th Cir. 2022) ................................42

*Smith v. Chi. Transit Auth.,* 806 F.3d 900 (7th Cir. 2015) ......................42

*Spurling v. C & M Fine Pack, Inc.,* 739 F.3d 1055 (7th Cir. 2014)...........32

*Ulrey v. Reichart,* 941 F.3d 225 (7th Cir. 2019)........................................42

*Village of Bartonville v. Lopez,* 2017 IL 120643 .......................................50

**STATUTES:**

28 U.S.C. § 1331 .......................................................................................1

42 U.S.C. § 12111 ...................................................................................1

42 U.S.C. § 2000e ...................................................................................1

42 U.S.C. § 621 ........................................................................................1

42 U.S.C. § 1983 ......................................................................................1

28 U.S.C. § 1367 ......................................................................................1

820 ILCS 115 ...........................................................................................1

28 U.S.C. § 1291 ......................................................................................3

720 ILCS 5/14-2........................................................................................45

65 ILCS 5/10-2.1-1 ...................................................................................50

65 ILCS5/10-10-2.1-17 .............................................................................50

28 U.S.C. § 1912 ......................................................................................52, 55

**RULES:**

Fed. R. App. P. 3(c)(6) .............................................................................2-3

Fed. R. Evid. 201 .....................................................................................2

Ill. S. Ct. R. 324.......................................................................................2

Fed. R. Civ. P. 56(e) .................................................................................26

29 CFR § 1630.2(o)(4) ..............................................................................36

29 CFR § 1630.2(p)(2) ..............................................................................36

Fed. R. App. P. 38......................................................................................52, 55

## <u>JURISDICTIONAL STATEMENT</u>

Appellants' jurisdictional statement is not complete and correct. The District Court had original jurisdiction over Counts I through VI, VIII through X, and XII of the Second Amended Complaint[1] (#37)[2] as federal questions pursuant to 28 U.S.C. § 1331. Counts I through III alleged violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq*. Counts IV and XII alleged violations of Title VII of the Civil Rights Act, 42 U.S.C. 2000e *et seq*. Counts V and VI alleged violations of the Age Discrimination in Employment Act, 29 U.S.C. § 621. Count VIII alleged a violation of due process rights pursuant to 42 U.S.C. § 1983. Counts IX and X alleged a violation of the right to equal protection under the law pursuant to 42 U.S.C. § 1983.

The District Court had supplemental jurisdiction over Illinois state law Counts VII, XI, and XIII pursuant to 28 U.S.C. § 1367. Count VII alleged intentional interference with employment relations. Count XI alleged breach of contract. Count XIII alleged an Illinois Wage Payment and Collection Act claim, 820 ILCS 115 *et seq*.

On February 2, 2023, the District Court denied the Plaintiffs' Motion to Amend their Response to the Motion for Summary Judgment. (A1) On May 10, 2023, the District Court issued its Final Order and Opinion (A4) granting summary judgment for Defendants on all Counts except Count VII, over which the District

---

[1] The "Second Amended Complaint" (#37) was the third filed. (A2, n.2) The District Court referred to Document 37, the operative complaint during summary judgment, solely as the "Second Amended Complaint" for sake of clarity and this Brief continues that convention.
[2] Citations to "#" are to the District Court ECF document number. Citations to "A" are to the "Short Appendix" attached to Appellants' Brief.

Court declined to exercise supplemental jurisdiction. (A66) Final judgment was entered on May 11, 2023. (A68)

On June 7, 2023, Plaintiffs filed their Notice of Appeal. (#189) Appellants' Brief seeks reversal only "regarding counts 1-4 of their second amended complaint." (App. #20, p. 2)[3] The Notice of Appeal, however, does not contain an express statement limiting its scope. See Fed. R. App. P. 3(c)(6). The failure to limit the scope of the appeal placed jurisdiction of the entire matter before this Court. Compare *Gonpo v. Sonam's Stonewalls & Art, LLC*, 41 F.4th 1, 10-11 (1st Cir. 2022) (limiting scope of appeal requires express statement in notice) with *Grube v. Lau Industries, Inc.*, 257 F.3d 723, 731 (7th Cir. 2001) (once notice of appeal is filed, appellate court assumes jurisdiction).

The Court can take judicial notice of a proceeding in another court that has a direct connection to issues on appeal. See Fed. R. Evid. 201; *Philips Med. Sys. Intl., B. V. v. Bruetman*, 982 F.2d 211, 215, n.2 (7th Cir. 1992). The same day the Notice of Appeal was filed, Plaintiff Simmons refiled Count VII in the Circuit Court of Tazewell County, Illinois. Defendants request the Court take judicial notice of the file-stamped Complaint (DSA 1)[4] and pending Motion to Dismiss (DSA 5) as their accuracy cannot reasonably be questioned. See Ill. S. Ct. R. 324.

---

[3] Citations to "App. #20, p. __" are to Appellants' Brief and the page numbers set forth in the brief, not any PDF sequential pagination

[4] References to "DSA" are to the Defendants' Supplemental Appendix. Plaintiffs also filed a Supplemental Appendix which contains irrelevant documents from an unrelated arbitration proceeding that are not publicly available and outside the record. Neither leave to supplement the record nor a request to take judicial notice was filed for the documents in the Plaintiffs' Supplemental Appendix.

The Court therefore has jurisdiction over the Notice of Appeal pursuant to 28 U.S.C. § 1291. Jurisdiction was not limited pursuant to Fed. R. App. P. 3(c)(6). This Court assumed jurisdiction over Count VII when the Notice was filed, as an order declining to exercise supplemental jurisdiction is appealable. *Carlsbad Technology, Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 636 (2009).

## STATEMENT OF THE CASE

### Burris Votes Against Simmons' Pension Request

Plaintiff-Appellant Greg Simmons, a City of Pekin (the "City") Police Officer, was suspended without pay between 2006 and 2008. (#172-1, p. 8-11, 72, 86-89) After the suspension, Simmons requested the pension board grant him free pension credit for his time suspended. (#172-1, p. 87-88) Officer Greg Burris voted against Simmons' request. (#172-2, p. 2-3) Burris believed Simmons was "out to get" him ever since. (#172-3, p. 12)

### Burris Investigates Simmons for Sexual Harassment

On October 14, 2015, Burris, now a Lieutenant, was assigned to investigate a complaint that Simmons had harassed a teenager about his sexuality and "fuck boy haircut" at his job. (#172-4, p. 1-2) Burris spoke with employees at Andy's Diner who told him Simmons, on duty and in uniform, made comments about the sexuality of multiple teenage employees for at least seven months and harassed two male employees, one homosexual and one not, about being in a relationship. (#172-4, p. 1-3) Simmons reportedly told staff he did not want a homosexual to serve him.

3

(#172-4, p. 3) Plaintiff-Appellant John Brooks, a City Police Lieutenant and Simmons' supervisor, ultimately gave Simmons a verbal reprimand. (#172-4, p. 5)

### Simmons Complains About a Burris Comment

On December 16, 2016, Burris asked Simmons if he was dating or sleeping with Ina, who Burris said had brain damage. (#172-6, p. 1) Simmons reported the comments to Deputy Chief Donald Baxter. (#172-6, p. 1) Baxter spoke with multiple officers who said Burris was joking. (#172-6, p. 1) Burris confirmed he made the comment as part of the usual joking around and his desire to include Simmons in the group. (#172-6, p. 2) Burris received a two-day suspension for the comment. (#172-7)

### Simmons Begins Secretly Recording Police Meetings

Thereafter, Simmons began to secretly record police meetings and conversations. (#172-1, p. 147) Simmons did so without permission (#172-8, p. 23, 33) and such recording was forbidden by Department policy. (#172-9, p. 2)

On January 11, 2017, Simmons secretly recorded the shift brief. (#172-8, p. 5) During the meeting, Chief John Dossey and Baxter discussed a Fire and Police Commission ("FPC") decision to terminate Officer Nate Ujinski for striking a minor and lying about what occurred. (#172-8, p. 1, 15) After recording the meeting, Simmons called the minor's family and spoke to Lefante Law, the firm representing the minor. (#172-1, p. 161) Simmons gave a copy of the recording to Lefante Law. (#172-8, p. 14, 26) Simmons continued to make secret recordings, (#172-8, p. 20-25) producing nine in discovery. (#186, p. 131, ¶ 34)

**Simmons Reports Another Burris Comment**

On April 7, 2017, Simmons reported a Burris comment to Dossey. (#172-2, p. 1) Simmons reported a woman came to the lobby to speak with him and Burris asked if he was having sex with her. (#172-2, p. 1)

Dossey ordered Deputy Chief Kaminski to investigate (#172-2, p. 2) and Burris moved to second shift to separate him from supervising Simmons. (#172-2, p. 2) Burris denied making the comments and stated this was Simmons' retaliation for the pension vote. (#172-2, p. 2-3; #172-12, p. 25, 29) Burris, after being placed on leave, agreed to a Stipulated Last Chance Agreement with a permanent demotion to patrol and a 21-day suspension. (#172-13; #172-14)

**Brooks Makes Inappropriate Comments as First-Shift Lieutenant**

When Burris was demoted, Brooks was transferred to first shift. (#172-16) Brooks previously spent "most" of his career on second shift. (#172-15, p. 18-19)

During his first shift brief, Brooks told officers he was sorry for their "eight months of abuse" under Burris and they should not let Burris into the union. (#172-17, p. 1) The next day, Brooks again discussed union issues and twice asked Officer Will Taylor if "the drapes match the carpet," referring to his pubic hair. (#172-17, p. 1)

A few days later, Brooks admitted to engaging in inappropriate conversations at shift brief. (#172-17, p. 1) Baxter told Brooks any future misconduct would result in Brooks being transferred off first shift. (#172-17, p. 2) Baxter recommended Brooks receive a written reprimand and counseling. (#172-17, p. 2)

**Simmons Reports Melton for Calling Him a "Jackass"**

On May 5, 2017, Simmons asked Officer Jennifer Melton to hand him something, and she said "here you go, buddy." (#172-18, p. 1) Simmons asked, "so now I'm your buddy?" (#172-18, p. 1) Melton responded, "ok, here you go jackass." (#172-18, p. 1; #172-19, p. 18-19) Simmons reported this to Brooks, claiming Melton was mad at him and does not like him. (#172-18, p. 1) Brooks recommended Melton be disciplined. (#172-18, p. 2)

**Melton Reports Simmons' Comments about her Breasts**

On May 24, 2017, Melton reported to Baxter that Simmons recently made inappropriate comments about Melton's breasts. (#172-23, p. 1) On March 3, 2017, when Melton was leaving the squad room with her husband, Simmons stated: "Jen I didn't realize that you had such big boobs." (#172-23, p. 1-2) Melton's husband later stated Simmons also made a hand gesture to describe the size of Melton's breasts. (#172-23, p. 2; #172-19, p. 97, 100-101; #172-24, p. 35) On March 25, 2017, Simmons made a similar comment about Melton's breasts to a citizen named Doug Vogel at a local Steak 'n Shake. (#172-23, p. 1)

On May 26, 2017, Baxter e-mailed Brooks requesting he speak to Simmons. (#172-25) Brooks asked if Melton had gone "direct" to Baxter because Brooks would "prefer" Melton "follow her chain of command," but would still "take care of it." (#172-25) Brooks alleged Melton's allegations were retaliatory and Simmons denied them. (#172-26, p. 1) Brooks claimed it was inappropriate for Melton to make

comments "and then turn around and claim to be offended when like comments are made either to her or to someone else in her presence." (#172-26, p. 2)

Baxter found Vogel that same day. (#172-23, p. 1; #172-28) In a recorded interview, Vogel confirmed Simmons said Melton had either "big" or "medium size" breasts. (#172-28, p. 3)

The following day, Melton emailed Baxter, explaining Simmons invited Vogel, an adult male with an intellectual disability, to their table and pointed out her "big boobs" to Vogel, who laughed nervously. (#172-30) Melton was embarrassed and upset by Simmons' comments. (#172-30)

