No. 23-2140

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

JOHN BROOKS and GREGORY SIMMONS,

      Plaintiffs-Appellants,

    v.

CITY OF PEKIN, et al.,

      Defendants-Appellees.

---

Appeal from the United States District Court
for the Central District of Illinois
Case No. 1:18-01334

The Honorable James E. Shadid Presiding

---

REPLY BRIEF OF PLAINTIFFS-APPELLANTS
JOHN BROOKS and GREGORY SIMMONS

---

JULIE L. GALASSI, Esq., Bar No. 6198035
HASSELBERG, ROCK, BELL & KUPPLER, LLP
Associated Bank Building, Suite 200
4600 N. Brandywine Drive
Peoria, Illinois 61614
Telephone:   (309) 688-9400
Facsimile:    (309) 688-9430
Email:         jgalassi@hrbklaw.com

JAMES L. HAFELE, Esq., Bar No. 1096834
HALL RUSTOM, LLC
316 SW Washington St., Ste. 1A
Peoria, IL 61602
Telephone:   (309) 699-4691
Facsimile:    (309) 699-4693
Email: hafele@hallrustom.com

# TABLE OF CONTENTS

TABLE OF CONTENTS......................................................................................... 1

TABLE OF AUTHORITIES/CASES ........................................................................ 2

INTRODUCTION.................................................................................................4

MISCHARACTERIZAION OF THE COURT'S ORDER...................................…......4

SIMMONS' RECORDINGS................................................................................. 5

FRIVOULOUS....................................................................................................8

ANDY'S DINER................................................................................................10

RETALIATORY ANIMUS...........................................................….....................10

ARBITRATION.................................................................................................13

BROOKS' ADA CLAIMS...............................................................…..................13

FAILURE TO ACCOMMODATE.........................................................................17

THE INTERACTIVE PROCESS.........................................................................18

CITY'S TREATMENT OF BROOKS' ACCOMMODATION REQUESTS.…..…........19

BROOKS AND HIS ATTORNEY AGREED TO THE CITY'S ACCOMMODATION
PLAN...............................................................................................................19

THE CITY'S PROPOSED ACCOMMODATIONS WERE
UNREASONABLE.............................................................................….............20

MOVING BROOKS BACK TO FIRST SHIFT WAS NOT
UNREASONABLE.............................................................................…..............22

ADA DISPARATED TREATMENT.................................................................…....25

BROOKS WAS CONSTRUCTIVELY DISCHARGED.……..................…...............25

BURRIS IS A VALID COMPARATOR..............................................…...…............26

ADA RETALIATION..............................................................................28

CONCLUSION.....................................................................................29

FED. R. APP. P 32(g) CERTIFICATE OF COMPLIANCE WITH
TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND
TYPE-STYLE REQUIREMENTS ...................................................... 31

CERTIFICATE OF SERVICE.............................................................. 32

## TABLE OF AUTHORITIES/CASES

<u>Cases</u>

*Bender v. Bd. of Fire & Police Comm'rs. of the Vill. of Dolton* 183 Ill. App 3rd 562,

565-566 (1st Dist., 1989) ……………………...……………………………….7

*Brady v. Maryland* 373 U.S. 83 (1963)………………………………………**13**

*Burlington Northern R.R. Co. v. Woods*, 480 U.S. 1, 4 (1987)……………………**8**

*Eckles v. Consolidated Rail Corp.*, 94 F.3d 1041, 1052 (7th Cir. 1996)……………**16**

*EEOC v. Wal-Mart Stores, Inc., 38 F.4th 651*……………………………………**...21**

*Gonpo v. Sonam's Stonewalls*, 41 F.4th 1 (1st Cir. 2022)………………………**8**

*Harris N.A. v. Hershey*, 711 F.3rd 794, 802 (7th Cir. 2013)……………………**9**

*Herzfeld & Stern v. Blair*, 769 F.2d 645 (10th Cir., 1985)……………………**9**

*In re Dordevic*, 67 F.4th 372 (7th Cir. 2023)………………………………………**8**

*Kazmierski v. Bonafide Safe & Lock, Inc.* 223 F.Supp. 3d 838, 853 (E.D. Wis. 2016)
.........................................................................................................21

*McCurry v. Kenco Logistics Services, LLC*, 942 F.3d 783 (7th Cir. 2019).................9

*Michael v. City of Granite City, Illinois*, No. 06CV01 WDS, 2006 WL 2539719 (S.D. Ill. Aug. 31, 2006).........................................................................................18

*Paulik v. Rizkalla*, 796 F.2d 456 (Fed. Cir. 1986)..............................................9

*People v. Beardsley*, 115 Ill. 2nd 46 (1986)....................................................7

*Rodrigo v. Carle Foundation Hospital*, 879 F.3d 236, 243 (7th Cir., 2018).............29

Statutes, Rule, and Other Authorities

65 ILCS 5/10-2.1-17.................................................................................13

## INTRODUCTION

Counts I-IV named only one party Defendant, the City of Pekin. (hereafter "City") (#37, p. 16-22) Throughout the "Brief and Supplemental Appendix of Defendants-Appellees" (hereinafter "the Brief") (App. #27) the plural of the word "Defendant" is used. In the Conclusion (App. #27, p. 55) this Court is asked to "allow Defendants to seek damages and costs…." The City is the only party making that request.