**Melton Fears Retaliation from Brooks**

Baxter recommended Melton speak with HR Director Sarah Newcomb. (#172-19, p. 112) Melton, visibly upset, reported her fear of retaliation from Brooks for reporting his friend Simmons. (#172-31, p. 2; #172-32, p. 17; #172-33, p. 6-7) Melton previously moved to first shift to get away from Brooks and believed he did not like female officers. (#172-31, p. 1)

**Simmons Violates Instruction to Not Speak About the Investigation**

On June 6, 2017, Simmons was served a Notice of Interrogation regarding his comments about Melton's breasts. (#172-37) The Notice orders Simmons to "refrain from discussing this investigation or the underlying facts with any other officer until the investigation is concluded or you are otherwise authorized to do so." (#172-37, p. 1) Later that day, Simmons called Brooks and discussed the investigation. (#172-39, p. 1; #172-1, p. 262-63)

**Brooks is Reassigned to Second Shift**

On June 19, 2017, Melton filed a formal Sworn Complaint against Simmons for his comments. (#172-34) To avoid Brooks supervising Melton, Brooks was assigned to second shift. (#172-27, p. 152-53; #172-35, p. 66-67)

**Brooks Immediately Requests to Stay on First Shift**

The next day, Brooks filed a "Reasonable Accommodation Request Form" claiming he could not work second shift because of sleep apnea. (#172-36, p. 1-2) Brooks stated "[i]t will be very difficult, if not impossible to maintain a consistent sleep schedule on 2nd shift. I worked 2nd shift for close to 10 years so I know from experience." (#172-36, p. 1) Brooks stated the "denial to work my preferred shift as my seniority allows" was the limitation he was experiencing. (#172-36, p. 2)

**Simmons Denies Discussing the Investigation**

Simmons was interrogated on June 19, 2017. (#172-40) Simmons denied speaking to anyone except Dossey and Baxter about the investigation and specifically denied speaking to Brooks. (#172-40, p. 4-5) Two days later, Simmons was placed on unpaid leave. (#172-42)

**Brooks Files an HR Complaint**

On June 26, 2017 and July 6, 2017, Brooks filed complaints with the Pekin Human Resources Department against Melton, Baxter, and Dossey regarding his shift transfer and "unprofessional treatment." (#172-43; #172-44)

Newcomb spent nearly 40 hours investigating Brooks' complaints and interviewing ten witnesses. (#172-45, p. 1) Newcomb concluded there was no

substantiated harassment, discrimination, or intimidation against Brooks. (#172-45, p. 12) Newcomb concluded Brooks was complaining of reasonable efforts by Dossey and Baxter to manage Brooks (#172-45, p. 12) and, if anything, Dossey was more lenient on Brooks than others. (#172-45, p. 10) Newcomb found moving Brooks to second shift was done to protect Brooks, Melton, and the City. (#172-45, p. 11)

Newcomb found Brooks' request that Melton be moved instead of him untenable because Melton's shift was controlled by the union contract, requiring her to move would deny her afforded protections, and Brooks, a non-union employee, had no guaranteed assignment as lieutenants were assigned as needed. (#172-45, p. 11) Brooks could not be moved to special services because he had no investigation experience and there was an active murder investigation. (#172-45, p. 13, #172-46, p. 40-41; #172-35, p. 86-87; #172-32, p. 43) Brooks would not be moved to third shift because Lieutenant Little had agreed to move to third shift because of a serious family issue. (#172-45, p. 3; #172-35, p. 87)

Newcomb found no one could corroborate Brooks' claims.  (#172-45, p. 12) She found "several incidents of opposing statements to those Lt. Brooks directly associated with people in his narrative." (#172-45, p. 12) Newcomb interviewed numerous individuals who denied the statements Brooks attributed to them (#172-45, p. 4-10, 36-40)

### Brooks Denies He Needs Accommodation

On July 12, 2017, Brooks attended a meeting to discuss his disability claim. (#172-47) Brooks sent an e-mail to Newcomb stating: "I just wanted to clarify that

in essence my request is really not a special accommodation in that as the senior Lieutenant my seniority allows me to work day shift already." (#172-47) Brooks reiterated "the denial to work [his] preferred shift as [his] seniority allows" was the "limitation" "interfering with [his] ability to perform [his] job." (#172-47; #172-36) Brooks provided a doctor's report that said he could perform the job "with or without accommodation." (#172-15, p. 185) Two days later, Newcomb informed Brooks that since he claimed he needed no accommodation and was able to complete all job functions, he would not be moved back to first shift.  (#172-48)

### A Disciplinary Complaint is Filed Against Simmons

On August 23, 2017, an FPC Complaint was filed against Simmons regarding his comments about Melton's breasts, violating the order to not discuss the investigation, and lying about it. (#172-63)

### Brooks Files an IDHR Complaint

On September 27, 2017, Brooks executed an Illinois Department of Human Rights (IDHR) complaint for failure to accommodate his disability, requesting dual filing with the EEOC. (#172-49) The City was not notified until a letter dated October 27, 2017. (#172-51, p. 1)

### Brooks is Offered Multiple Accommodations

On October 12, 2017, Brooks and his attorney met with Newcomb, Kaminski, and Joshua Herman, City Labor Counsel, to discuss accommodations for Brooks. (#172-53, p. 1) Brooks stated he did not take medication for sleep apnea because he "don't want to." (#172-53, p. 6) While discussing managing his sleep apnea, Brooks

told Herman: "Is there anything else you want to tell me to do with my life, Josh? I mean, come on." (#172-53, p. 9) Herman told Brooks remaining on first shift was not reasonable as he was accused of creating a harassing work environment for others on first shift. (#172-53, p. 10) Extracting Brooks from supervising certain officers would be impossible without requiring a second Lieutenant assigned for that shift. (#172-53, p. 12)

Herman offered to allow Brooks to go home and take a nap during his shift when sergeants are on duty. (#172-53, p. 25-26) Brooks was also offered staggered shifts, rest periods, and the ability to sleep during his shift. (#172-53, p. 15-16, 24) If Brooks' doctor recommended medication, the City would "accommodate a work schedule that allows [him] to adjust to [his] medication." (#172-53 p. 22) Brooks confirmed he was allowed these accommodations. (#172-15, p. 238-39) Brooks later admitted his doctor said he could perform all necessary tasks of the job "with or without accommodation." (#172-15, p. 185)

The meeting concluded with the agreement Brooks would try the accommodations, log which worked best for him over the next two weeks, meet with his doctor, and reconvene after Brooks' vacation. (#172-53, p. 37-38, 40, 43) Brooks' vacation started on October 26, 2017. (#172-53, p. 37)

**Subordinate Officers Report Brooks Pressuring them for Support**

On the evening of October 26, 2017, Lieutenant Jeff Little sent an e-mail to Baxter regarding questioning two officers received from Brooks. (#172-54) Officer Willmert told Little that Brooks said he "hopes people tell the truth when the time

11

comes" and asked Willmert to provide him "written documentation" if needed. (#172-54) Officer Jones told Little that Brooks asked if Dossey ever lied to him and that Dossey said he would not promote Jones because of his complaining. (#172-54)

Little felt he needed to bring this to Baxter's attention because the situation with Brooks was "putting undue stress on our personnel at all different levels." (#172-54) Little asked Baxter to speak with the officers. (#172-54)

**Investigation Reveals Brooks' Insubordination and Intimidation**

On October 30, 2017, Dossey ordered Baxter to begin a formal investigation into Brooks' comments to subordinates. (#172-55) Baxter interviewed numerous officers who reported Brooks had recently questioned or pressured them about supporting him against the City, that the City was "screwing with him," he had a lawsuit and ADA claim, that Command and City employees were liars, and other denigrating statements. (#172-56, p. 1-5) Brooks asked Officer Thompson to read over Brooks' HR complaints for "accuracy." (#172-56, p. 4; #177-19, p. 29-30) Officers reported Brooks was vindictive and they feared retaliation for reporting him. (#172-56, p. 1-5)

Baxter concluded Brooks was "attempting to obtain support from subordinate officers through use of his superior rank and the implied threat of retaliation." (#172-56, p. 1) When Brooks returned from vacation, he was immediately placed on leave. (#172-57)

12

**Simmons is Suspected of Secretly Recording Meetings**

In October of 2017, the City's risk manager handling the Ujinski matter was told by the minor's attorney there was an audio recording of the shift brief, which he would use to elevate the case's value. (#172-64, p. 1) The risk manager requested the recording from Dossey, but there was no recording. (#172-64, p. 2) The risk manager continued to question the attorney, deducing Simmons was the recorder. (#172-64, p. 2) When the risk manager asked if Simmons provided it, the attorney replied: "If you already knew who it was why are you asking me?" (#172-64, p. 2)

**Brooks Continues his Mutinous Conduct**

On December 15, 2017, Brooks was interviewed by Herman and Baxter. (#172-56, p. 5; #172-58) Brooks claimed to not remember making the statements the subordinate officers reported. (#172-58, p. 3, 5, 9, 12, 16) Brooks stated the City was "definitely screwing with [him]" (#172-58, p. 3) and was "confident that people will support [him], the ones that feel obligated to." (#172-58, p. 5) Brooks admitted he asked Jones if Dossey lied to him and told Jones that Dossey started the rumors about him not getting promoted. (#172-58, p. 8-10)

Brooks stated "the Chief does not tell the truth and everybody knows it and everybody talks about it" and "nobody trusts him." (#172-58, p. 11-12) When asked if he told Sergeant Bush that Dossey is a liar, Brooks responded "Chief is a liar," but claimed not to remember. (#172-58, p. 16) Brooks claimed he previously did not think Baxter was a liar, but now has his doubts. (#172-58, p. 17) When asked if he told Bush the "people upstairs" are liars, Brooks claimed not to remember, but

stated "Sarah Newcomb is a liar." (#172-58, p. 17) Brooks could not remember other conversations in which he said Dossey or others were liars. (#172-58, p. 17) Brooks admitted he "probably" told Officer Eeten that Dossey was a liar. (#172-58, p. 23)

Brooks could not remember telling people the City is a "shitty place to work," but stated "right now it is a shitty place to work." (#172-58, p. 21) Brooks claimed this investigation was a plot to force him to retire so that Jones could be promoted. (#172-58, p. 26-27) Brooks could not remember if he showed his HR complaint to Thompson but could not explain how he would otherwise have a copy. (#172-58, p. 28) Brooks claimed Newcomb lied in her report, that "she's a liar," and "has a history of lying." (#172-58, p. 31-34)

Brooks admitted he was aware of the policy (#172-79, p. 7, Sec. 300.3.19) that required Lieutenants to not ridicule rules and regulations, orders, subordinate officers, or superior officers. (#172-58, p. 55) Brooks admitted he was aware of the policy (#172-79, p. 7, Sec. 300.3.16) that required Lieutenants to foster discipline and morale. (#172-58, p. 55) Brooks admitted the policies must be followed, but "we have a Chief that no one trusts, that doesn't tell the truth. We have a HR Director that doesn't tell the truth." (#172-58, p. 56)

### Brooks is Discovered Secretly Copying Personnel Records

Following the interview, Brooks provided supplemental information and statements to the City on January 10, 2018. (#172-60) Brooks included multiple narratives in response to Newcomb's report and the statements from officers. (#172-61)

14

Brooks described Little as a "weak supervisor who bullies and retaliates against those who disagree with him," "has poor leadership abilities," and "engaged in unprofessional conduct toward another command officer." (#172-61, p. 52) Brooks described Baxter in the following manner: "I expect everyone to do their jobs.  I expect everyone to be dedicated, competent and trustworthy.  Baxter falls well short of all of my expectations." (#172-61, p. 25) Brooks commented that Dossey had engaged in "poor leadership." (#172-61, p. 8)