## MISCHARACTERIZATION OF THE COURT'S ORDER

In the SUMMARY OF ARGUMENT (App. #27, p. 21) the Brief claims that "[t]he District Court accepted as true the noncompliant Additional Material Facts of the Plaintiffs' Response, causing no harm to Plaintiffs." Then, in the substance of the Argument portion of the Brief, it is argued that the District Court simply chose to take the offending Additional Material Facts as undisputed. (App. #27, p.26) The argument continues with the contention that there was no penalty whatsoever imposed on Plaintiffs, which was a benefit to the Plaintiffs, not a penalty. (App. #27, p.26). The Brief argues that it was the Defendant who was harmed, if anyone, because the Plaintiffs got what they wanted, and Plaintiffs' claim that the District Court's benevolence was error is a mystery. (App. #27, p.27) The Brief is flat wrong in this regard.

All of this is made perfectly clear when the provisions of the District Court's Order and Opinion (#187, p. 5) (A. p. 8) are examined. The issue before the District Court was which remedy, pursuant to FRCP 56(e), should the Court impose when

Plaintiffs failed to properly support an assertion of fact or failed to properly address another parties assertion of fact. The Court chose option number (2), that is, to consider the facts in question as undisputed for purposes of the Motion. While the District Court's language in making its ruling is not perfectly clear, there's no doubt as to its meaning. The Court ruled that "… the Court finds that the appropriate remedy is to treat as undisputed those facts that Plaintiffs failed to adequately establish…." (#187, p. 5) (A. p. 8)[1] "Those facts" obviously means Defendants' facts, not Plaintiffs'. Thus, every fact stated by Defendants in their Motion for Summary Judgment that Plaintiffs failed to adequately establish in their Response, is to be taken as undisputed. It is impossible to interpret this ruling in the manner argued in the Brief. Claiming "legal malfeasance" on the part of Plaintiffs, the Brief seeks this Court to hold the appeal frivolous, based, in part, on the contention that Plaintiffs appealed a ruling which benefited Plaintiffs. (App. #27, p.55)

## SIMMONS' RECORDINGS

At page 47 of the Brief, it is argued that Simmons "purposefully misrepresents" the testimony of D.C. Baxter at the FPC. Simmons did argue in Appellants' Brief that what Baxter said before the FPC did create a question of fact on the recording issue. (App. #20, p. 23) It is true that the question asked of Baxter dealt with "permission." Baxter's direct response was "so, you know, he can record anything he'd liked." (#172–29, p. 15, p. 49 of transcript) The very next question was

---

[1] The pleading and proposed response (the subject of the District Court's order) (#183) (#183-1) highlights in red clarifications and corrected miscites. The miscites constitute a very small portion of Plaintiffs' Response.

in the hypothetical, and in his answer Baxter stated "I would have explained to him that you can record whatever you want, but I don't want that out anywhere. That's why you're in my office with the door closed." (#172-29, p. 15, p. 49 of transcript) Nevertheless, Simmons' argument that Baxter's testimony had created a question of fact on the recording issue remains valid.

Simmons admits the citation on page 22 of Plaintiffs' Brief (App. #20, p. 22) is a mistake. The citation should have read "#172, p.71," not "#172-29, p. 71." The exact quote from Defendants' Motion for Summary Judgment is "The Class 4 felony that Simmons secretly committed is what caused his termination, not any sexual harassment complaints he made." (#172, p.71) So, the point made in Plaintiffs' Brief remains valid, that the "releasing" was found by the District Court to be one of the factors that broke the causal chain even though the Defendants had not made that argument.

Beginning on page 48 of the Brief and carrying over to page 49 (App. #27, p.48-49) the City claims that Simmons "in another act of dishonest citation" employed a strategically placed ellipsis and intentionally removed the word "taping" from Simmons' quote of the District Court Order. (App. #27, p.48-49) The Brief claims that Simmons contended that the District Court relied solely on "*releasing*" and that Simmons used an ellipsis to remove the word "taping." Simmons' quote was to #187, p. 49, n. 25. The exact words used in note 25 are "… gave those recordings to parties suing the City," just as used by Simmons at page 24 of Plaintiffs' Brief. (App. #20, p. 24) Nowhere in note 25 does the word "taping" appear.

6

True, at page 50 of the Order, the Court did include the word "taping." (#187, p.50) (A. p. 53) Plaintiffs' argument at page 24 of Appellants Brief (App. #20, p.24) did not address what the Order contained, but only the point that Dossey's Complaint filed with the FPC did not charge Simmons with releasing the tape to parties suing the City. Simmons has never argued that the District Court "relied solely on the *releasing*" (App. #27, p.49) but only that the City did not charge "*releasing*" with the FPC, and that the FPC made no findings regarding "*releasing*." (#172-73, p.1-5) Simmons also argued that Dossey's Amended Complaint did not allege facts relative to the reasonableness of the department's claimed expectation of privacy and that the FPC made no relevant findings, an argument ignored in the Brief.

Most important to the "recordings" issue is the fact that the City has ignored in the Brief any mention of the fact that Simmons' recordings were of conversations he had a right to hear. Because Simmons did not violate the eavesdropping statute, he could not have violated any department policy. (App. #20, p. 22) *Bender v. Bd. of Fire & Police Comm'rs. of the Vill. of Dolton* 183 Ill. App 3rd 562, 565-566 (1st Dist., 1989) The Brief fails completely to address this issue.

The Brief mischaracterizes Simmons' argument on the recordings. The crux of Simmons' argument is that he had violated no law when he recorded conversations he had a right to hear thereby making the recordings not "surreptitious," (App. #20, p.20) relying on *Bender.* This portion of Simmons' argument on the recordings is based on *Bender*, not *Beardsley* (*People v. Beardsley*, 115 Ill. 2nd 46 (1986)) as claimed by the Brief. (App. #27, p.46)

## FRIVOULOUS

Plaintiffs have made it clear that they seek reversal only of Counts I-IV of their Second Amended Complaint. (App. #20, p. 2) Simmons does not seek reversal of the District Court's Order declining to exercise supplemental jurisdiction over the State law claim. (#187, p. 63) (A. p. 66) The City's argument appears frivolous.