Brooks attached numerous documents, including a copy of a 2007 Letter of Reprimand from Sergeant Von Rohr's personnel file. (#172-61, p. 44; #172-35, p. 46) Pursuant to union contract, this record was destroyed and removed from the file after 18 months, meaning Brooks copied and retained it prior to destruction. (#172-35, p. 46) This led the City to discover Brooks had been copying and retaining documents from the personnel and disciplinary records of other officers. (#172-62, p. 13-14)

During his deposition, Brooks admitted the documents he submitted were copies he took from the police department on or after January 1, 2017. (#172-15, p. 51-52) Brooks admitted that if a document was "an important document" he "needed to keep," he emailed it to his personal email address. (#172-15, p. 53) Brooks admitted he "probably" made both a paper copy and an electronic copy of any "important document." (#172-15, p. 53) Brooks claimed he deleted any emails he sent to himself containing the "important documents" he kept. (#172-15, p. 53-54)

**Simmons Files an IDHR and EEOC Complaint**

In January 2018, Simmons executed an IHDR and EEOC Charge of Discrimination against the City regarding his complaints about Burris. (#172-66; #172-67)

**The City Investigates Who Recorded the Shift Brief**

On February 1, 2018, Baxter was ordered to conduct an internal investigation into the recording of the January 11, 2017 shift brief. (#172-68) Baxter interviewed numerous witnesses, and one remembered Simmons never looked up to watch the Ujinski video. (#172-68, p. 1-3)

**Simmons Admits He Secretly Recorded Numerous Meetings**

On February 14, 2018, Simmons was served with a Notice of Formal Interrogation regarding allegations that he secretly recorded the shift brief. (#172-68, p. 3; #172-69) On February 16, 2018, Simmons was interrogated and admitted he secretly recorded the shift brief (#172-8, p. 5) and numerous others, including eight meetings involving Dossey, Baxter, and Kaminski without requesting or obtaining permission. (#172-8, p. 23) Simmons admitted he gave the recording to Lefante Law. (#172-8, p. 14)

Baxter found Simmons' conduct violated numerous policies, including intentionally releasing confidential information. (#172-68, p. 4) Baxter recommended Simmons' conduct be added to his pending FPC complaint. (#172-68, p. 4)

**An Amended Complaint is Filed against Simmons**

On February 19, 2018, an Amended Complaint was filed with the FPC against Simmons (#172-72), adding allegations of his recordings. (#172-72, p. 3)

**Simmons Does Not Attend the FPC Hearing**

On February 21, 2018, the FPC held its evidentiary hearing on Simmons. (#172-29) Simmons chose to not appear. (#172-29, p. 5)

Melton (#172-29, p. 7-9) and her husband (#172-29, p. 12-13) testified to Simmons' comments and gesture in the squad room. Melton testified to Simmons' comments at the Steak 'n Shake. (#172-29, p. 9-11) Vogel testified he remembered when Simmons called him over and said something about Melton's breasts that made him uncomfortable. (#172-29, p. 14-15)

Brooks was subpoenaed to testify. (#172-29, p. 16) Brooks testified Simmons contacted him after Simmons received his Notice of Formal Interrogation and discussed what the investigation was about. (#172-29, p. 18)

Baxter testified to his investigation of Melton's allegations (#172-29, p. 24-25), Simmons lying about not speaking to Brooks about the investigation (#172-29, p. 30-32), Simmons' secret recordings, Simmons giving the recording to LeFante Law, and his violation of departmental policies by his conduct. (#172-29, p. 36-42) Baxter testified Simmons knew the policy on audio recording devices, (#172-29, p. 46) violated those policies, (#172-29, p. 47-49) and his belief Simmons could not continue being a police officer. (#172-29, p. 50-51)

On March 13, 2018, the Commission issued its Findings and Decision (#172-73) ordering Simmons' employment terminated. (#172-73, p. 5)

## A Disciplinary Complaint Against Brooks is Filed

On March 28, 2018, a Complaint was filed with the FPC against Brooks. (#172-75) The Complaint recounted Brooks' intimidation of subordinates, untrue statements in his complaints against the City, his mutinous and insubordinate comments, and taking documents from other officers' disciplinary and personnel files. (#172-75, p. 1-13)

## Brooks Retires Rather than Proceed to Hearing

Brooks was aware he had the right to go before the FPC and put on evidence. (#172-15, p. 68) Instead, Brooks sent in his retirement letter on July 6, 2018. (#172-76)

## Plaintiffs File Suit

On September 14, 2018, Brooks and Simmons filed a 17-count Complaint against the City, Dossey, Baxter, Newcomb, and Melton. (#1) After motion practice, the operative 13-count "Second Amended Complaint" was filed on September 30, 2019. (#37)

## Defendants Move to Stay Proceedings as to Simmons

On October 19, 2020, Defendants moved to stay Simmons' claims, pursuant to the Federal Arbitration Act, because Simmons was simultaneously litigating in federal court and in arbitration. (#63) Simmons resisted. (#64, #65) On December 16, 2020, the District Court denied the motion. (#71, p. 8) The District Court found

there was no risk of inconsistent rulings because "the issues to be arbitrated are substantively different than those to be litigated in this federal lawsuit." (#71, p. 9-10)

### Defendants' Motion for Summary Judgment is Filed and Plaintiffs' Response is Stricken

On September 30, 2022, Defendants filed their Motion for Summary Judgment (with 84 exhibits) on all 13 counts. (#172) Plaintiffs filed their Response on November 14, 2022 (#175) followed by 155 exhibits filed the next day. (#176) On November 16, 2022, the District Court entered a Text Order directing the Clerk to strike Plaintiffs' Response and exhibits. (Text Order 11/16/22)

### Plaintiffs Re-File Their Response to the Motion for Summary Judgment and Defendants Reply

On November 16, 2022, Plaintiffs re-filed their Response with 157 exhibits. (#177) Defendants filed their Reply on January 4, 2023. (#180)

### Plaintiffs' First Request to Amend Their Response

Two days after receiving the Reply, Plaintiffs moved to "amend and/or correct" 13 citations in their Response. (#181) Defendants did not object, so long as they did not have to rewrite the Reply. (#182) The District Court allowed Plaintiffs to file the "Amended Response" with the corrections within five days. (Text Order 1/13/23)

### Plaintiffs' Second Request to Amend Their Response

Five days later, Plaintiffs did not file the Amended Response. Instead, Plaintiffs filed an "Amended Response as Ordered by the Court and Request for

Supplemental Relief." (#183) Plaintiffs had "discovered significantly more miscites to the record than previously identified" (#183, p. 2) and requested leave to file a new Response (#183-1), six additional exhibits (#183-2 through #183-7), a corrected exhibit list, and offered to reimburse Defendants for fees incurred in replying. (#183, p. 4) Because Plaintiffs filed this request as a "response," Defendants filed a motion for leave to file a "reply." (#184) Defendants opposed the request, as Plaintiffs were seeking to make substantive changes after reviewing the Reply for two weeks. (#184-1) Plaintiffs argued "clarity" should be the "guiding principal" to grant their request. (#185, p. 3)

### The February 2, 2023 Order

On February 2, 2023, the District Court entered a Text Order reciting the background of Plaintiffs' requests to amend their Response. (A1) The District Court denied the second request because Plaintiffs were now requesting to add hundreds of new citations, new exhibits, and substantive changes after reviewing the Reply. (A2) The District Court allowed Plaintiffs three days to file the originally requested 13 unopposed citation changes. (A3) Plaintiffs did so the next day. (#186)

### The District Court Grants Partial Summary Judgment and Plaintiffs Appeal

On May 10, 2023, the District Court granted summary judgment on all counts (A4) except Count VII, a state law claim by Simmons against Melton.  With all other counts dismissed, the District Court declined to further entertain supplemental jurisdiction over Count VII. (A66) Judgment was entered on May 11, 2023. (A68) Plaintiffs filed their Notice of Appeal on June 7, 2023. (#189)

**Simmons Files a Lawsuit in State Court Repleading Count VII**

The same day the Notice of Appeal was filed, Simmons filed a lawsuit in the Circuit Court of Tazewell County, Illinois. (DSA 1) This suit repleads the dismissed Count VII against Melton. Melton moved to dismiss, arguing this Court has jurisdiction. (DSA 5)

## SUMMARY OF ARGUMENT

**I.     Arguments unrelated to Counts I through IV were waived.**

Plaintiffs only seek reversal as to Counts I through IV, waiving any argument for reversal of other counts.

**II.     The District Court did not abuse its discretion in refusing to allow Plaintiffs to file an Amended Response nor to deem the noncompliant paragraphs of the Response admitted.**

District courts may require strict compliance with local rules. Plaintiffs' request to re-write the Response after reading the Reply did not comply with the local rules on summary judgment procedure and was properly denied. The District Court accepted as true the noncompliant Additional Material Facts of the Plaintiffs' Response, causing no harm to Plaintiffs.

**III.     The City did not fail to accommodate Brooks' disability.**

The City engaged in the interactive process with Brooks, offering him numerous accommodations and a plan to try them that he agreed with. Brooks waived his claims that there was an unreasonable delay in accommodation or a failure to engage in the interactive process by not raising them in the District Court. Allowing Brooks to supervise the employees who

21

reported him is unreasonable and reconfiguring the entire department for Brooks' benefit is an undue hardship.

## IV.    Brooks did not receive disparate treatment for making ADA claims.

Brooks chose to retire in the face of a disciplinary hearing, and was therefore not constructively discharged as a matter of law. The sole comparator offered did not engage in conduct of comparable seriousness to Brooks and, because Brooks quit, there is no discipline to compare.

## V.    Brooks was not retaliated against for making ADA claims.

Brooks cannot establish pretext because he has no evidence the City did not honestly believe the reports of Brooks pressuring subordinates to support him, making mutinous comments about the City administration, and secretly copying and retaining other officers' disciplinary records.

## VI.    Simmons was not retaliated against for reporting Burris.

The causal connection between Simmons' report of believed sexual harassment by Burris and his termination was severed by Melton reporting him for sexually harassing her, Simmons violating the order to not discuss the investigation, lying about it, secretly recording police meetings, and releasing a recording to a law firm threatening suit. Simmons' arbitration proceedings are entirely irrelevant to his retaliation claims, and he chose to oppose the stay that would have allowed the arbitration to proceed first. The District Court's decision did not rely on discriminatory animus, but a lack of

causation. The sole comparator Simmons raises did not engage in conduct of comparable seriousness and was a command officer.

## VII.  The Court should hold this appeal frivolous.

Plaintiffs' brief is rife with misrepresentations of facts, meritless arguments, and falsehoods. The Court should hold the appeal frivolous.

## <u>ARGUMENT</u>

## I.  Plaintiffs affirmatively waived review of any rulings beyond Counts I through IV.

Plaintiffs state they seek reversal regarding Counts I through IV only. (App. #20, p. 2)  Plaintiffs intentionally waived any argument against the District Court's other rulings. See *Bradley v. Village of University Park, Illinois*, 59 F.4th 887, 898 (7th Cir. 2023). Defendants therefore do not address other counts.

## II.  The District Court did not abuse its discretion in refusing to allow Plaintiffs to file an Amended Response or holding their noncompliant facts undisputed.

Plaintiffs ask this Court to reverse the District Court's refusal to allow them to amend their Response to the Motion for Summary Judgment after all briefing had been completed. The history of Plaintiffs' failures to comply with local rules shows there was no abuse of discretion. The Response the Plaintiffs did eventually file was substantially noncompliant, but the District Court held their noncompliant Additional Material Facts undisputed, causing no injury to Plaintiffs.