*Gonpo v. Sonam's Stonewalls*, 41 F.4th 1 (1st Cir. 2022) related that Fed R. App. P.3 (c)(1), prior to amendment effective 12/1/21, provided that an appellant had to "designate the judgement, order, or part thereof being appealed." *Id*, p. 16, n. 7. Quoting the advisory committee notes on the amended Rule, the court stated that … "'[i]t is the role of the briefs, not the notice of appeal, to focus the issues on appeal.'" Id., p. 10. *Gonpo* does not hold – or even imply – that to limit the scope of the issues appealed the notice of appeal must include an express statement of the limitation. To the contrary, *Gonpo* held that the testimony of a witness, and his pocket calendar, which had been excluded from evidence by the district court, were subject to appellate review even though not itemized in appellant's itemized notice of appeal.

*In re Dordevic*, 67 F.4th 372 (7th Cir. 2023) cited by the City, does not support the City's "frivolousness" argument. The court in *Dordevic* refused to award sanctions for frivolity because the appellant "… presented colorable 'legal contentions' …." *Id.*, at 388. Citing *Burlington Northern R.R. Co. v. Woods*, 480 U.S. 1, 4 (1987) the court stated that even if an appeal is found to be frivolous, the appellate court's decision to issue sanctions is a matter of discretion and, citing

*Harris N.A. v. Hershey*, 711 F.3rd 794, 802 (7th Cir. 2013), stated that the Seventh Circuit does not invoke Rule 38 lightly, in that reasonable lawyers often disagree and that the court's doors are open to consider such disagreements. *Dordevic*, at 389.

In *McCurry v. Kenco Logistics Services, LLC*, 942 F.3d 783 (7th Cir. 2019) the appellant's arguments were "...insubstantial to the point of incoherence and had no chance of prevailing in this court." *Id.*, at 791. The court described the appellants brief as "gibberish." *Id.*, at 792. Certainly, Plaintiffs' Brief here does not fit that description.

In *Paulik v. Rizkalla*, 796 F.2d 456 (Fed. Cir. 1986) Rizkalla in his brief used an ellipsis to eliminate an entire clause from an argument concerning what Paulik had claimed about introducing additional evidence on a previous remand. Paulik had in fact urged the Board to permit additional evidence. Rizkalla made it seem in the record that Paulik had made no such request. When omitted material was reinserted it became clear that Rizkalla's counsel had flagrantly distorted the record. *Id.*, at 460. *Paulik* does not apply here. As previously argued, *infra*, p. 2-3, Plaintiffs used the ellipsis to accurately quote the District Court's footnote (#187, p.49, n. 25) (A. p. 52) in support of Plaintiffs' argument that Dossey did not charge "releasing" of the recordings with the FPC. The record was not distorted in Plaintiffs' argument.

In *Herzfeld & Stern v. Blair*, 769 F.2d 645 (10th Cir., 1985) is likewise inapposite to the case <u>sub judice</u>. Blair refused to pay for investments made on his behalf by

defendant and on appeal, after Blair lost on trial, Blair, for the very first time, argued an employee at defendant had mislead Blair about FDA approval. The appellate court searched the record for evidence supporting Blair's assertion and found none. *Id.*, at 647. "This issue has the substance of a puff of smoke." *Ibid*. The same cannot be said here.

## ANDY'S DINER

The Order and Opinion (#187, p. 7) recited that Simmons received either no discipline or a verbal reprimand. In the Brief, the City claims that Lieutenant John Brooks "gave Simmons a verbal reprimand." The Brief cites #172-4, p. 5 which purports to be a Citizens Complaint on the Andy's Diner matter. Simmons disputed Defendants' UMF #12, (#172, p. 13) (cited by the District Court at #187, p. 7), (A. p. 10) claiming Defendants' Exhibit 4 (#172-4) was a "manufactured document." (#186, p. 11) Yet, irresponsibly, the Brief cites Exhibit 4 as if a verbal reprimand was an established fact. Clearly it was not.

## RETALIATORY ANIMUS

If the "recordings and release" causal chain ruling by the District Court is error, then the issue of retaliatory animus is important. All of Dossey's malicious acts against Simmons are relevant, including banning Simmons from City property, (#172-42) forcing Simmons to submit to a police escort through the department lobby to pay his wastewater bill in City Hall, (#172-1, p.77) requiring Simmons to turn in his badge and ID's while on *paid* administrative leave. (#172-38) It is interesting to note that Dossey even inaccurately alleged facts in his FPC

Complaint, so malicious was he. He charged Simmons with having said "boobs" in the squad room, when Melton made it perfectly clear Simmons did not. (#172-19, p. 100 of transcript).

Another undisputable fact shows the depth of Dossey's retaliatory animus towards Simmons. Only two days elapsed between Dossey's Amended Complaint filed with the FPC (#172-72) charging Simmons with the recordings, and the trial at the FPC. (#172-29)

What did Burris do to warrant the harsh discipline of a 21-day unpaid suspension and, most serious, permanent demotion from Lieutenant to Patrol? Obviously, he lied, and he admitted he was accused of lying. (#172-12, p. 36) But the lie was covered up in the Last Chance Agreement (#177-30) and the Order of Suspension. (#172-14) When placed on paid leave, Burris was not restricted from city property, he was not ordered to not discuss the matter with any other officer and he was not required to turn in his badge and ID's while he was on paid leave. (#172-14) (#177-117) (#177-136) Both Simmons (#172-38, #172-37) and Brooks (#172-57, #172-60) suffered all of these penalties.