**A.    The District Court properly denied the request to file an Amended Response.**

Plaintiffs attempted to file a 245-page Response with 439 paragraphs of Additional Material Facts on November 14, 2022. (#175) Plaintiffs filed their exhibits late the next day, and the District Court could have struck them all permanently. (A1-3; A6-8) Instead, because the exhibit filing was done so poorly and with no index, the exhibits were stricken with leave to refile. (Text Order 11/16/22) Plaintiffs re-filed the exhibits (#177) and Defendants filed their Reply on January 4, 2023. (#180)

Two days after reading the reply, Plaintiffs realized they needed to correct thirteen citation errors in their Response. (#181) The District Court ordered Plaintiffs to make the thirteen citation corrections within five days. (Text Order 1/13/23)

Five days later, Plaintiffs did not file the Amended Response as ordered. Instead, they filed "Plaintiffs' Amended Response As Ordered by the Court and Request for Supplemental Relief." (#183) After all briefing was over and having the Reply for two weeks, Plaintiffs incredibly requested to redo their Response. Plaintiffs did not even file the request correctly, necessitating Defendants seeking leave to respond. (#184) Defendants pointed out the "Amended Response" was little more than a sur-reply, changing the meaning of facts, re-writing quotes, adding new exhibits, and changing the substance of arguments. (#184-1)

On February 2, 2023 the District Court entered a text order. (A1) The District Court held Plaintiffs' "repeated and blatant disregard for the Local Rules and for

proper docketing are not well-taken." (A2) No one, including the District Court, could locate a case where a non-movant was allowed to amend their Response after reviewing the Reply. (A2) The District Court, noting its discretion to strictly enforce local rules and summary judgment procedure, went through the "ample opportunities" Plaintiffs were already provided to properly file their Response yet now wanted to amend in "hundreds of record citations and five new exhibits." (A2) The District Court denied the request. (A2-3)

Plaintiffs now claim that they were only trying to correct "citation errors" and accost the District Court for taking this as a "nefarious plot" and "improperly took umbrage against Plaintiffs for having citation errors." (App. #20, p. 18) Plaintiffs have blatantly misrepresented the District Court's ruling. The District Court took "umbrage" not with citation errors, but with "the extent to which Plaintiffs' amended response went beyond merely correcting citations and re-wrote or supplemented their brief based on issues identified by the Defendants in their reply." (A7, n.4)

These were not mere "citation errors." Plaintiffs read the Reply, realized they were in trouble, and then wanted to dramatically alter their Response. Plaintiffs' proposed Amended Response would have only further violated the local rules by offering new exhibits to unrelated facts to backdoor them into the case, misrepresent Request to Admit answers, and more. (#184-1, p. 4-10) The "nefarious plot" was obvious—read the Reply and then try to "fix" their weaknesses by

rewriting the Response, making a mockery of summary judgment practice. The District Court did not abuse its discretion by enforcing the local rules.

**B.      Plaintiffs appealed a ruling exclusively to their benefit.**

Despite Plaintiffs not timely filing the 13 citation corrections it originally requested, the District Court still let them do so. (A8) What Plaintiffs did file was substantially noncompliant with local rules and summary judgment procedures. (A7) The District Court noted more than 70 of the Plaintiffs' Additional Material Facts were noncompliant, citing documents which do not support the facts alleged, rewriting quotes to the point of inverting their meaning, and repeatedly citing entire documents with no page references. (A7-8)

The District Court, which could have simply struck the offending paragraphs, instead chose to "treat as undisputed those facts that Plaintiffs failed to adequately establish" pursuant to Fed. R. Civ. P. 56(e). (A8) The District Court, noting the Plaintiffs' "struggles so far in the summary judgment process," (A8) simply chose to move forward with summary judgment by taking the offending Additional Material Facts as undisputed as if the Plaintiffs had adequately established them.

Plaintiffs somehow completely misread this ruling.  They now claim the District Court issued "too severe of a penalty" by taking these "material facts the court knows are disputed as undisputed solely due to citation mistakes and formatting errors." (App. #20, p. 19) There was no penalty whatsoever—the noncompliant Additional Material Facts the Plaintiffs offered were treated as undisputed, a benefit to the Plaintiffs, not a penalty. Defendants disputed these

facts with good reason (See, e.g., #180, ¶ 328, 331, 336, 340, 341), but the District Court understandably wanted to complete summary judgment proceedings without further delay.

Why Plaintiffs are claiming the District Court's benevolence was error is a mystery. If anyone was harmed, it was Defendants, who requested the noncompliant Additional Material Facts be excluded. Plaintiffs got what they wanted—the 70-plus noncompliant Additional Material Facts were taken as true despite their failings. The District Court issued no penalty to the Plaintiffs and this was frivolous to appeal.

### C.     Plaintiffs have continued their rule violations in their brief.

Plaintiffs' claims of "citations errors" are also belied by the fact they repeatedly make the same violations in this Court. While several misrepresentations are addressed in the argument herein, Defendants have only enough space to point out some examples.

## III.     Counts I – III – Brooks' ADA Claims.

Brooks brought three different ADA claims. Count I alleged the City failed to accommodate Brooks' sleep apnea. (#37, p. 8, ¶ 51-52; p. 16-17, ¶ 90-94) Count II alleged disparate treatment, claiming Brooks was placed on "involuntary unpaid leave" and constructively discharged because of his disability. (#37, p. 18) Count III alleged those same actions were done in retaliation for Brooks requesting accommodation, filing his internal complaint, and filing with IDHR and EEOC. (#37, p. 19)

The timing and history of Brooks' accommodation requests are critical to analyzing these claims. Despite working second shift for ten years, Brooks alleged he could only work first shift as soon as the City informed him he was being transferred. (#172-36, p. 1) Brooks' first request was on June 19, 2017 when he met with Newcomb (#172-47) and a written request (#172-36) followed the next day. In response to what job functions he was having difficulty performing, Brooks wrote "none at the moment," but being on any shift other than first would be "detrimental" to his health. (#172-36, p. 2) Brooks claimed the limitation he was experiencing was "the denial to work [his] preferred shift as [his] seniority allows." (#172-36, p. 2) Brooks provided Newcomb a doctor's note, but the note did not "specify any job function that [Brooks] will not be able to complete." (#172-48)

On July 12, 2017, Brooks met again with Newcomb and Baxter. (#172-48) Brooks stated he had no problem doing the job, and when Newcomb suggested adjusting his hours, Brooks refused. (#172-48) When asked about accommodations, Brooks stated it was "unreasonable to ask for an accommodation," did not want one, but wanted to stay on first shift by seniority. (#172-48; #172-33, p. 22) After the meeting, Brooks sent Newcomb an email again stating he was not asking for an accommodation, but his "seniority allows [him] to work day shift already." (#172-47) Newcomb therefore determined no accommodation was necessary as Brooks could complete all job functions without issue. (#172-48)

Brooks made another request on September 28, 2017 via email to Baxter. (#177-123) On October 13, 2017, Brooks and his attorney met with the City to

discuss reasonable accommodations. (#172-53) When asked if he was taking medication for sleep apnea, Brooks stated he was not because he "don't want to" and would only do so if his doctor said that was his only choice. (#172-53, p. 6) Numerous options were discussed, including staggered shifts, rest periods, a work schedule to adjust to any medication, and even going home to take a nap during his shift. (#172-53, p. 15-37) Although a shift adjustment was not "off the table," switching the schedules of three lieutenants was not something the City could do overnight. (#172-53, p. 40-41)

Brooks was scheduled for vacation in two weeks, so the meeting concluded with the agreement Brooks would try these accommodations, log which ones work best, meet with his doctor, and reconvene with the City after his vacation. (#172-53, p. 38-39) Brooks worked for two weeks and then left on vacation on October 26, 2017. (#172-53, p. 37)

That evening, Lieutenant Little reported the complaints by subordinate officers that Brooks had been pressuring them for support. (#172-54) This launched Baxter's formal investigation on October 30, 2017 (#172-55) which revealed Brooks had pressured numerous subordinate officers, many of whom feared retaliation from Brooks. (#172-56, p. 1-5) When Brooks returned from vacation, he was immediately placed on leave. (#172-57)

A.    Count I – Failure to Accommodate.

To prove a failure to accommodate, Brooks must show (1) he is a qualified individual with a disability; (2) the employer was aware of the disability; and (3) the

employer failed to reasonably accommodate the disability. *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 682 (7th Cir. 2014). "Reasonable accommodation" means modification to the work environment or the manner in which the position is performed to enable a qualified individual with a disability to perform the essential functions of the position. *Id.* (quoting 29 C.F.R. § 1630.2(o)(1)(ii)).

Reasonable accommodation is a "process, not a one-off event." *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1178 (7th Cir. 2013) (reversed on other grounds regarding "convincing mosaic" test by *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016)). This process brings the employee and employer together in cooperation to identify the precise limitations of the employee and determine what accommodation might allow the employee to continue working. *Id.* at 1178-79 (holding employer had "no way of knowing" seemingly reasonable accommodations were insufficient until tried). An employer does not have to provide the exact accommodation preferred by the employee. *Bunn*, 753 F.3d at 683. An employer is not required to "bump" other employees, create a vacancy, or create a new position. *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996).

The District Court found Brooks failed to show a genuine issue of material fact that he was not offered reasonable accommodation. (A45) The District Court held Brooks was offered numerous accommodations and either refused them or claimed they would not work, which could not create a genuine issue of material fact. (A46-47) The District Court determined that even if Brooks could prove the only reasonable accommodation was returning to first shift, there was no

30

opportunity to do so because he was suspended shortly after the meeting. (A47)[5]

Brooks makes several claims of error in these rulings.

### 1.     The City engaged in the interactive process with Brooks.

Despite the Second Amended Complaint containing no such allegation,

Brooks now claims the City failed to engage in the interactive process. Brooks

alleges the City "never reengaged regarding sleep apnea" because the "October 13

meeting only dealt with shift work disorder." (App. #20, p. 41) This was never

argued in the District Court (#186, p. 230-31) and therefore waived, see *Jeppesen v.*

*Rust*, 8 F.3d 1235, 1237 (7th Cir. 1993), but it is also proven false by the *first page* of

the transcript of the meeting, directly from Brooks' mouth:

> Joshua Herman: … We are here today scheduled to partake in continuing
> interactive process to discuss requested reasonable accommodations related
> to Lieutenant Brooks, uh, well, *what is it at this point? Originally, it was*
> *sleep apnea.*
>
> John Brooks: *Still is.* (#172-53, p. 1) (emphasis added)

Brooks flat out states he "has severe sleep apnea." (#172-53, p. 43) Brooks

references sleep apnea several times. (#172-53, p. 3)

Brooks' lawyer merely chimed in that he also has "shift work disorder" (#172-

53, p. 1), but his doctor never said that. All the doctor said is that it "*seems* to me he

*may* also be experiencing" "shift work disorder." (#177-52, p. 1) (emphasis added)

This cannot possibly qualify as a diagnosis. Moreover, the document suggests "shift

work disorder" is merely another name for Brooks' sleep issues. (#177-52) There was

---

[5] The District Court's timeline is incorrect, stating Brooks went on vacation immediately
after the meeting, returned to work for a few weeks, and was then suspended. Brooks
worked two weeks after the meeting, then went on vacation, and was suspended
immediately upon return. (#172-53, p. 37; #172-57)

no evidence offered about how, if Brooks had "shift work disorder," it would necessitate accommodations different than the ones offered. As the District Court noted, several of the accommodations offered are the same ones referenced in this letter. (A46) More telling, "shift work disorder" does not appear in the Second Amended Complaint (#37), Brooks' initial IDHR/EEOC charge (#172-49, p. 2), or his final one (#172-71, p. 4), all of which talk about sleep apnea.

Brooks' claim the City never "reengaged" is completely false, as is his argument the City did "nothing to engage in finding alternative accommodations." (App. #20, p. 41) Regardless of how Brooks wants to label his condition, no reasonable jury could find the City violated its obligations. Failure of the interactive process is not an independent basis for liability. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1059 n.1 (7th Cir. 2014). Plaintiffs still must show the failure to engage in an interactive process resulted in a failure to identify an appropriate accommodation. *Id.* The City was actively engaging with Brooks to determine what reasonable accommodation would work when his malfeasance was uncovered and he was placed on leave.