The District Court refused to address the question of whether Simmons could have reasonably believed Burris' two comments violated Title VII. (#187, p.49) (A. p. 52) Why then does the Brief recite the City's same old arguments on this point. There was no ruling and therefore no error. The District Court declined to rule because it found Simmons "…fails to prove the required causal connection…." (#187, p. 49) (A. p. 52) Ruling further, the District Court specifically found that Simmons

11

"… failed to create a genuine issue of fact that Melton, Burris, and Dossey fabricated or aided the fabrication of disciplinary charges against him in retaliation for his complaints against Burris." (#187, p. 49) (A. p. 52) The Brief reduces the matter to "…his secret recordings, lying, and comments about Melton's breasts, broke any connection." (App. #27, p. 44)

(1) Simmons did not lie, or at least a question of fact exists on the point (App. #20, p.6);

(2) Simmons did not make comments about Melton's breasts, or at least a question of fact exists on the point (App. #20, p.4);

(3) Simmons' recordings were legal, not class 4 felonies, or at least a question of fact exits on the point (App. #20, p.20-23).

The Brief, erroneously, adopts these three facts as established and undisputed facts. (App. #27, p.44)

At page eight of the Brief, the City claims that two days after Simmons was interrogated (June 19, 2017) Simmons was placed on "unpaid leave," a clear miscite. (App. #27, p.8) Actually, Simmons was placed on "unpaid leave" on *July 21, 2017*. (#172-42) We all make mistakes.

At page thirty-one of Plaintiffs' Brief, Simmons rightly argued that the FPC is required by statute to conduct a fair and impartial hearing, and that this duty is separate and apart from any duty born by Dossey or by any other City official. (App. #20, p.31) Simmons went on to argue that the Commissions' failure was indicia of animus and that ignoring *Lopez* by the Commission was a violation of its statutory

duty. (App. #20, p.31) The City also withheld the exculpatory testimony of Richardson (#177-40 p. 4, p. 14 of transcript and p. 8, p.29 of transcript) and Vogel's exculpatory testimony (#177-55, p. 40-43) from the FPC. (#172-29, p.2) Is that not indicia of retaliatory animus, being akin to a *Brady* violation? *Brady v. Maryland* 373 U.S. 83 (1963)

## ARBITRATION

The Brief argues that *Lopez* is "simply irrelevant" and that this "…appeal has nothing to do with arbitration." (App. #27, p. 50) The entire FPC proceeding is evidence of retaliatory animus. The fact is that the proceeding commenced two days after Simmons was charged with the recordings. The fact is that Richardson was not called to testify. The fact is that Vogel told an entirely different story ("he just said something about her breasts"), and he testified he did not recall what Simmons said. (#172-29, p. 6, p. 15 of the transcript)

65 ILCS 5/10-2.1-17 makes arbitration mandatory unless it is mutually agreed otherwise. Ignoring the provisions of the CBA, and the statute, the City rushed to the FPC, and then contended that Simmons had his hearing and was not entitled to arbitration. All of that is rank retaliatory animus.

## BROOKS' ADA CLAIMS

The City argues that Brooks' claim that he could only work first shift was because he received the order that he was being moved to second shift. (#172-43, p. 4) (#172-61, p. 31) The record does not support the City's argument. During Brooks' twenty-two-year career with the City he cumulatively worked second shift for ten

13

years as a patrol officer, but he had not worked second shift after he was promoted to lieutenant in 2012. (#177-31) Brooks testified he was on second shift at the beginning of his career and was assigned to third shift when he was promoted to sergeant. (#172-15, p. 19) Brooks told Baxter in May 2017 that he was planning to retire early due to the difficulty working second and third shift with his severe sleep apnea. (#177-13, ¶80) In June 2016, Brooks told Dossey and Kaminski that he was going to retire early because he was being bumped off first shift. (#177-13, ¶77) Around December 2016, Brooks went to the Pension Board to purchase additional creditable service based on his military service in anticipation of early retirement. (#177-13, ¶79)

Brooks' first accommodation request was made to Baxter on June 16, 2017, not June 19, 2017 as the City claims in the Brief. (#177-14) (App. #27, p. 28) Baxter denied it nine minutes later. Brooks then sent his accommodation request to the City Manager the same day. (#177-14)

On June 19, 2017, Brooks submitted a Reasonable Accommodation Request Form stating he was requesting to remain on his assigned first shift. Working first shift allowed him to perform his job functions. (#172-36) Brooks wrote that he could maintain a consistent sleep schedule on first shift and it would be difficult, if not impossible, to maintain a consistent sleep schedule on second shift. (#172-36) He had worked second shift for 10 years and knew from experience. (#172-36) Brooks had issues staying awake on third shift in 2006. At that time was placed on light duty and sent to the city doctor. (#177-125)

Brooks met with Newcomb and Kaminski, not Baxter, on July 12, 2017.[2] Like Baxter, Newcomb denied Brooks' Accommodation Request on July 14, 2017. (#172-48) Brooks did not refuse an offer to adjust his hours as claimed by Newcomb. (#172-48) Brooks stated, and Kaminski agreed, that doing so would cause scheduling issues. (#177-50) According to Kaminski, Brooks stated that the transfer from third shift to first shift extended his career. (#177-50, p. 1) Contradicting her July 14 memo to Brooks, Newcomb testified that moving all the lieutenants' shifts would not work and everybody in the department had told her, "no, that won't work." (#172-33, p.19)