### 2. Brooks waived argument on unreasonable delay by not presenting it to the District Court.

Brooks complains the District Court incorrectly held there was not enough time to accommodate him after the October 13 meeting, instead claiming there was enough time to accommodate him from his first accommodation request. This claim appears nowhere in the Second Amended Complaint (#37) or the Response to the Motion for Summary Judgment. (#186) Brooks' argument at summary judgment

was based on what occurred after the October 13 meeting (#186, p. 230-31) with no mention of any prior failure or unreasonable delay. By not presenting this argument to the District Court, it was waived. See *Jeppesen v. Rust*, 8 F.3d 1235, 1237 (7th Cir. 1993).

Nevertheless, Brooks cannot meet the test for an unreasonable delay. Whether a delay is unreasonable depends on the totality of the circumstances. *McCray v. Wilkie*, 966 F.3d 616, 621 (7th Cir. 2020). Brooks made his first request in person to Newcomb on June 19, 2017, and met with Newcomb and Baxter on July 12, 2017, when Brooks denied the need for an accommodation and stated he had no limitations. Brooks requested to be transferred to first shift on September 28, 2017, and the City met with him roughly two weeks later and offered numerous accommodations. No reasonable jury would hold there was an unreasonable delay when the City met with Brooks multiple times soon after his requests and, when he requested accommodation, offered numerous ones.

### 3. Brooks and his Attorney Agreed to the Accommodation Plan.

Brooks next claims there was "no evidence" that the two weeks after the meeting "was not enough time for Brooks and the city to know whether the October 13 plan would work to quell Brooks' disability." (App. #20, p. 40) This is another obfuscation of reality. Brooks and his counsel agreed to use the two weeks before his vacation to determine if the accommodations were working, then meet with Brooks' doctor, and thereafter reconvene. The statements made at the meeting by Brooks' attorney proves this false, such as this one:

Julie Galassi: … I'll advise you as to when his appointment is and maybe then you and I can, uh, pick a time to regroup when he gets back from vacation. … And then we'll have the the, the two weeks under our belt to see what if, if anything, how it helps. (#172-53, p. 43)

Brooks' counsel agreed with this plan, repeatedly. (#172-53, p. 18, 31, 34) This argument is frivolous.

### 4. The offered accommodations were reasonable ones to try.

Brooks takes issue with the District Court's analysis that he refused all accommodations offered. The District Court makes clear it was talking about the numerous accommodations offered during the October 13 meeting for him to try. (A46) The reason the District Court said Brooks refused them was because he did—Brooks' argument has always been that only a transfer to first shift would accommodate him. (#186, p. 9, 226-27, 231) Brooks asserts the City denied all of his requests (App. #20, p. 38), but this is irrelevant as the City is under no duty to give Brooks the exact accommodation he wants.

In support of this argument, Brooks provides another misrepresentation of the record. Brooks claims his doctor's only recommendation for sleep apnea was a transfer to first shift, and all other recommendations were for "shift work disorder." (App. #20, p. 38) The document he cites does not even contain the words "sleep apnea," let alone say the "only" recommendation was transfer to first shift. (#177-52)

Brooks swaps between "sleep apnea" and "shift work disorder" whenever it suits him. Brooks made a similar false statement when he claimed the October 13 meeting was "only" about "shift work disorder," the condition his doctor would only

say it "seems" Brooks "may" have. (#177-52, p. 1) As far as accommodation is concerned, the distinction does not matter—the City offered numerous accommodations for Brooks' sleeping problems and the District Court noted they matched the "shift work disorder" recommendations as well. (A46) If Brooks also had insomnia and restless leg syndrome inhibiting his sleep, the accommodations are the same. Moreover, Brooks testified his doctor said he could perform all necessary job tasks "with or without accommodation." (#172-15, p. 185)

Brooks also complains the City rejected his "offer" to stay on first shift but make others "handle any issues involving Melton." (App. #20, p. 38) Having others do parts of Brooks' job is not a reasonable accommodation as a matter of law. *EEOC v. Wal-Mart Stores, Inc.*, 38 F.4th 651, 657 (7th Cir. 2022).

Brooks ultimately claims that because he testified in his deposition that these accommodations did not work, the Court "ignore[d] the summary judgment standard." (App. #20, p. 39-40) Brooks does not understand the summary judgment standard, as he believed the District Court was simply "stuck" with whatever he claimed. (A27, n.18) Nevertheless, the District Court made no such ruling. The District Court said Brooks could not create a genuine issue of material fact merely by saying what he thought did not work without evidence. (A46-47) The District Court properly held the City was meeting its obligation by identifying numerous accommodations and offering them to Brooks.

Brooks admittedly never told the City he thought none of the accommodations worked (#172-15, p. 239) because he was immediately placed on

leave when he returned from vacation. The District Court properly ruled there was no opportunity for him to be reasonably accommodated, fatal to his claim.

### 5. Moving Brooks back to first shift was unreasonable.

An employer is not required to provide accommodation that would result in undue hardship. 29 CFR § 1630.2(o)(4). Factors to consider when determining undue hardship include the type of work operation, including the "composition, structure and functions of the workforce," and its "impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business." 29 CFR § 1630.2(p)(2).

Brooks claims putting him back on first shift was the only acceptable accommodation, but the City was (1) not required to give him the exact accommodation he wanted and (2) Brooks went on leave before any accommodation decision was reached. Nevertheless, the City explained exactly why moving Brooks back to first shift was unreasonable and an undue hardship.

Just as the City separated Burris from supervising Simmons (#172-2, p. 2), the City separated Brooks from Melton. The City could not allow Brooks to supervise employees (Melton and others) who complained about his harassment, vindictiveness, and their fear of retaliation. Nor could it reconfigure every shift to only put the officers who had not complained about Brooks on first shift, particularly when those employees have union rights to shift bids. (#172-19, p. 20-21; #172-32, p. 22-23, 49) Brooks, a non-union Lieutenant, had no right to any specific shift and could be reassigned for any reason. (#172-45, p. 11) Moving only

Brooks was done to prevent undue hardship. No reasonable jury could hold the City must reconfigure the entire police department for Brooks.

Brooks also could not maintain the duties and responsibilities of a Lieutenant as he could not supervise the people who complained about him. The only way to combat that problem would be to hire a second first-shift Lieutenant to supervise those employees on Brooks' shift, which even his counsel admitted was unreasonable. (#172-53, p. 10-12)

Brooks now alleges these reasons for moving him were pretextual, claiming the question "becomes whether the city even had a justifiable reason to move Brooks from first shift" and that a reasonable jury could find it was done with "discriminatory animus."  (App. #20, p. 36) The reality is when Baxter interviewed Brooks about Melton's allegations against Simmons, Brooks made comments revealing he "truly disliked her and it almost felt like it was personal…." (#172-27, p. 34-35; 172-23, p. 3) Brooks, who was Melton's boss, claimed *she* was creating a hostile work environment for *him* (and Simmons). (#172-18, p. 2) Brooks described Melton's insignificant "jackass" comment as an "outburst," (#172-18, p. 1) "unprofessional, offensive, derogatory and disrespectful," (#172-18, p. 2) yet defended Simmons' comments about Melton's breasts as retaliatory and chastised her for claiming to be offended. (#172-26, p. 1-2) Brooks apparently believed Melton calling Simmons a "jackass" was worse than Simmons pantomiming the size of Melton's breasts and telling an intellectually disabled man about their size in front

of her. The City had good reason to believe there was something to Melton's fear of Brooks' retaliating.

There was no pretext here. The City reasonably believed Melton's fears that Brooks might retaliate and they had to be separated. (#172-27, p. 88-89; #172-32, p. 16-17) The District Court correctly ruled no reasonable jury would hold Brooks had to go back to first shift.

### B.    Count II – ADA Disparate Treatment.

Count II of the Second Amended Complaint was a disparate treatment ADA claim. (#37, p. 18) Brooks alleged he was placed on involuntary unpaid leave and constructively terminated because of his disability. (#37, p. 18) ADA claims require "but-for" causation and mixed motives do not suffice. *Hillman v. City of Chicago*, 834 F.3d 787, 795 (7th Cir. 2016). For Brooks to prove disparate treatment, the City's employment decision must be made "because of" his disability. *Id.*

Brooks sought to prove discrimination under the *McDonnell Douglas* burden shifting framework. See *Marnocha v. St. Vincent Hospital and Health Care Center, Inc.*, 986 F.3d 711, 718-19 (7th Cir. 2021); (A47). The "similarly situated" prong of the test required Brooks to show that similarly situated employees (comparators) were treated more favorably than him. *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). While comparators need not be identical, they must be comparable in all material respects. *Marnocha*, 986 F.3d at 719. The conduct of the comparator must be of comparable seriousness to qualify as a comparator. *Id.* at 850. There must be

enough common factors to allow for a meaningful comparison to determine if the true motive of the action was discrimination. *Id.* at 846.

### 1.    Brooks was not constructively discharged.

Brooks challenges the District Court's ruling he was not constructively discharged, but he has no basis to do so. This Court has held resigning in the face of a disciplinary proceeding is not constructive discharge. *Palka v. Shelton*, 623 F.3d 447, 453 (7th Cir. 2010). Though it may be a "difficult choice" to fight the disciplinary charges or retire, that does not make retirement involuntary. *Id.* Brooks resigned rather than face the FPC and was therefore not constructively discharged. (A34-37)

Brooks now claims the workplace was so unbearable he had to quit. Brooks was not even working when he quit—he had been on leave since November of 2017 and retired in July of 2018. (#172-76) Allowing an employee to claim they were forced to quit when they (1) were not even working at the time, and (2) were staring down a termination hearing, would upend *Palka*. Brooks cannot seriously claim second shift was so unbearable he had to quit when he worked it for years without quitting, worked it again for months without quitting, and only quit after the FPC complaint.

The District Court correctly saw through this. Brooks produced no evidence in support, relying on his own retirement letter rather than evidence. (A36) The District Court contrasted Brooks' claim that second shift was "literally killing him" with his cavalier attitude (such as not taking medication because he "don't want

to"), his prior work on second shift for years, and the absence of any medical records to support this extreme allegation. (A36-37) If working second shift was truly "killing him" and so unbearable he had to quit, Brooks would have quit while he was working, not months after he was suspended. Interestingly, Brooks also claimed third shift was "killing [him]," (#172-15, p. 20-21) but never quit that position or asked for an accommodation either.

The District Court also noted that if Brooks was complaining about the shift change only, that is not an adverse employment action. (A48) The Second Amended Complaint does not even list the shift change as an adverse employment action (#37, p. 18), but Brooks now claims the City was exploiting his "known vulnerability." This makes no sense. Brooks worked second shift for, as he described it, "150 years, it seemed like" (#172-15, p. 19) and did not make any accommodation claim until now. The City could not be exploiting a "known vulnerability" when Brooks never needed a prior accommodation for the same shift.

### 2. Burris is not a valid comparator for Brooks.

Although Brooks alleged numerous comparators in the District Court, he has apparently abandoned them and focuses solely on Burris. The District Court properly concluded that Burris' two inappropriate comments about Simmons' sex life months apart were "substantially different and less serious" than what Brooks did. (A43) This is correct—Brooks pressuring subordinates to support him, spreading insubordination, and copying and retaining disciplinary records of other

officers are far more serious. More importantly, Brooks' conduct violated different rules and policies than Burris' conduct. (A43)

Brooks claims Burris "lied during the April 2017 investigation but was not disciplined for it," citing nothing. (App. #20, p. 45) Deputy Chief Kaminski was unable to reach a conclusion that Burris had lied, as Burris was adamant he did not say what Simmons alleged, whereas he normally readily admitted his mistakes. (#172-22, p. 20-22) Burris, to this day, maintains Officer Jeff Richardson made the comment. (#172-12, p. 24) Lying was not a basis of Burris' agreed upon discipline. (#172-14)

Brooks downplays his own conduct while alleging the District Court "characterized" it worse than it was. (App. #20, p. 46) No characterization was necessary: Brooks admittedly copied and retained personnel records of others (#172-15, p. 51-54); Brooks admittedly said Dossey and others were liars (#172-58, p. 11-12, 16-17, 23, 31-34); Numerous officers reported Brooks pressuring them, and the best defense Brooks could muster was selective memory loss. (#172-55; #172-58, p. 3, 5, 9, 12, 16) Brooks also misrepresents City policy 400.10(2) (for which he conveniently provides no reference), by claiming he was "following" the policy. (App. #20, p. 46) The policy (#172-79, p. 12) says records or reports may only be removed for "official business and in accordance with established procedures." Brooks retaining another officer's disciplinary letter which was previously destroyed is neither official business nor in accordance with established procedures.