Newcomb testified that the City was under no obligation to re-open the shift bid for Melton and then claimed, "why it would be extremely difficult for us to accommodate him [Brooks] was because we would have to go back to the Union and actually go back into kind of a negotiation process with them to figure out how to change -- you know, if we were going to need to change somebody's shift, how we would go about doing it." (#172-33, p. 27-28) Even if such actions were necessary to reasonably accommodate Brooks, any complication due to dealing with the union does not relieve the City of its ADA obligations. Seniority rights under a CBA are

---

[2] More than once in the City's response to Counts I-III, the City states Brooks' first accommodation request was made on June 19 when it was actually made on June 16 (#177-14) and that Newcomb and Baxter met with Brooks on July 12. Kaminski, not Baxter, was present for the meeting. (#172-48) (#177-50) Plaintiffs assume this was an inadvertent mistake-though one may strive for perfection it is rarely achieved.

the only special rights that impact an employer's duty pursuant to the ADA. *Eckles v. Consolidated Rail Corp.*, 94 F.3d 1041, 1052 (7th Cir. 1996)

Brooks' attorney wrote to Newcomb on August 1, 2017 renewing his accommodation requests. She reminded Newcomb that when Brooks had been on second shift years ago he began treatment for sleep apnea because he was falling asleep while on duty and had hit a parked car. (#177-48, #177-125) The letter pointed out that Newcomb's suggestion about adjusting Brooks' hours had been vetoed by Kaminski. (#177-50, p. 2) Even though Brooks had the most seniority, Newcomb's suggestion to move him to third shift was vetoed by Kaminski. (#177-48) (#177-50, p. 2) The letter requested Brooks be assigned back to first shift as the patrol lieutenant or as the investigations lieutenant, a position that had been offered to him the previous year. (#177-13, ¶48-49)

Brooks' attorney renewed his accommodation requests again on September 1, 2017. (#177-118)

On September 28, 2017, Brooks emailed Baxter stating that while on second shift he was having difficulty staying alert, focused and awake. He had at times become so sleepy while driving at work he was forced to immediately pull over. Brooks again requested an accommodation to be reassigned to first shift. (#177-123)

On October 13, 2017, there was a meeting between Brooks, his attorney, Newcomb, Kaminski and the City attorney. The City attorney said, "we are here today scheduled to partake in a continuing interactive process to discuss requested

reasonable accommodations related to Lieutenant Brooks, uh, well, what is it at this point? Originally, it was sleep apnea." (#172-53, p. 1) Brooks made it clear it was related to sleep apnea and for a new condition, shift work disorder. (#172-53, p. 1) Brooks agreed to try every accommodation suggested by the City. (#172-53, p. 21, 34, 39, 42, 46) The City affirmed the proposed accommodations a few days later, in writing. (#177-119) City attorney Herman's October 16, 2017 email states the accommodations offered were for shift work disorder. Nowhere in Herman's email does he state the accommodations offered were for sleep apnea, (#177-119) an obvious avoidance of the actual requests.

## FAILURE TO ACCOMMODATE

The record does not support the Court's finding that Brooks was offered numerous accommodations or a finding that he refused them all or claimed they would not work. (#187, p. 43) (A. p. 46) Brooks agreed to try every accommodation suggested. The District Court erred in determining that even if a transfer to first shift was the only reasonable accommodation, there was no time to try it because Brooks was almost immediately suspended after the October 13 meeting. (#172-57) Brooks made six accommodation requests prior to the October meeting, all of which were denied or ignored, including working first shift patrol, first shift investigations and working third shift. (#177-14) (#172-36) (#177-48) (#177-118, p. 1-3) (#177-123)

The District Court also mistakenly found that Brooks refused to take medications prescribed by his doctor. Brooks' doctor never prescribed medication.

Brooks' doctor never suggested melatonin. (#177-52, p. 1-3) He had tried melatonin but gave up when he experienced severe headaches. (#172-53, p. 5-6)

The District Court accepted the City's argument that its purported concerns about Brooks and Melton working together justified keeping Brooks on second shift. The clash between potential retaliation and Brooks' ADA rights ended with the City refusing to provide a reasonable accommodation to Brooks. If the City feared Melton might accrue some Title VII claim by working with Brooks, such a contingency does not justify denying Brooks' ADA rights. "[A]ny curtailment of First Amendment rights must be based on a present abuse of rights, not merely a fear of future misconduct." *Michael v. City of Granite City, Illinois*, No. 06CV01 WDS, 2006 WL 2539719 (S.D. Ill. Aug. 31, 2006). The same point of law should apply to Brooks' ADA rights.

## THE INTERACTIVE PROCESS

Brooks is not making a separate claim about the interactive process. The City used the interactive process to deny reasonable accommodations for his sleep apnea. (#172-53) (#172-48) The City only offered accommodations for shift work disorder, and that was nearly four months after his original accommodation request. Brooks reported on July 12, 2017 that after four weeks working on second shift, he was tired, not sleeping well and not transitioning to the new hours. (#177-50)

The City argues it satisfied its obligations under the ADA because Brooks has sleep disorders and there was no evidence presented to the District Court that the accommodations offered were different than the ones needed. (App. #27, p. 32)

18

Brooks' doctor stated that first shift seems to be the only way Brooks can function and maintain throughout the day/shift properly. The doctor then goes on to say Brooks may also be experiencing shift work disorder. A reasonable jury could find that accommodations other than working first shift were not reasonable. (#177-52)

Finally, a reasonable jury could find that Brooks was going to retire because he could not continue to work second and third shift due to his sleep apnea, so requiring him to work second shift was unreasonable.