No reasonable jury would ever think Burris' conduct was comparable to Brooks' conduct. In any event, since Brooks retired before discipline, he cannot even say what discipline he would have received to compare to Burris' discipline. See *Ulrey v. Reichart*, 941 F.3d 255, 262 n.2 (7th Cir. 2019); *Poke v. City of La Cross Wisconsin*, 2020 WL 143214 at *4 (W.D. Wis. Jan. 13, 2020).

### C.    Count III – ADA Retaliation.

To make a prima facie retaliation claim, the plaintiff must prove (1) he engaged in statutorily protected activity; (2) he suffered an adverse action; and (3) a 'but-for' causal connection between the two. *Parker v. Brooks Life Science, Inc.*, 39 F.4th 931, 936 (7th Cir. 2022). If plaintiff can, the burden shifts to the defendant to show a proper reason for the action. *Koty v. DuPage County, Illinois*, 900 F.3d 515, 519 (7th Cir. 2018). The plaintiff may then show the reason is merely a pretext for retaliation. *Id.* Pretext is not just a mistake or decision that is incorrect, foolish, trivial, or even baseless; pretext must be a lie. *Brooks v. Avancez,* 39 F.4th 424, 436 (7th Cir. 2022); *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015). If the employer honestly believes the reasons for the actions it took, even if incorrect, then those reasons were not pretextual. *See v. Ill. Gaming Bd.*, 29 F.4th 363, 368 (7th Cir. 2022).

The District Court found Brooks could not establish pretext by failing to "meaningfully challenge many of the allegations against him." (A51) Brooks denying he did anything wrong or calling everyone a liar is irrelevant. The City did not even know of Brooks' IDHR/EEOC complaints until it received a letter dated October 27

(#172-51), after the October 26 email from Little reporting Brooks pressuring his subordinates. (#172-54)  Brooks cannot establish the City did not honestly believe the numerous allegations against him. These were not lies or concoctions, as Brooks admitted to many of them. No pretext was established.

## IV.   Count IV – Simmons' Title VII Retaliation Claim.

Simmons' Title VII retaliation claim is premised solely upon his filing of two sexual harassment complaints against Burris. (#37, p. 20-21) To make out a prima facie retaliation claim, the plaintiff must prove (1) he engaged in statutorily protected activity; (2) suffered an adverse action; and (3) a 'but-for' causal connection between the two. *Parker v. Brooks Life Science, Inc.*, 39 F.4th 931, 936 (7th Cir. 2022).

A valid Title VII sexual harassment claim requires proof the plaintiff was (1) subjected to unwelcome conduct of a sexual nature; (2) the conduct was directed at him because of his sex; (3) the conduct was so severe or pervasive that it created a hostile work environment; and (4) there is a basis for employer liability. *Benitez v. American Standard Circuits, Inc.*, 678 F.Supp.2d 745, 757 (N.D. Ill. 2010).  Sexual harassment is only actionable under Title VII if it is based on gender, *Holman v. Indiana*, 211 F.3d 399, 403 (7th Cir. 2000), and only if so severe and pervasive it creates an abusive work environment. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 270 (2001). When "no reasonable person could have believed" that the complained of conduct "violated Title VII's standard," the complaint does not

constitute protected activity to support a claim of retaliation. *Breeden*, 532 U.S. at 271.

Burris' two comments, separated by four months, were not sexual harassment. The comments were not based on Simmons' gender, not sexual advances or threats, and not so pervasive to create an abusive work environment. The District Court found them "insufficient as a matter of law to violate Title VII." (A52) Nevertheless, Simmons might have thought they were sufficient. (A52) But even in that event, there was no causal connection between his reports and his termination because his secret recordings, lying, and comments about Melton's breasts broke any connection.

### A.    Simmons' recordings violated department policy.

Although the District Court felt it "too implausible" to believe Melton's "mere friendship" with Burris created a genuine issue of fact for retaliation, it concluded it need not reach that issue. Simmons failed to show how his surreptitious recordings were not an independent, superseding basis for his termination that severed any connection to his complaints against Burris. (A52-53)

Simmons argues the causal chain was not broken because his secret recordings were "legal." The Amended FPC Complaint alleged these recordings violated departmental policy 449.5.1, which states employees "shall not surreptitiously record another department member without a court order or unless lawfully authorized by the Chief of Police or the authorized designee," and violated departmental policy 449.6, which prohibits employees both from making recordings

for "personal use" and duplication or distribution of even legitimate recordings "except for authorized legitimate department business purposes." (#172-72, p. 6; #172-9, p. 2) Policy 449.5.1 references the Illinois criminal eavesdropping statute, 720 ILCS 5/14-2, prohibiting "any individual from surreptitiously recording any conversation in which any party to the conversation has a reasonable belief that the conversation is private or confidential." (#172-9, p. 2)

Simmons admitted to recording the shift brief where Dossey and Baxter discussed the firing of Ujinski who slapped the minor. (#172-8, p. 5-6, 33; #186, p. 131, ¶ 34) Simmons admitted to recording eight other meetings without permission. (#172-8, p. 23; #186, p. 131, ¶ 34) Simmons later made these admissions under oath. (#172-1, p. 163-64, 183-84)

Ignoring departmental policies to the contrary, Simmons argues the Illinois Appellate Court's recent decision in *Cook Au Vin LLC v. Mid-Century Ins. Co.*, 2023 IL. App. (1st) 220601 allowed him to record because the conversations were not "private." In other words, Simmons suggests Dossey, Baxter, or anyone else Simmons may have wished to surreptitiously record was first required to formally designate any given conversation as "confidential"; otherwise, Simmons thinks he had free reign to record anything. This is a misreading of *Cook Au Vin LLC* and Illinois law.[6]

---

[6] Plaintiffs claim Defendants "overlook [ ] the law." (App. #20, p. 20) Though the case is not relevant to Simmons' policy violations, *Cook Au Vin LLC* was not decided until May 24, 2023, years after Simmons' recordings and two weeks after the District Court's summary judgment Order.

Citing the eavesdropping statute, *Cook Au Vin LLC* defines "surreptitious" as something "obtained or made by stealth or deception, or executed through secrecy or concealment." *Id*. at ¶22. That is exactly what Simmons did, recording others without notice or permission. (#172-8, p. 23) Again citing the statute, *Cook Au Vin LLC* instructs that a "private conversation" occurs when "one or more of the parties intended the communication to be of a private nature." *Id*. at ¶ 24.  In his "complaint" to the City Manager dated August 17, 2017, Simmons provided several verbatim quotations from the January 11, 2017 shift brief that Simmons knew were of a private nature, including one concerning a potential lawsuit by the minor's family.[7] (#172-65)

Simmons, aware he recorded sensitive departmental discussions, now argues they were never "private."  Baxter summed it up best during the FPC proceedings, describing the January 11, 2017 shift brief as not "something we would go out and discuss with the public. That's why the doors are shut. There's confidential information on every wall in that room. So every officer in there understands that that's a confidential setting for them, you know, to stay amongst the officers." (#172-29, p. 15, transcript p. 48)

Relying on *People v. Beardsley*, 115 Ill.2d 47 (1986), Simmons claims, referencing his own unsourced affidavit, that had Dossey "intended to keep his comments 'entirely secret' he would have followed the custom and practice of stating

---

[7] Simmons knew they were private because he tried to blackmail the City with them, threatening to "use a different avenue of reporting these incidents if I do not hear from you," a now obvious reference to his secret recording and disclosure to the law firm.  (#172-65, p. 2; #172-8, p. 26-27)

'this conversation is not to leave this room.'" (App. #20, p. 21) *Beardsley* is completely inapposite, as Simmons' secret recordings did not take place in the presence of an arrestee in a police vehicle that could be exited for additional privacy. *Beardsley*, 115 Ill.2d at 54-55. Any officer would know privacy was expected in a closed door shift brief. Moreover, this clear expectation of privacy is outlined in departmental policy which prohibits officers "from using personally owned recording devices while on-duty without the express consent of the Shift Commander." (#172-9, p. 2) Simmons acts as if some magic words had to be said in every conversation in the department to stop his secret recordings despite multiple policies already preventing him from recording. No jury would believe Simmons had permission to record anything he wanted, contrary to multiple written policies.

Simmons purposefully mispresents Baxter's testimony to the FPC that Simmons could "record anything he'd like." (#172-29, p. 15, transcript p. 49) Baxter was speaking hypothetically if Simmons had asked to record a conversation between them within Baxter's office. Baxter might have given permission, but he would not want the recording distributed "out anywhere," which is why they are in the "office with the door closed." (#172-29, p. 15, transcript p. 49) Regardless, Simmons never asked for permission (#172-29, p. 13, transcript p. 41-42), and departmental policy 449.5.1 allows only the Chief of Police (or his authorized designee) to authorize a surreptitious recording. (#172-9, p. 2)

Moreover, the Pekin City Handbook, applicable to all City employees, states that daily work may involve access to information or conversations about citizens,

employees, or members of the general public that is "sensitive" and "technological or manual capabilities should not be used to infringe upon an individual's right to privacy." (#172-77, p. 58) Disclosure of any confidential information may subject an employee to termination.  (#172-77, p. 58) Simmons recorded and disclosed a shift brief involving a clearly "sensitive" incident between a Pekin officer and a minor. See *In re Lakisha M.*, 227 Ill.2d 259, 269 (2008) (holding juveniles have heightened privacy interests).

Referring to a non-existent page 71 of #172-29, Simmons alleges Defendants "argued only the class 4 felony caused his termination," an apparent reference to the Illinois Eavesdropping Statute. (App. #20, p. 22) This is clearly not true.  The Amended FPC Complaint was full of allegations of departmental policy violations. (#172-72, p. 4-6) While it did not specifically mention Simmons giving the shift brief recording to the law firm, it was a natural corollary, and the FPC heard testimony that Simmons did just that. (#172-29, p. 13, transcript p. 40) Nonetheless, it does not matter.  The FPC decision found Simmons violated two policies prohibiting unauthorized recordings.  (#172-73, p. 4-5) In other words, Simmons' termination did not turn on *giving* the recordings to Lefante Law, but *making* them. Even though Simmons did violate the statute, the ruling was based on departmental policy.

Critically, the District Court ruled Simmons failed to demonstrate how both the "taping and releasing" of "confidential information" was not a "superseding cause that breaks this chain." (A53) In another act of dishonest citation, Simmons

falsely asserts the District Court relied solely on the *releasing* by employing a strategically placed ellipsis to remove the word "taping" from his quote of the Order. (App. #20, p. 24) The District Court clearly considered both the taping and releasing in Simmons' failure to maintain the causal chain to his complaints against Burris.

### B.    Simmons cannot link his Burris complaints to his suspension.

Simmons argues his termination was not the "initial adverse action" by the City against him.  Simmons posits his unpaid suspension for greater than five days constituted "suspicious timing" for causation purposes. Simmons fails to acknowledge that his attorney negotiated for him to remain on unpaid suspension for more than five days. (#172-35, p. 36-39) Regardless, there are several independent events breaking several links in the causal chain from his Burris reports to his unpaid suspension.