## CITY'S TREATMENT OF BROOKS' ACCOMMODATION REQUESTS

The City misapprehends the significance of the City's delays in addressing Brooks' accommodation requests. The District Court found there was not enough time to accommodate Brooks. (#187-44) (A. p. 47) The plain reality from the record of events between June and October, 2017 is that the City was not going to allow Brooks to work any shift other than second shift. Brooks was reporting fatigue and difficulty working second shift. (#177-50) The goal was to push Brooks to retire, not to accommodate him. The District Court ignored the August 1 and September 1 accommodation requests. The only accommodations proposed by the City did not address Brooks' sleep apnea, or the significant history of the problems Brooks suffered working second shift. (#177-125, p. 1-2)

## BROOKS AND HIS ATTORNEY AGREED TO THE CITY'S ACCOMMODATION PLAN

All the parties agree that the District Court mistakenly found there was no time to accommodate Brooks because he went on vacation for two weeks after

19

October 13, 2017 and was immediately suspended upon his return. (App. #27, p. 31, n. 5)

Brooks was trying to get back to first shift in some capacity. No reasonable person would refuse to try an employer's plan, thereby never getting the chance to argue day shift was the only reasonable accommodation. Finally, there is no evidence in the record that Brooks' superiors even inquired whether sending the senior command officer home to take a nap was having any impact on his symptoms of fatigue and starting to fall asleep while driving. A reasonable jury could find that the City was opposed to accommodating Brooks. The City, to avoid the upcoming agreed accommodation meeting, suspended Brooks upon his return from vacation. (#172-57)

## THE CITY'S PROPOSED ACCOMMODATIONS WERE UNREASONABLE

Brooks had a documented history of performance issues while working second shift. (#177-125) In September 2006, Deputy Chief Brecher noted that it was the second time in three years Brooks' inability to stay awake became an issue. (#177-125) Brooks' difficulty staying awake became an almost nightly occurrence. Brooks' inability to stay awake placed himself and the public in danger. (#177-125) Clearly, the City recognized his disability.

Ten years later, Brooks advised Dossey and Kaminski that he could not work third shift and would have to retire. (#177-13, ¶58) Brooks was told he could pick second or third shift or go to special services. (#177-13, ¶58) Brooks had heard the spot was being saved for Lt. Little, so Brooks went to third shift. (#177-13, ¶58)

The City equates Brooks' request to stay on first shift and have other command handle any issues with Melton as if Brooks was requesting someone else perform his job. (App. #27, p. 35) Sergeants, not Lieutenants, are the first-line supervisors responsible for the direction and control of subordinate officers and are responsible for reporting any misconduct. (#172-79, p. 6-9) Lieutenants have no disciplinary authority over officers except for counseling. (#172-79, p. 6-9) Certainly in the case of Burris, the City thought it was reasonable for Burris to simply have another command member present if Burris needed to have supervisory contact with Simmons. (#177-25) Not so with Brooks. (#172-53, p. 10-12) Brooks was not requesting a life coach, as in *Wal-Mart Stores*, to perform the essential functions of his job, he just wanted the same treatment Burris received. *EEOC v. Wal-Mart Stores, Inc., 38 F.4th 651* has no applicability to Brooks' accommodation requests.

"Of course, the EEOC guidance provides that a coworker's unhappiness over having to perform some of the disabled employee's marginal functions is not a reason that supports denial of a reasonable accommodation, so long as the employer determines that the coworker can absorb the extra work without disrupting the company's operations." *Kazmierski v. Bonafide Safe & Lock, Inc.* 223 F.Supp. 3d 838, 853 (E.D. Wis. 2016) Compare and contrast the suggested treatment of Burris' situation with Simmons, to the refusal to apply similar treatment in the Brooks and Melton situation.

A reasonable jury could find that the City was not really worried about Brooks retaliating against anyone. Why move him from a shift staffed with the

21

Chief, two Deputy Chiefs, another lieutenant and three sergeants, where he could be kept an eye on, to a shift where he was the highest commanding officer? Denying Brooks' request to remain on first shift and later requests to be transferred back to first shift was unreasonable.

Brooks was the most senior lieutenant in June 2017. (#172-46, p. 39-40) The City acknowledged it recognized seniority for lieutenants in choosing shifts. (#172-46, p. 73) (#172-45, p 11, par. B) The City never responded and thereby denied Brooks' August 1, 2017 request to be assigned as first shift lieutenant in special services. (#177-48, p. 2) A reasonable jury could find that the City did not want to accommodate Brooks in refusing an assignment that was an option the year prior to his request.

Dossey testified that third shift lieutenant Little had an issue with his father which was the reason for Little's desire to work third shift. Little should not be inconvenienced based on the actions of another (Brooks). (#172-35, p. 86-87) In other words, it was Brooks' fault he needed an accommodation in the first place, so the seniority policy would be disregarded. Certainly, Dossey's denial of a third shift assignment as an accommodation creates a genuine issue of material fact as to whether the request was an undue hardship on the City.

The District Court erred in finding Brooks refused all the accommodations offered and failed to consider alternative accommodation requests that were denied well before he was placed on leave.

### MOVING BROOKS BACK TO FIRST SHIFT WAS NOT UNREASONABLE

The City attempts to justify its actions by claiming Brooks was defending the alleged offensive comments about Melton's breasts. #172-26 does not reveal Brooks was cheering on sexual harassment as the City implies. #172-26 establishes the fact that both Simmons and Richardson denied comments were made about Melton's breasts.