Simmons proffers a tortured "causal connection" between his Burris complaints and his unpaid suspension. (App. #20, p. 26-28) Simmons' suspension became unpaid effective July 21, 2017.  (#172-42)  This did not even happen until after (1) Simmons' comments about Melton's breasts were reported on May 27, 2017 (#30), (2) he received the June 6, 2017 formal notification of the internal investigation with instructions not to discuss the investigation (#172-37), (3) he denied talking to Brooks about the investigation in his June 19, 2017 departmental interrogation (#172-40, p. 5), and (4) Brooks confirmed in a June 28, 2017 interview that Simmons discussed the investigation with him. (#172-39, p. 1) All this occurred after his second Burris report in April of 2017. (#172-2) No reasonable jury would

49

make it through Simmons' multi-page causation chain without it breaking somewhere. As the District Court found, these links are "far too attenuated for proximate cause purposes." (A34)

### C. Simmons' arbitration proceedings are irrelevant to his Title VII claim.

Simmons has extensively briefed his belief he had no choice but to avoid participating in the FPC hearing due to the Illinois Supreme Court's decision in *Village of Bartonville v. Lopez*, 2017 IL 120643. This has absolutely nothing to do with this case.

The City was required by Illinois law to appoint a board of fire and police commissioners with sole power to permanently discharge a police officer. 65 ILCS 5/10-2.1-1; 65 ILCS 5/10-2.1-17.  Simmons' Collective Bargaining Agreement provided for discipline via the FPC, followed by an appeal either through the courts or arbitration, but not both. (#172-78, p. 17, Sec. 13.6, Sec. 13.7) In other words, the Commission had no choice but to hear testimony and render a decision on Simmons' termination, and Simmons could then choose an appeal route.

Crucially, Simmons misunderstands he is not appealing his FPC termination; he is appealing his Title VII retaliatory discharge claim.  While his termination could not have occurred but for the operation of the FPC, Simmons was not bound by the factual determinations of the FPC. (A30) Simmons could, and did, relitigate the FPC findings in the District Court with years of discovery and depositions. This appeal has nothing to do with arbitration. The District Court did not "misconstrue" *Lopez*, it is simply irrelevant and was never before the District Court.

Moreover, Defendants moved to stay all proceedings as to Simmons due to his simultaneous arbitration (#63), but Simmons opposed the stay. (#64, #65) The District Court denied the stay, holding "the issues to be arbitrated are substantively different than those to be litigated in this federal lawsuit." (#71, p. 9-10) Simmons could have agreed to the stay request, yet now launches into an irrelevant defense of his arbitration rights that have nothing to do with Title VII retaliation.

### D.   The District Court's Order did not rely on a lack of retaliatory or discriminatory animus.

Simmons attacks the District Court's rulings on his failure to prove retaliatory animus, but those rulings never mattered. While the Court analyzed Simmons' arguments, it mostly did so as an esoteric exercise because Simmons argued only animus, not retaliatory or discriminatory animus. (A32) The District Court ultimately ruled the causal connection between Melton's complaint and Simmons' termination was so attenuated to not be the cause, so animus was irrelevant. (A34) That is the correct ruling.

Even so, the District Court found Simmons failed to create a genuine issue of material fact that Melton, Burris, and Dossey fabricated or aided the fabrication of the FPC charges against him in retaliation for Simmons' complaints against Burris. (A52) The District Court held "it feels too implausible that an employees' mere friendship with another who is the target of complaints creates a genuine issue of fact." (A53) The District Court also found Simmons' "cat's paw" theory unavailing because while disliking someone may equate to animus, it does not equate with the requisite discriminatory or retaliatory animus. (A32) The District Court noted

Simmons' friendship claim of retaliatory animus was "considerably weaker" than any case cited. (A33) Although these rulings did not have to be reached, they were correct.

### E.     Burris is not a valid comparator for Simmons

Simmons believes the District Court "took away" from the jury any comparison of his conduct with Burris' conduct because of the recordings.  Even assuming that was true, Burris could never be a valid comparator for Simmons because Burris was a lieutenant and Simmons was a patrolman. Moreover, just like Burris and Brooks (p. 40-42, *supra*), Burris and Simmons' conduct is not comparable. Burris did not secretly record meetings or give a recording to a law firm threatening to sue the City.

## V.   The Court should hold the appeal frivolous.

Upon finding an appeal is frivolous, the Court may, after a separately filed motion or notice and reasonable opportunity to respond, "award just damages and single or double costs to the appellee." Fed. R. App. P. 38.  See also 28 U.S.C. § 1912. Frivolous is not a synonym for "unlikely to succeed"; however, appealing a losing argument is frivolous when done without arguable reason why the ruling was error. *In re Dordevic*, 67 F.4th 372, 388 (7th Cir. 2023). An appeal is frivolous when the appellant's claims are cursory, totally undeveloped, reassert previously rejected versions of facts, or presents arguments so insubstantial they are guaranteed to lose. *McCurry v. Kenco Logistics Services, LLC*, 942 F.3d 783, 791 (7th Cir. 2019) (awarding sanctions for brief "laden with assertions that have no basis in the

record" and other reasons). Arguments based on factual misrepresentations and false premises are frivolous and sanctionable. *Romala Corp. v .U.S.*, 927 F.2d 1219, 1222 (Fed. Cir. 1991). See also *Paulik v. Rizkalla*, 796 F.2d 456, 459 (Fed. Cir. 1986) (misrepresenting the record through use of an ellipsis is sanctionable); *Herzfeld & Stern v. Blair*, 769 F.2d 645, 647 (10th Cir. 1985) (inaccurate references, due to cavalier approach or intent to mislead, add to the frivolity of an appeal).

Despite being chastised by the District Court for this conduct (A6-8), and then downplaying it as mere "citation errors" (App. #20, p. 18), Plaintiffs still doubled down and repeated the misconduct in this Court. Plaintiffs falsely claimed the October 13 meeting was only about "shift work disorder" (p. 31, *supra*), falsely claimed a diagnosis that was never made (p. 31-32, *supra*), falsely attacked the two-week accommodation plan their lawyer agreed to (p. 33-34, *supra*), falsified Brooks' doctor's recommendation for his sleep apnea (p. 34-35, *supra*), and falsified a quote from the District Court's Order by using an ellipsis to remove a critical word. (p. 48-49, *supra*) In addition to the malfeasance already discussed, there is substantially more, such as:

1.  Plaintiffs twice attributing a quote about Burris' comments being "crude and harmful" (App. #20, p. 3), but none of the exhibits cited even contain those words.

2.  Plaintiffs alleging, citing nothing, that Newcomb did not interview 10 witnesses (App. #20, p. 14), but her report lists them all with the length of each interview. (#172-45, p. 1)

3.  Brooks claiming it was not his responsibility to destroy the Von Rohr reprimand letter he copied and retained (App. #20, p. 48), but the document he cites says nothing of the sort.

4.  Brooks claiming there was "no response" to his attorney's letters until October of 2017 (App. #20, p. 11), but the very first line of the September 1, 2017 letter admits there was: "I am following up regarding our recent telephone conversation regarding my client's request to stay on first shift due to his sleep apnea problems." (#177-118)

There is unfortunately more, but space is limited.

Even when compared to their re-writing quotes to invert their meaning in the District Court (A7, n.6), many of these misrepresentations are just as egregious and even more bold. For example, how did they have the nerve to say the October 13 meeting was "only" about "shift work disorder" to claim the City failed the interactive process when Brooks acknowledges sleep apnea on the first page of the transcript? How did they think removing the critical word from a ruling by the District Court via an ellipsis was acceptable?  While any brief is bound to have some unintentional "citation errors" (undoubtedly including some within this brief's 450-plus cites), removing a critical word from the District Court's Order via ellipsis was intentional.  Plaintiffs also cannot credibly claim their blatant misrepresentations of the critical accommodation meeting was inadvertent "error" given the magnitude of the distortion.

Their legal malfeasance is nearly as bad as the factual. Why would Plaintiffs appeal the District Court's ruling that held their noncompliant Additional Material Facts undisputed, when that ruling benefits them? Why would they make multiple arguments they never made in the District Court? Why waste pages of argument on Simmons' irrelevant arbitration issues? The Plaintiffs' brief is confusing, disjointed, and full of frivolous and meritless arguments.

The Court should hold this appeal frivolous and allow Defendants to seek their damages and costs pursuant to Fed. R. App. P. 38 and 28 USC § 1912. There are far too many misrepresentations that are far too audacious to attribute to "citation errors" or lazy drafting. Plaintiffs are purposefully trying to mislead this Court just as they tried to purposefully mislead the District Court.

## VI.    Conclusion.

The District Court's rulings were correct and this appeal is frivolous. The Court should affirm the District Court's Orders, hold the appeal frivolous, and allow Defendants to seek damages and costs, including the filling of a separate motion further outlining Plaintiffs' brief's obfuscations, if the Court believes it useful.

Respectfully submitted,

s/ Christopher H. Sokn
CHRISTOPHER H. SOKN
Attorney for Defendants-Appellees

CHRISTOPHER H. SOKN
Kingery Durree Wakeman & O'Donnell, Assoc.
416 Main Street, Suite 1600
Peoria, Illinois 61602
Telephone: (309) 676-3612
Email: chsokn@kdwolaw.com

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(g):

1.     This document complies with the type-volume limit of Circuit Rule 32(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), the brief contains 13,823 words.

2.     This document complies with the typeface requirements of Circuit Rule 32(b) and Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft Office 365 (Version 2307) in 12-point Century Schoolbook font.

s/ Christopher H. Sokn
CHRISTOPHER H. SOKN
Attorney for Defendants-Appellees

Dated: August 30, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2023, I electronically filed the foregoing BRIEF AND SUPPLEMENTAL APPENDIX FOR APPELLEES with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

s/ Christopher H. Sokn
CHRISTOPHER H. SOKN
Attorney for Defendants-Appellees

Dated: August 30, 2023

# DEFENDANTS' SUPPLEMENTAL APPENDIX

# TABLE OF CONTENTS

Complaint filed in the Circuit Court of the Tenth Judicial
Circuit, Tazewell Illinois, on June 7, 2023 by Plaintiff
Gregory Simmons.........................................................................................1

Motion to Dismiss (without exhibits) filed in the Circuit Court
of the Tenth Judicial Circuit, Tazewell County, Illinois, on
July 18, 2023 by Defendant Jennifer Melton...........................................5

FILED
6/7/2023 10:33 AM
TAZEWELL COUNTY CIRCUIT CLERK
TENTH JUDICIAL CIRCUIT OF ILLINOIS
REVIEWED BY: TS

# IN THE CIRCUIT COURT OF THE TENTH JUDICIAL CIRCUIT OF ILLINOIS

## TAZEWELL COUNTY

| | | |
|---|---|---|
| **GREGORY SIMMONS,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| vs. | ) | 2023-LA-000047 |
| | ) | |
| **JENNIFER MELTON,** | ) | **JURY DEMAND** |
| | ) | |
| Defendants. | ) | |

THIS CASE IS SET FOR A MANAGEMENT CONFERENCE
ON December 7 20
AT 9:00AM AM MAIN COURTROOM 1
OF Tazewell County
IF THE DEFENDANT(S) ANSWER(S) MORE THAN 35 DAYS
BEFORE THIS DATE, THEN THE PARTIES SHALL
SCHEDULE A CASE MANAGEMENT CONFERENCE WITHIN
35 DAYS OF THE DATE THE ANSWER'S PLED.

## COMPLAINT

Now comes **GREGORY SIMMONS** by and through his attorneys **JAMES L. HAFELE**, of counsel at **HALL & RUSTOM, L.L.C**, and **JULIE L. GALASSI OF HASSLEBERG, ROCK, BELL, AND KUPPLER, L.L.P.,** and for his cause of action against **JENNIFER MELTON** for tortious interference with employment relationship, states as follows:

1. Plaintiff is a resident of the state of Missouri.

2. Plaintiff was employed by the City of Pekin as a law enforcement officer from October 9, 1995, to March 13, 2018.

3. On March 13, 2018, Plaintiff's employment with the City of Pekin was terminated by the Pekin Fire and Police Commission.

4. Defendant became employed by the City of Pekin as a police officer in the year 2003.

5. Plaintiff and Defendant were both employed as patrol officers.

6. Plaintiff had a reasonable expectation of continued employment by the Pekin Police Department until, at a minimum, he reached retirement age, and for years continuing beyond that date.