The City argues it moved Brooks just like it did Burris. (App. #27, p. 36) There are crucial differences between the two situations. When Simmons complained about sexual harassment by Burris in December 2016, he told Baxter he was afraid of retaliation by Burris. ( #177-18, p. 42-43) Burris was not moved to another shift. (#177-18, p. 42-43) (#172-6, p. 1-2) Only after Simmons complained in April 2017 that Burris was harassing him again was Burris moved off of first shift. (#177-25) The City has used two different rationales for moving Brooks to second shift. The first excuse was that Melton feared retaliation by Brooks. (#172-45, p. 10, 34) (#177-13 p. 47, 82) Baxter initially told Brooks he did not believe Melton because she could not produce one example of retaliatory conduct. (#177-13, ¶47) (#172-43, p. 4-5) Later, Baxter claimed that Melton said Brooks was nit picking her about going over lunch break. (#172-19, p. 15-16) Melton denied any command officer ever complained about her going over her lunch break. (#172-19, p. 15-16) Brooks did not have a documented history of harassing, targeting or retaliating against officers. (#172-27, p. 155)

The second proffered reason to move Brooks was that he showed bias towards Simmons and purposefully neglected to investigate Melton's complaint against

Simmons. (#172-45, p. 11, 36) Brooks' "lackluster" investigation was a reason for moving Brooks to second shift. (#172-53, p. 19) Baxter told Newcomb that if Brooks had not shown such clear bias in the Melton investigation, there would not have been much merit in moving him. (#172-45, p. 4) Yet Baxter, in self-contradiction, testified "I never once said that John didn't do his job. I knew John did exactly what I told him to do. He asked him about it, he came back, and I told him don't do any more." (#172-27, p. 97) Baxter disagreed that Brooks' investigation was lackluster. (#172-27, p. 157) Burris was moved because the complaint against him was proven. Brooks was moved for obviously false reasons.

The City would not have had to do any shift reconfiguration to accommodate Brooks. (#172-33, p. 27-28) Melton had already put in a shift bid to go to third shift. This was before Brooks made his accommodation request. (#172-33, p. 25-26) In 2016 Melton exercised her shift bid rights to get away from Brooks after he administered discipline (approved by his superiors) to her for dereliction of duty. (#177-105) Melton said it was pretty customary for officers to switch shifts to avoid working with supervisors they did not agree with. (#172-19, p. 21) Rather than just honor Melton's request to go to third shift, the City engineered a shift trade for Melton to remain on first shift and thereby created a phony excuse so Brooks could be moved to second shift. (#177-16)

Given that Brooks had not conducted a biased investigation of Melton's allegation and there was no evidence of him retaliating against Melton, it was

unreasonable to deny Brooks' request to stay on first shift. (#172-27, p. 96-98, 102-103)

## ADA DISPARATED TREATMENT

But for Brooks' disability and protected activity in repeatedly requesting reasonable accommodations he would not have been suspended and discharged.

## BROOKS WAS CONSTRUCTIVELY DISCHARGED

The District Court framed Brooks' retirement as a binary choice, namely, face the charges or quit. The District Court erred.

First, Brooks had been on suspension since November 13, 2017. (#172-57) Brooks knew his fate was sealed that day. (#177-10) Brooks notified the City of the reasons for his retirement on July 10, 2018. (#177-84)

Second, Brooks had been suspended without pay for nearly four months at the time he retired. (#172-74)

Third, Brooks' retirement could not terminate a hearing on the charges against him, per Policy 339.7. (#177-74, p. 8)

Fourth, the City had already disregarded his lieutenant seniority rights so he had no expectation of being able to work first shift ever again. (#177-84) (#172-53, p. 19-20)

Fifth, the City was considering whether to retroactively terminate Brooks two weeks after he retired. The City communicated that the commission case could go away *if* Brooks provided a release and waiver, thereby preserving his insurance benefits. (#177-116)

Likewise, the City downplays Brooks' disability claiming the District Court was correct that it could not have been that bad since he refused to take medicines prescribed by his doctor and had never made an accommodation request before. Brooks was never prescribed medications for his sleep apnea. Brooks had not previously asked for an accommodation because he knew an ADA accommodation request could not interfere with an existing seniority policy. Prior to Burris' demotion, Brooks did not have the seniority to bump a more senior lieutenant off a shift assignment. (#177-13, ¶58)

## BURRIS IS A VAILID COMPARATOR

The only way the District Court could conclude Burris' conduct was substantially different and less serious than Brooks' was to ignore Plaintiffs' evidence in its entirety.

Burris had a history of making comments a command officer should not make. (#177-12, p. 22) Burris was not professional and yelled at a subordinate. Burris could be abrasive and rude. (#172-27, p.27-28) While Brooks was on third shift, the day shift officers routinely complained about their frustration and displeasure with Burris as a command officer. Burris was moody, abusive and mistreated officers. Simmons often complained to Brooks about Burris' singling him out for harassment. (#177-13, ¶24, 25) Baxter had more than one discussion with Burris about his people skills and about what he can say to subordinates in conversations. (#172-6) Burris was crass. (#172-35, p. 51) Several officers reported Burris' maltreatment and unpredictable behavior to the sergeants. (#177-138, p. 2-

3) Brooks was terminated for what he allegedly said to subordinates and Burris was not. Unlike Brooks, Burris could not be suspended after the April incident with Simmons unless the complaint was substantiated. (#177-25, p. 2)

Burris was not placed on unpaid suspension for nearly four months. (#177-136) (#172-13) (#172-14) Burris was not brought up on formal charges or permanently transferred. (#172-27, p. 88) (#177-24, p. 25, #74) Burris could not be suspended in December 2016 because he was an exempt employee, but Brooks could. (#177-18, p. 36-38) (#177-104, p. 2) (#172-46, p. 10, 16) Like Burris, Brooks was accused of lying during an investigation. Burris was not disciplined for lying. The City sought to fire Brooks over alleged lying. (#172-12, p. 36) (#177-30) (#172-14) (172-75)