DSA 1

7. Defendant knew of Plaintiff's expectation of continued employment in that they had discussed the subject of employment and retirement on several occasions.

8. Without just cause or justification on or about May 24, 2017, and again on a date later in May of 2017, Defendant did intentionally, falsely, and maliciously, and in clear violation of Policy, accuse Plaintiff of having sexually harassed her on two occasions in March of 2017.

9. Defendant made her accusations against Plaintiff to a Deputy Chief of the Pekin Police Department and to others, including the Pekin Fire and Police Commission.

10. Defendant's accusations were retaliatory and not true, and she knew them to be untrue when she made them.

11. Defendant made her accusations in response to her being disciplined for conduct she erroneously believed Plaintiff reported.

12. Defendant's false accusations of sexual harassment of her by Plaintiff caused the police department to initiate an internal investigation of Plaintiff and caused the Chief of Police to file charges seeking Plaintiff's termination by the Fire and Police Commission.

13. By making said accusations Defendant did proximately interfere in Plaintiff's continued employment and did proximately cause Plaintiffs termination as a police officer.

14. Defendant made her false and malicious accusations during the conduct of the internal investigation under oath.

15. Defendant made her false and malicious accusations under oath to the Pekin Fire and Police Commission with the intention to justify and cause the termination of Plaintiff's employment.

16. As a direct and proximate result of defendant's intentional, malicious and false accusations against Plaintiff, Plaintiff's employment with the City of Pekin was terminated and Plaintiff suffered the loss of pecuniary and valuable benefits, including his wages, accruing retirement benefits, certification as a police officer in the State of Illinois, health insurance benefits provided by the City of Pekin to retired police officers, certain other benefits provided to retired police officers who had not been terminated, and including depriving Plaintiff of the ability to be employed by other municipalities or entities as a police officer, as well as mental and emotional suffering.

**WHEREFORE** Plaintiff by his attorneys as aforesaid prays this court to enter judgement against defendant for compensatory damages in excess of $50,000.00 for costs and attorney's fees, for punitive damages and for such other relief as may be just.

Plaintiff demands trial by jury.

By: _____

JAMES L. HAFELE, OF COUNSEL
HALL & RUSTOM, L.L.C
316 SW WASHINGTON ST
SUITE 1A
PEORIA, IL 61602
PH: 309-699-4691
FAX: 309-699-4693
HAFELE@HALLRUSTOM.COM
ARDC: 1096834

JULIE GALASSI
HASSELBERG, ROCK, BELL AND KULPPER, L.L.P
ASSOCIATED BANK BLDG., SUITE 200
4600 N. BRANDYWINE DR
PEORIA, IL 61614

DSA 3

PH: 309-688-9400
FAX: 309-688-9430
EMAIL: JGALASSI@HRBKLAW.COM
ARDC: 6198035

FILED
7/18/2023 11:43 AM
TAZEWELL COUNTY CIRCUIT CLERK
TENTH JUDICIAL CIRCUIT OF ILLINOIS
REVIEWED BY: SK

**IN THE CIRCUIT COURT OF THE TENTH JUDICIAL CIRCUIT OF ILLINOIS**
**TAZEWELL COUNTY**

|  |  |  |
|---|---|---|
| GREGORY SIMMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2023-LA-000047 |
| vs. | ) | |
| | ) | |
| JENNIFER MELTON, | ) | |
| | ) | |
| Defendant. | ) | |

**MOTION TO DISMISS**

NOW COMES the Defendant, Jennifer Melton, by and through her attorneys, Kingery

Durree Wakeman & O'Donnell, Assoc., and for her Motion to Dismiss this matter for Lack of

Subject Matter Jurisdiction, pursuant to 735 ILCS 5/2-619(a)(1) and (a)(3), states as follows:

**Summary**

1.      The Code of Civil Procedure, 735 ILCS 5/2-619(a)(1), provides for the filing of a

motion to dismiss an action on grounds that the court "does not have jurisdiction of the subject

matter of the action, provided the defect cannot be removed by a transfer of the case to a court

having jurisdiction." 735 ILCS 5/2-619(a)(1).

2.      The Code of Civil Procedure, 735 ILCS 5/2-619(a)(3), provides for the filing of a

motion to dismiss an action on grounds that there "is another action pending between the same

parties for the same cause." 735 ILCS 5/2-619(a)(3).

3.      Plaintiff originally filed this tortious interference claim against Defendant in the

United States District Court for the Central District of Illinois, which recently dismissed it

without prejudice and declined to exercise supplemental jurisdiction. Plaintiff filed a Notice of

Appeal of that ruling. Jurisdiction over this matter is now in the United States Court of Appeals

for the Seventh Circuit, and this Court lacks subject matter jurisdiction as a result.

1

DSA 5

4.     This is also the same action between the same parties pending in both the United States Court of Appeals and this Court. This matter should be dismissed on those grounds as well.

**Plaintiff Has Placed Jurisdiction Over this Matter in the United States Court of Appeals**

5.     On June 7, 2023, Plaintiff, Gregory Simmons, filed the Complaint in this matter against Defendant, Jennifer Melton, alleging tortious interference with employment relationship.

6.     This is the second time Simmons has made this claim against Melton. Simmons filed the same allegation against Melton in the United States District Court for the Central District of Illinois in a case captioned as John Brooks and Gregory Simmons versus City of Pekin, John Dossey, Donald Baxter, Sarah Newcomb and Jennifer Melton, case number 18-cv-1334 (the "federal case").

7.     Attached hereto as Exhibit 1 is a true and accurate file-stamped copy of the operative complaint in the federal case, the "Second Amended Complaint." Simmons' tortious interference claim against Jennifer Melton is Count VII of that complaint (Ex. 1, p. 24) and the facts.

8.     On May 10, 2023, the Central District of Illinois entered an Order and Opinion granting summary judgment in favor of the defendants on all but one count of the claims filed by Simmons and his co-plaintiff John Brooks. A true and correct file-stamped copy of the Order and Opinion is attached hereto as Exhibit 2.

9.     The only count Simmons did not lose was Count VII alleging the same tortious interference against Melton as the Complaint herein. However, the Central District declined to exercise supplemental jurisdiction to hear this Illinois state law claim against Melton as the

DSA 6

defendants received summary judgment on all the federal claims. Count VII was therefore

dismissed without prejudice. (Ex. 2, p. 61-64)

10.     On May 11, 2023, a judgment order was entered in the federal case against

Simmons and John Brooks. A true and accurate file stamped copy of the judgment order is

attached hereto as Exhibit 3.

11.     On June 7, 2023, Simmons and Brooks filed a Notice of Appeal of the federal

case. A true and accurate file stamped copy of the Notice of Appeal is attached hereto as Exhibit

4.

12.     Pursuant to the Notice of Appeal, Simmons was appealing the orders entered in

the federal case on May 10, 2023 and May 11, 2023. (Ex. 4)

13.     On June 20, 2023, the United States Court of Appeals for the Seventh Circuit

entered a text Order requiring Simmons and Brooks to file a docketing statement concerning

appellate jurisdiction. A true and correct copy of that Order is attached hereto as Exhibit 5.

14.     On June 27, 2023, Simmons and Brooks filed their "Docketing Statement

Concerning Appellate Jurisdiction." A true and correct file-stamped copy of the "Docketing

Statement Concerning Appellate Jurisdiction" is attached hereto as Exhibit 6.

15.     In the "Docketing Statement Concerning Appellate Jurisdiction," Simmons

discusses the order of dismissal of Count VII, his tortious interference claim against Melton. (Ex.

6, p. 2) Simmons states the Notice of Appeal was filed "appealing the above Orders and the

Judgment." (Ex. 6, p. 2)

16.     At no point in any of Simmons' filings in the federal case or in the Seventh

Circuit did he indicate he was not appealing the dismissal of the tortious interference claim in

Count VII. To the contrary, Simmons indicates that he is appealing every ruling made by the

district court in the Order and Opinion (Ex. 2), which includes the dismissal without prejudice of the tortious interference claim against Melton.

17.    "The timely filing of a notice of appeal transfers jurisdiction from the trial court to the appellate court. Once the notice of appeal is filed, the appellate court's jurisdiction attaches immediately, and the cause of action is then beyond the jurisdiction of the trial court." *Enbridge Pipeline (Illinois), LLC v. Hoke*, 2019 IL App (4th) 150544-B, ¶ 28 (internal citations omitted).

18.    The same premise is held in the federal courts. "The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). See also *Kusay v. U.S.*, 62 F.3d 192, 193-94 (7th Cir. 1995) ("Until the mandate issues, the case is 'in' the court of appeals, and any action by the district court is a nullity."); *Armstead v. HSBC Card Services*, 935 F.Supp.2d 907, 908 (C.D. Ill. 2013).

19.    Simmons filed a Notice of Appeal challenging the dismissal of his tortious interference claim against Melton from the federal case. By doing so, Simmons placed the issue of whether his tortious interference claim should remain in federal court before the Court of Appeals for the Seventh Circuit. If Simmons is successful on appeal, the Order and Opinion could be reversed and his tortious interference claim against Melton would stay in federal court.

20.    This Court is without jurisdiction to hear Simmons' Complaint until the ongoing appeal in the federal case is resolved. The Court should dismiss the Complaint for lack of subject matter jurisdiction pursuant to 735 ILCS 5/2-619(a)(1).

21.    The Court may dismiss a matter when there is another action pending between the same parties for the same cause. 735 ILSC 5/2-619(a)(3). Two actions are the same cause when

4

the "relief is requested on substantially the same facts." *Terracom Development Group, Inc. v. Village of Westhaven*, 209 Ill.App.3d 758, 762 (1st Dist. 1991). The crucial inquiry is whether the two actions "arise out of the same transaction or occurred, not whether the legal theory, issues, burden of proof or relief sought materially differ between the two actions." *Id.* (quoting *Skolnick v. Martin*, 32 Ill.2d 55, 57 (1964)). There need only be a substantial similarity of issues between the two cases to justify dismissal. *Id.*

22.     Simmons has filed the exact same cause in two different courts. Comparing the Complaint in this case with the Second Amended Complaint in the federal case reveals not just substantial similarity to justify dismissal, but identical allegations. Simmons is proceeding with his appeal of the federal case on his tortious interference count against Melton while also trying to proceed in this Court with a tortious interference count against Melton that is based on the exact same occurrence—Simmons' claim that Melton was lying about his sexual harassing comments and that those comments are what caused the loss of his employment.

23.     Simmons' tortious interference claim was already proceeding in federal court at the time Simmons filed the same claim in this Court. Pursuant to 735 ILCS 5/2-610(a)(3), the Court should dismiss this case while that same claim proceeds on appeal in federal court.

24.     Attached hereto as Exhibit 7 is an affidavit pursuant to 735 ILCS 5/2-619.

WHEREFORE, Defendant prays the Court dismiss the Complaint and for such other and further relief as the Court deems just and proper.

5

Respectfully submitted,

JENNIFER MELTON, Defendant.


By: _____
                    Christopher H. Sokn


Christopher H. Sokn (ARDC #6297663)
Philip M. O'Donnell (ARDC #6225759)
KINGERY DURREE WAKEMAN
 & O'DONNELL, ASSOC.
416 Main Street, Suite 1600
Peoria, IL   61602-1166
Phone: (309) 676-3612
Fax: (309) 676-1329
Email:  chsokn@kdwolaw.com


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document and exhibits were filed electronically and served via Odyssey E-File System of the Circuit Court to all counsel of record on July 18, 2023:

**jgalassi@hrbklaw.com**
Julie L. Galassi
Hasselberg Rock Bell & Kuppler, LLP
4600 N. Brandywine Drive, Suite 200
Peoria, IL  61614-5591

**hafele@hallrustom.com**
James L. Hafele
Hall & Rustom, L.L.C.
316 SW Washington Street
Suite 1A
Peoria, IL 61602


_____
                    Christopher H. Sokn


6

DSA 10