As Plaintiffs pointed out in their Brief, the District Court relied on Baxter and Newcomb's memorandums reciting their summaries of what subordinates said about Brooks. The actual interviews revealed a different picture. If Little's October 26, 2017 email about two officers was the justification for launching a formal investigation, the interview with one of those officers, namely Willmert, should have deeply concerned Dossey and Baxter that Little's email falsely accused Brooks of pressuring subordinates. Willmert said Brooks did not pressure him nor did he feel threatened. Willmert said he and Brooks got along well and Brooks treated him well. (#177-60, p. 1-3)

The District Court accepted without evidence that Brooks had taken Von Rohr's record that was "previously" destroyed. No evidence was presented by any

27

person that the record was actually destroyed. There is no evidence that anyone said, "I personally removed the record from the division files in the Lieutenants' office and destroyed it." Nor does the District Court's acceptance of this claim square with the fact that if all disciplinary records over 18 months old had been destroyed, why did the City produce so many old records from the files in the Lieutenants' office, including the Simmon's Andy's Diner document? (#177-7) (#177-8) (#177-9) (#177-4) The City's production of so many old records from the Lieutenants' office corroborates Brooks' testimony that Von Rohr's record was in the same office, he copied it, and attached it to a transmittal to Baxter. (#172-15, p. 122, 124, 141)) Brooks' interactions with Baxter (and Newcomb) were official business.

## ADA RETALIATION

The District Court dismissed Brooks' retaliation claim stating Brooks did not meaningfully challenge the misconduct charges against him. In other words, the District Court engaged in weighing the evidence. The District Court accepted as true that somehow Brooks had surreptitiously obtained Von Rohr's record and made a copy of it before the official record was destroyed, and that Brooks' treatment of subordinates was more serious than Burris'.  In light of the above, the District Court should have found that it was a jury question as to whether the record had ever been destroyed or was it exactly where Brooks said it was. It should have been a jury question as to whether Brooks' alleged recent and short inappropriate interactions with officers was more or less serious than Burris' long history of

inappropriate interactions with officers, plus two documented claims of sexual harassment.

Brooks' IDHR charge alleged, in part, that since June 9, 2017 Brooks had requested the City accommodate his disability and allow him to work first shift. (#172-49) Months before Brooks filed his charge he had made numerous accommodation requests. Two on June 16, one on June 19, July 12, August 1, and September 9. *Infra*. Dossey launched the formal investigation of Brooks on October 30, 2017, three days after the charge was mailed to the City. (#172-51) (#172-55)

The City tries to narrow its knowledge of Brooks' protected activity to the October 27, 2017 IDHR charge. The City was well aware of Brooks' dogged insistence he be provided with a reasonable accommodation through his individual requests, letters from counsel and meetings with City officials, all of which constituted protected activity. Protected activities under the ADA include asserting one's rights under the Act either by seeking an accommodation or raising a claim of discrimination. *Rodrigo v. Carle Foundation Hospital*, 879 F.3d 236, 243 (7th Cir. 2018).

## CONCLUSION

For the reasons set forth above, Plaintiffs' pray this Court reverse the District Court's Order dismissing Counts I-IV.

John Brooks and Gregory Simmons,
Plaintiffs-Appellants

By: /s/ Julie L. Galassi

29

One of the Attorneys for
Plaintiffs-Appellants

JULIE L. GALASSI, Esq., Bar No. 6198035
HASSELBERG, ROCK, BELL & KUPPLER, LLP
Associated Bank Building, Suite 200
4600 N. Brandywine Drive
Peoria, Illinois 61614
Telephone:   (309) 688-9400
Facsimile:   (309) 688-9430
Email:       jgalassi@hrbklaw.com

James L. Hafele, Esq., Bar No. 1096834
Hall Rustom, LLC
316 SW Washington St., Ste. 1A
Peoria, IL 61602
Telephone:   (309) 699-4691
Facsimile:   (309) 699-4693
Email:       hafele@hallrustom.com

30

## FED. R. APP. P 32(g) CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and the word limit of Cir. R. 32(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

  X this document contains 6,921 words, **or**

  ___this brief uses a monospaced typeface and contains [state the number of ] lines of text.


2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5), Cir. R. 32(b), and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

  ___ this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO in 12-point Times New Roman type, **or**

  x__ this document has been prepared in a monospaced typeface using Microsoft Word for Microsoft 365 MSO with 12-point Century type.


(s) */s/ Julie L. Galassi*     Attorney for Plaintiffs-Appellants     Dated: 9/20/2023

## CERTIFICATE OF SERVICE

The undersigned, counsel for the Plaintiffs-Appellants, John Brooks and Gregory Simmons, hereby certifies that on September 20, 2020, the Reply Brief was filed electronically with the Clerk of the Appellate Court of Illinois

Dated September 20, 2023.

<div style="margin-left:50%">

John Brooks and Gregory Simmons,
Plaintiffs-Appellants

BY: /s/ Julie L. Galassi
    One of the Attorneys for
    Plaintiffs-Appellants

</div>

JULIE L. GALASSI, Esq., Bar No. 6198035
HASSELBERG, ROCK, BELL & KUPPLER, LLP
Associated Bank Building, Suite 200
4600 N. Brandywine Drive
Peoria, Illinois 61614
Telephone:   (309) 688-9400
Facsimile:   (309) 688-9430
Email:       jgalassi@hrbklaw.com

James L. Hafele, Esq., Bar No 1096834
Hall Rustom, LLC
316 SW Washington St., Ste. 1A
Peoria, IL 61602
Telephone:   (309) 699-4691
Facsimile:   (309) 699-4693
Email:       hafele@hallrustom.com